IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GRADY GIBSON,
PETITIONER

2:07CV0009-MHT

-V-

RALPH HOOKS,
Warden of St. Clair Correctional Facility;
TROY KING, Attorney General of the State of Alabama,
RESPONDENTS

**BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS
BY A PRISONER IN STATE CUSTODY**

JENNY R. RYAN
CROWNOVER AND STANDRIDGE
2600 7th Street
Tuscaloosa, Alabama 35401
Attorney for Petitioner

<u>TABLE OF CONTENTS</u>

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4,5

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

I.          In Re: Suppression of Exculpatory
            Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

      A.    Petitioner is not Procedurally
            Barred from Asserting that the
            Prosecution Suppressed Exculpatory Evidence. . . . .    24

      B.    The Prosecution Suppressed
            Evidence Favorable to Petitioner
            in Violation of Petitioner's
            Right to Due Process of Law
            under the Fifth and Fourteenth
            Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

II.         Gibson was Deprived of Due Process of
            Law Under the Fifth and Fourteenth
            Amendments when the State Court Trial
            Judge Stated as a Matter of Fact, In
            the Presence of the Jury, That He Had
            Reviewed Prior Statements and Grand Jury Testimony,
            Which Were not in Evidence,        of Two Crucial Prosecution
            Witnesses, and Found no Inconsistencies with Their
            Trial Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39

III.    Gibson was Deprived of Due Process of
            Law Under the Fifth and Fourteenth
            Amendments when the Prosecution and
            the Trial Court Refused to Disclose
            Prior Grand Jury Testimony of Two
            Crucial Prosecution Witnesses Which
            Was Materially Inconsistent with Their
            Trial Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43

IV.         Gibson was Deprived of Due Process of

Law Under the Fifth and Fourteenth
Amendments When the Prosecutor Asserted,
As a Matter of Fact, In the Presence of
the Jury, that he had "Framed" a Man in
a Drug Case and Paid $20,000.00 in
Settlement of a Resulting Lawsuit . . . . . . . . . . . . . . . . . . . . . . . .    49

V.          Gibson was Deprived of Due Process of
Law Under the Fifth and Fourteenth
Amendments When He was Convicted Using
Testimony That Has Been Recanted  . . . . . . . . . . . . . . . . . . . . . .    52

VI.         Gibson was Deprived of Due Process of
Law Under the Fifth and Fourteenth
Amendments when the State Refused to
Conduct DNA Testing on Evidence Found
on the Victim at the Scene of the Crime . . . . . . . . . . . . . . . . . . . .    53

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    58

TABLE OF CITATIONS

Bowden v. State, 538 So. 2d 1226 (Ala. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     50

Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed 2d 215 (1963) . . . . . . . . . .     31,42, 52

Brooks v. Kemp, 762 F. 2d 1383 (11 Cir. 1985) . . . . . . . . . . . . . . . .     40,50

Dabbs v. Vergari, 149 Misc.2d 844,  570 N.Y.S.2d 765 (Sup.Ct. 1990). . . . .     55

Dennis v. State, 103 Ind. 142, 2 N.E. 349 (1885) . . . . . . . . . . . . . . . . . . . . . . . . . . . .     37

Dowdell v. State, 854 So.2d 1195 (Ala. Crim. App 2002) . . . . . . . . . . . . . .     53-56

Estes v. Texas, 381 U.S. 532,  85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) . . . . . . .     56

Ex parte Frazier, 562 So.2d 560 (Ala. 1989) . . . . . . . . . . . . . . . . . . . . . . . . .     56

Ex parte Heaton, 542 So.2d 931 (Ala. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     29

Ex parte Johnson, 576 So. 2d 1281 (Ala. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . .     27

Francois v. Wainwright, 741 F. 2d 1275(11th Cir. 1984).. . . . . . . . . . . . . . . . .     27

Gibson v. State, 580 So.2d 38 (Ala. Crim. App) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     21,24,26,31,33

Gibson v.  State, 555 So. 2d  784 (Ala. Crim. App. 1989) . . . . . . . . . . . . . . . . . . . . . . . . .     39, 40

Gibson v. State, 547  So. 2d 1196 (Ala. Crim. App. 1989) . . . . . . . . . . . . . . . . . . . . . . .     21, 24

Giles v. Maryland, 386 U.S. 66, 98 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     55-56

Johnson v. Mississippi, 486 U.S. 578, 100 L. Ed. 2d 575, 108 S. Ct. 1981 (1988) . . . . .     27

Kyles v. Whitle, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed. 2d 490 (1995). . . . . . . . . . . .     52

Maund v. State, 254 Ala. 452, 48 So.2d 553 (Ala. 1950). . . . . . . . . . . . . . . . . . . . . . . .     29

Millican v. State, 423 So. 2d 268 (Ala. Crim. App. 1982) . . . . . . . . . . . . . . . . . . . . . . .     39

Moore v. Illinois, 408 U.S. 786, 810 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     55

New Jersey v. Thomas, 245 N.J. Super. 428, 586 A.2d  250 (1991) . . . . . . . . . . . . . .     55

Pennsylvania v. Ritchie, 480 U.S. 39, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987). . . . . . .    32,48

Quercia v. U.S., 289 U.S. 466, 53 S. Ct. 698,77 L.Ed 1321 (1933). . . . . . . . . . . .    41

Reynolds v. City of Birmingham, 29 Ala. App 505, 198 So. 360 (1940). . . . . . . .    37

Sumner v. Mata, 449 U.S. 539, 66 L. Ed 2d 722, 101 S.Ct. 764 (1981). . . . . . . . . . . . .    26

Woodard v. State, 251 Ala. 312, 36 So.2d 897 (1948). . . . . . . . . . . . . . . . . . . . . . . . . .    29

United States v. Agurs, 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976). . . . . . . . .    31,32,52,55

U.S. v. Bagley, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed 2d 481 (1985).. . . . . . . .    31,32,35,42,48,52,56

U.S. v. Cisneros, 491 F. 2d 1068 (5 Cir. 1974). . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . .    41

U.S. v. Dennis., 786 F. 2d 1029, modified on rehearing, 804 F. 2d 1208 (11 Cir. 1986) . . .    40

U.S. v. Fischer, 531 F. 2d 783 (5 Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

U.S. v. Murrah, 888 F. 2d 24 (5 Cir.1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40,50

U.S. v. Pearson, 746 F. 2d 787 (11 Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40,50

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GRADY GIBSON,
PETITIONER

-V-

RALPH HOOKS,
Warden of St. Clair Correctional Facility;
TROY KING, Attorney General of the State of Alabama,
RESPONDENTS

**BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS BY A PRISONER IN STATE CUSTODY**

JENNY R. RYAN
CROWNOVER AND STANDRIDGE
2600 7th Street
Tuscaloosa, Alabama 35401
Attorney for Petitioner

INTRODUCTION

This constitutes the brief of the Petitioner, Grady Gibson, in support of his petition for a writ of

habeas corpus. Petitioner submits that his 1987 conviction for the offense of capital murder, and his

resulting sentence to life imprisonment without the possibility of parole, were unconstitutionally obtained,

in violation of his right to due process of law as secured to him by the Fifth and Fourteenth Amendments to

the Constitution of the United States. Specifically, Gibson contends that the prosecution suppressed

evidence which directly exculpated him of any involvement in the offense; that the state court trial judge

informed the jury of facts which were not in evidence, which supported the credibility of crucial

prosecution witnesses; that the trial judge and the prosecutor failed to reveal, upon Gibson's request, evidence which impeached the same crucial prosecution witnesses and that the prosecutor placed before the jury facts which were not in evidence, showing that Gibson had allegedly committed an unrelated, extrinsic offense. Furthermore, a crucial prosecution witness recanted and the State has denied a request for DNA testing that would exonerate the petitioner.

No procedural bar exists with respect to the issues herein presented. These issues were presented to the Alabama Court of Criminal Appeals, which held them meritless, on direct appeal, following which they were presented to the Supreme Court of Alabama, which denied Gibson's petition for certiorari. As to the issue of the suppression of exculpating evidence, the state appellate court found that it could not be asserted due to a procedural bar; as will be demonstrated, this conclusion, along with numerous other factual determinations by the state courts, is not supported in any respect by the record, and is clearly erroneous. Justice further requires that the petitioner's habeas petition be granted. Accordingly, the alleged procedural bar will be first addressed, followed by a discussion of the merits of the various issues.

Before proceeding to the procedural and substantive issues before this Court, however, it is appropriate to summarize the factual background of this case. The underlying facts illuminate the issues presented, and demonstrate the egregious prejudice to Petitioner resulting from the various violations of his due process rights. The record also reveals the many erroneous factual conclusions reached by the state courts.

## FACTUAL BACKGROUND

The state's case against Gibson was primarily circumstantial, being based upon numerous facts which were subject to different interpretations of varying decrees of reasonableness. The most damaging evidence against Gibson consisted of several alleged admissions against interest, which were testified to by three witnesses (Charles Costner, Rose Pogue, and Richard Mobley) whose veracity was open to question. This background information is meant to summarize the basic facts surrounding the issues in this case.

Unless otherwise indicated, all record references are to the clerk's record (CR), reporter's transcript of

petitioner's trial (RT), clerk's record of Rule 32 proceeding (R32RT), and clerk's record of R32 proceeding

(CR32R).

Gibson and his codefendant, Eddie Hart, were jointly indicted by the Grand Jury of Butler County,

Alabama, for the capital murder of Dana Hart (CR-l). The indictment alleged murder committed "for a

pecuniary or other valuable consideration, to-wit: the proceeds of a life insurance policy on Dana Hart"

(CR-l). Both defendants were tried together. Gibson was convicted of the capital offense charged, and

sentenced to life imprisonment without parole, while the jury found Eddie Hart guilty of manslaughter; he

was sentenced to 50 years' imprisonment as a habitual offender.

Gibson had been an Alabama Bureau of Investigation (ABI) agent with the Department of Public

Safety since 1975, where his primary duties involved the investigation of drug trafficking (RT-2254-55).

Gibson first met his codefendant, Eddie Hart, in 1983 (RT-2257). He developed Hart into a drug informant

(RT-2262). Gibson recommended that Hart be hired by the ABI as a contract informant (RT-1418).

Gibson's recommendation was approved, and Hart was hired on that basis by Gibson's superiors (RT-

827,1418). Hart was paid a regular weekly salary for obtaining information and assisting agents in

undercover work (RT-832-33). The fact that Hart was hired by the ABI, through the proper channels, is

notably omitted from the Court of Criminal Appeals' opinion, which strongly infers that Gibson engaged in

some form of impropriety by personally giving Hart his informant status. 555 So. 2d at 787.

Hart married Dana Pouncey, the deceased, in November of 1984. Oscar Paul Thompson was a

Liberty National Insurance Company agent with an office in Alexander City, Alabama (RT-506-07). On

January 4, 1985, Eddie Hart made a visit to Thompson's office, accompanied by Gibson (RT-509-10).

Thompson had known Hart and had done business with his family for 20 or more years (RT-508). Hart

wanted to purchase life insurance on his wife, Dana (RT-511). Thompson proposed the same policy for

Dana as Eddie already had on himself through Thompson's office -- a $10,000.00 whole life policy (RT-

513,514). Gibson stated that Hart could buy more insurance if he bought term insurance, rather than the

whole life type of insurance which Hart already had (RT-514). This testimony reveals one of the most

blatant misstatements in the Court of Criminal Appeals' opinion. The state court found that at this meeting

with Thompson, "Mr. Gibson said that a $100,000.00 policy would provide more adequate coverage." 555

So. 2d at 787. There is simply no evidence that Gibson ever suggested a $100,000.00 policy.

On January 14, Eddie and Dana Hart came to Thompson's office to discuss life insurance (RT-515). Gibson was not present. The Harts applied for $100,000.00 of term life insurance on each of their

lives (RT-516). The Liberty National policies were never issued because of a gunshot wound Dana Hart

had received before she met Eddie Hart, about which the insurance company wanted further information

(RT-518-20). There is no support whatsoever in the record for the state court's conclusion that Hart

"communicated this difficulty to Mr. Gibson on the following day." 555 So. 2d at 787. Subsequently, Hart

told Thompson to cancel the insurance applications (RT-522).

William Cauthen, a New York Life Insurance agent, arranged life insurance for Eddie and Dana

Hart in January of 1985 (RT-603-610). Gibson had been an insurance customer of Cauthen's Slnce 1982

(RT-603). Cauthen contacted the Harts as a result of having spoken with Gibson (RT-615). Gibson had

mentioned to Cauthen that he had a new baby, which prompted Cauthen to suggest that Gibson needed

more insurance (RT-651). As a result, Gibson purchased further term insurance, in addition to what he

already owned (RT-653). At this time, Cauthen specifically asked Gibson for referrals to anyone he knew

who might be interested in insurance (RT- 615). Gibson referred Cauthen to Eddie Hart (RT-615). Cauthen

constantly and customarily asked for such leads to additional customers in the normal course of his

business (RT-654-55). Other than giving Cauthen such a lead, Gibson had no discussion whatsoever with

Cauthen concerning the Harts' insurance program (RT-656-57). The state court's conclusion that Gibson

"sent his insurance agent, William Cauthen, to Mr. Hart's trailer to discuss a policy on Mrs. Hart's life" is

not supported by the record. 555 So. 2d at 787, emphasis added.

When Cauthen met with Eddie and Dana Hart, they discussed insurance on the lives of both the

Harts (RT-605). Cauthen suggested a $10,000.00 whole life policy, but Hart stated that he felt term

-9-

insurance was a better purchase (RT-609-10). The Harts applied for a $150,000.00 term life insurance policy, with double indemnity, on both their lives; each was the beneficiary of the other's policy (RT-610-613). Gibson was not present when Cauthen obtained the applications (RT-614). Dana Hart participated in the insurance discussions in a normal manner (RT-648). The policies were delivered to the Harts on February 25, 1985 (RT-664). Each of the Harts' policies cost $32.00 per month (RT-645). Hart wanted to pay for the policies on a bank draft basis, whereby the monthly premiums would be deducted from a checking account, instead of making quarterly payments (RT-621-22,664). At the time, Hart had no checking account. Gibson loaned Hart $100.00 to open a checking account so that the insurance premiums could be paid by bank drafts, since the minimum amount that one could open a checking account with was $100.00 (RT-2379).

A fishing trip had been planned by Gibson and several of his coworkers for the weekend of Friday, March 1, 1985; the plans for the trip were made approximately a week earlier (RT-1824-25). Gibson and his friends periodically went on such fishing trips, which were actually "more of a drinking party" than anything else (RT-2272-73). On Thursday, February 28, 1985, at approximately 7:30 p.m., Gibson picked up Eddie Hart at the Harts' trailer (RT-1143,2287). Gibson and Hart drove to a cabin on Fish River in Baldwin County, making no stops while en route (RT-1143-44,2287). From the morning of Friday, March 1, 1985, through the following Sunday, Gibson and Hart were in the company of numerous individuals, including law enforcement officers who accompanied them on the fishing trip (RT-1834-54,2474-77,1478,1660).

Pamela Sue Piggott lived in a trailer directly behind the Harts (RT-684). At approximately 5:30 p.m. on Thursday, February 28, 1985, she saw Dana Hart in her car, leaving the trailer park (RT-688-90). The state court erroneously found the time to be 8:00 p.m. 555 So. 2d at 787.  Ms. Piggott stayed in her trailer that night, and did not know who, if anyone, came and went at the Hart trailer during the evening (RT-705).  She first learned that Dana was missing the following Sunday (RT-690). Gibson and Eddie Hart were both very concerned about the fact that Dana was missing (RT-693,707).

Hart filed a missing persons report on his wife with the Sheriff of Elmore County on March 6, 1985 (RT-675-76). Gibson and Hart filed another missing persons report with the ABI on March 11, 1985 (RT-756). According to Hart, he and Dana would occasionally have arguments, and she would leave; when Dana first turned up missing, Hart initially thought that this is what had happened - that she had left him (RT-677).

Gibson had been having an affair with a woman named Rose Pogue (RT-1467), who was working at a truck stop and lounge, the Parkway Truck Stop, on the causeway between Baldwin and Mobile counties (RT-1472-72). Pogue testified that she saw Gibson at the truck stop on Friday morning, March 1, 1985; Gibson was tired looking, with dirty clothes, and said he had not slept all night (RT-1488). Later that day, Pogue and Gibson went to a local shopping mall (RT-1481). During the trip, Pogue testified, Gibson asked her if her brother-in-law would be interested in going into business with him in Florida, because he was going to come into a lot of money soon (RT-1482,83). She testified that the next day, Gibson asked her if he could borrow some money from her to have a carpet cleaned in the cabin where he was staying, and she either loaned him (RT-1489) or gave him (RT-1572) $200.00.

Pogue further testified that during the 1984 Christmas season, Gibson and Hart were drinking in the lounge in the Parkway Truck Stop (RT-1531-32). According to Pogue, Hart made a statement that Gibson was going to buy an insurance policy for Dana, at which time Gibson remarked, "Yeah. Eddie says if we knock her off we'd better hurry up and get some insurance on her" (RT-1532-33).

Pogue admitted on cross-examination that this exchange was casual, joking conversation, and that everyone present took it as a joke (RT-1543). Her sister, Patricia Reaves, and her brother-in-law, Charles Costner, had been indicted for "bad checks" in Baldwin County, which cases were still pending as of the time of Gibson's trial (RT-1693-96). Pogue did not tell anyone in law enforcement about Gibson's and Hart's remarks until after her sister and brother-in-law were indicted (RT-1544-45,1644). Her sister's and brother-in-law's cases had been postponed since the April, 1986, return of indictments in Baldwin County, and had never gone to trial; they had been set for trial on the Monday preceding

-11-

Gibson's trial, and were postponed again (RT-1549-50). However, she contended that the existence of these indictments had no influence on her testimony (RT-1533). She admitted that she had given a statement to the ABI in which she did not relate any of the matters to which she had just testified (RT1540-41) .

Pogue's brother-in-law, Charles Costner, contradicted Pogue's testimony as to the appearance of Gibson and Hart on the morning of Friday, March I, 1985. He testified that their demeanor and the appearance of their clothes were normal (RT-1660). He also testified to the remarks allegedly made by Gibson and Hart in December of 1984. According to Costner, Hart made a statement that Gibson was going to buy some insurance on Dana, at which time Gibson stated "that if he was going to knock her off they had better go ahead and buy an insurance policy on her so it wouldn't look funny" (RT-1656). He admitted that he did not pay any attention to these statements at the time (RT-1656), and testified that after the exchange between Hart and Gibson, "one of them or both of us or everybody laughed. I didn't think any more of it, sir" (RT-1760).

He denied that his testimony was in any way influenced by the pending indictments against him and his wife (RT-1697). He admitted having made statements that he had been "harassed" by the ABI throughout the investigation of the Hart homicide, and that he had been "hounded" on the bad check charges (RT-1778-79). He had testified before at least three grand juries (RT-1714). He admitted that he had never mentioned the Gibson-Hart remarks concerning insurance on Dana to at least one grand jury, while contending that he had related the remarks to another grand jury or juries (RT-1715-19).

It should be noted here that the state court found that Gibson was "overheard in a bar saying to Mr. Hart that if they were going to 'knock off' the new Mrs. Hart they had better hurry up and buy some insurance on her." 555 So. 2d at 787, emphasis added. Needless to say, this statement was not "overheard", but rather, was made openly in a joking conversation with several persons.

J.D. Hobbie, an Alabama State Trooper working with the narcotics unit of the Alabama

Department of Public Saftey, testified to statements made by Gibson approximately two or three months before the murder of Dana Hart (RT-1421-22). Gibson had books at his workplace in the narcotics unit of the ABI which he was talking about to Hobbie, and which he described as "books about murders and books pertaining to perfect murders and how to commit a perfect murder"; however, Hobbie did not see him actually reading any of the books (RT-1421-23). Hobbie also testified that Gibson had asked him if it was possible to insure someone's life without that person's knowledge (RT-1421). This testimony constituted the only basis for the state court's findings that Gibson became "preoccupied" with insurance at his workplace, and that he was "seen reading" books about the "perfect" murder. 555 So. 2d at 787.

Dana Hart's car was observed by a K-Mart security guard on March 1, 1985, parked in the K-Mart parking lot in Montgomery (RT-727-29). The car remained there approximately one week, at which point it was impounded by the authorities (RT-731). One partial palm print that was usable for identification purposes was found on Dana Hart's vehicle (RT-1103). The person who left the palm print was never identified (RT-1103). The palm print was checked against known prints of Gibson and Eddie Hart, and it did not belong to either of them (RT-1103,1113-16).

On March 14, 1985, Gibson received a threatening phone call at the ABI narcotics unit (RT-802-808,836-38). Gibson immediately told those present about the threat (RT-804-06,836). Gibson appeared to these individuals as though he had just received a threat; he was upset and excited (RT-806,856). Gibson told them that he had been told by a male that if he would go to the Grace Exit, he would see what was going to happen to him, his family, and Eddie Hart (RT-806-08,837-38). The office receptionist received the call and put it through to Gibson (RT-802-03). The voice of the caller was that of a male; the receptionist was familiar with the voice of Eddie Hart, and the voice on the phone was not his (RT-811-812).

The caller mentioned to Gibson that he knew Gibson had received a letter (RT-838). The letter was located by the receptionist in the incoming mail (RT-846-47). It read as follows:

> You are stupid. Go to the Grace Exit in Butler County and look a mile off I-65 about ten

feet off the road and you will see what is going to happen to your wife and then to you and Eddie Hart. I promise you I will kill you. (RT-852).

A group of investigators was immediately organized to go to the Grace Exit and make a search of the area(RT-838). Gibson gave instructions to turn right off the Grace-Garland Exit (RT-877), although no such directions were given by the anonymous caller or in the letter. The driver of Gibson's vehicle testified that he could have turned left, instead of right, from the exit (RT-877-78). However, a southbound driver on 1-65 who takes the Grace-Garland Exit will go to Garland if he turns left; Grace is to the right. The telephone call and letter both mentioned the Grace Exit, without reference to Garland. As Gibson testified, he did not recall telling the investigators to turn to the right, but he knew that to get to Grace, one has to go to the right (RT-2324-25) .

The decomposed body of a person was discovered in the edge of the woods line off the road, at the approximate location described by the call and letter (RT-880). The investigator who located the corpse described it as consisting of "nothing but bones" from the waist up (RT-883). The body was severely decomposed, and bore evidence of considerable post-mortem animal activity (RT-986). The investigator who found the remains testified that Gibson walked up to the body and said, "That's her. That's Dana" (RT-914). Gibson testified that when he saw the body, he said that it was probably Dana (RT-2329). The investigator who related Gibson's remark admitted that when he found the body, he assumed that it was the body of Dana Hart, and that the search team was operating on the assumption that they were looking for Dana's remains (RT-936,937).

The corpse was identified as that of Dana Hart (RT984,1360-61). Dana died from stab wounds to the back of the head and neck (RT-990). Nothing of any real evidentiary value was found on Dana's body (RT-1337-1350). Although hair fragments were found, they were compared with known head hairs taken from Gibson, and found to be inconsistent (RT-1341-42,1350). No fingerprints were found on the threat letter; although there were prints on the envelope in which the letter was mailed, they did not match those of Gibson (RT-1093,1113-16). In fact, the fingerprints on the envelope were never identified (RT-1105).

The examining pathologist testified that Dana Hart died anywhere from ten days to twenty-eight days before the March 14, 1985, autopsy (RT-1003).

New York Life Insurance Company refused to pay Eddie Hart's subsequent claim on the Dana Hart policy (RT-1231-32). The grounds for nonpayment were misrepresentations by Dana in her insurance application (RT-1267,2611,2619). Dana Hart had undergone previous mental illness treatment, had been hospitalized, and had suffered a gunshot wound, and had not revealed these facts in response to questions on the application (RT-1267-68). Eddie Hart finally filed a lawsuit on the policy (RT-1232). The suit was eventually settled for the sum of $80,000.00 (RT-1248). Hart was represented by attorney Claude Patton (RT-2617). Patton received a contingency fee for his services (RT-2621), which is the normal method by which an attorney is paid in such cases (RT-1260). Patton split his fee with Ira Colvin, who had referred the lawsuit to Patton (RT-2621). Colvin was a lawyer who owned the cabin where the fishing party had stayed on the weekend of March 1, 1985; he was a friend of Gibson, Hart, and Patton (RT-1473-74,2293-95).

Gibson received $5,000.00 of the insurance proceeds (RT-1301). Eddie Hart's deposition was taken in the lawsuit he brought against New York Life. In his deposition, he testified that he owed Gibson and Gibson's wife, Kathy, some $4,000.00 from the many times he had borrowed money from them, eaten their food, and stayed at their house, and that he intended to pay the Gibsons back from the proceeds of the life insurance policy (RT-1273-74). Hart's aunt testified that after he received the insurance proceeds, he had a conversation with her about whether he should pay Gibson the money he owed him, to which the aunt replied that "you don't sponge off of other people" (RT-2696-97). The state court's opinion makes no mention of Eddie Hart's debt to Gibson, nor of the referral fee arrangement between attorneys Patton and Colvin. 555 So. 2d at 788.

Another ABI agent, Richard Mobley, was a personal friend of Gibson's (RT-1803). Two or three months after the discovery of Dana's body, Mobley was visiting Gibson at Gibson's house (RT-1864-69). The two were discussing rumors in the ABI that Gibson and Hart had killed Dana for the

-15-

insurance money (RT-868). Mobley testified that Gibson made the statement, "Anyway, that ain't the motive. The motive is that she found out something about me and was going to flip me. That's the reason I had to kill her" (RT-1868). Later in the same conversation, Gibson denied having killed Dana (RT-1872). At that time, Mobley did not accept Gibson's statement in his own mind as a confession, and he "just kind of wrote it off as, you know, not being that important" (RT-1872-73).

In May of 1986, Gibson and Mobley were discussing the fact that they had been instructed by the ABI not to associate with one another (RT-1886). Mobley told Gibson that Gibson needed to move back to California and stay there, because every time Mobley turned around, he was getting in trouble with the ABI for associating with Gibson (RT-1886). According to Mobley, Gibson then said, "Alright. Alright. I will move to California. I killed that girl. I will move to California" (RT-1886). At this point, Mobley still did not believe that Gibson had committed the murder (RT-1887).

Mobley did not tell anyone about either of Gibson's statements until December of 1986, when he was summoned to Montgomery and confronted with a large number of his superiors, including Major Shoemaker, the head of the Department of Public Safety (RT1891). Mobley was advised of his Miranda rights (RT-1891-92). He was then told that he could be indicted himself, and that his cooperation was necessary in the Dana Hart murder case (RT-1893). The ABI personnel tried all day long to induce him to make a statement about Gibson, and it was late in the afternoon when he finally did so, following which they took him directly to the Montgomery County grand jury (RT-1894,1916-17). Mobley did not initially tell the grand jury the same thing that he had told the ABI personnel (RT-1898-99). He was taken out of the grand jury room and told that he needed to tell the truth, and that he should consider the consequences of being indicted himself for complicity to murder and hindering prosecution (RT-1937-38). He then provided the grand jury with different testimony (RT-1904). When he testified before the grand jury, he still did not believe that Gibson's statements to him were confessions to murder (RT-1919-22). Mobley never did interpret Gibson's statements as the truth (RT-1924). He admitted that when he later told Gibson what he had said to the grand jury, which was the same thing he had testified to at trial (RT-1893), Gibson called him "a blister-mouth liar" (RT-1926).

Gibson testified that his statements to Mobley were only slightly different than Mobley had related, but with one crucial difference: he never told Mobley that he had killed Dana. Gibson testified

-16-

that when Mobley made the statement that he should move to California because Mobley was always in trouble with the ABI for associating with him, he had said, "They say I killed that girl. I'm going to California" (RT-2358). The discussion with Mobley at Gibson's house involved the investigative theories of an ABI officer, John Perdue (RT-2360). What Gibson had told Mobley was, "John's theory is Dana had found out something about me and that I was afraid that she was going to flip me ... His theory was that I had killed her for that reason" (RT-2360).

Gibson denied having told Rose Pogue during the weekend of the fishing trip that he would be coming into some money soon (RT-2301). Pogue never gave him $200.00, and he never said anything to her about getting a carpet cleaned (RT-2310-11). As noted earlier, Rose Pogue and Charles Costner testified to an incident which allegedly occurred in December of 1984 at the Parkway Truck Stop, wherein Gibson made a comment to the effect that insurance needed to be purchased on Dana so that she could be "knocked off". Gibson specifically denied making any such remarks (RT-2368).

Gibson eventually filed a lawsuit against the ABI, because he was "fed up with" the ABI spreading rumors that he had committed the Hart murder (RT-2457). Gibson retained Montgomery attorney Charles Allen to represent him (RT-2518). Allen testified that Gibson filed the suit because he felt like he was being "maligned" by the ABI (RT-2518). At one point, Gibson even wanted Allen to "go get him indicted", so that he could "bring the whole thing to a head" (RT-2533). In this regard, Gibson told Allen, "I ain't guilty. Let them try me" (RT-2533).

Allen had interviewed Charles Costner (RT-2521). Costner told Allen that he had adamantly maintained to ABI investigators that Gibson was not involved in the Hart homicide (RT-2522). However, Costner informed Allen that the ABI was putting pressure on him to change his story about Gibson's lack of involvement in the homicide, through theft of property charges which had been brought against him for bad checks (RT-2523,2527-28).

Freida Lawrence had previously lived with Dana Hart, who referred to her as "Mama Lawrence" (RT-2683). According to Ms. Lawrence, Dana did not like being alone, and she had known Dana "just to go off somewhere" when she had been left alone (RT-2684). Dana would often "hang out" around the Atlanta Highway K-Mart parking lot, where her automobile had been found, with other young people her age (RT-2685).

-17-

Eddie Hart had made a large number of drug cases working for the ABI (RT-939-40).  This included some sixty cases he had made working as an undercover informant in Tallapoosa County; when this undercover operation was completed, the general population in Tallapoosa County knew that Hart was an informant (RT-2265-66).  One Jeffrey Evans, who was a professional thief, was from Tallapoosa County (RT-2268-69).  Jeffrey Evans' brother, Larry, lived in the same trailer park where the Harts resided (RT-1069).  Eddie Hart had informed the ABI that Jeffrey Evans had made a threat against his life (RT-1056,1074).  At the time Dana Hart was murdered, Jeffrey Evans had been "on the run" from a conviction in Troy, Alabama, where his punishment was life without parole (RT- 1397-98,1403).  In a subsequent interview, Jeffrey Evans told ABI agent John Perdue that he blamed Gibson for his life without parole sentence (RT-1397-98).

It was uncontradicted that the cases against Gibson and Hart had been initially presented to the Montgomery County Grand Jury, which declined to return indictments (RT-1395-96,2516-17). The State's theory of the case, as argued to the jury, was that Dana Hart had been killed by Gibson and Eddie Hart on the night of February 28, 1985, and her body dumped off Interstate Highway 65 by them as they were en route to the Baldwin County fishing camp from Montgomery (RT-2744- 45,2770,2778,2779,2879,2893-94).

Appellant was indicted for the capital murder of Dana Hart.  The State's evidence presented at trial showed Ms. Hart to have been last seen alive at approximately 5:30 p.m.,  February 28, 1985 (RT-690).  On March 14, 1985, a law enforcement search party was organized to scour the area of the Grace Exit off Interstate Highway 65 (RT- 837,838).  The badly decomposed body of Dana Hart was discovered approximately a mile from the Interstate off the Grace-Garland Exit (RT-843,880).  Appellant and Eddie Hart, the deceased's husband, had left Wetumpka, where the Hart's resided, during the evening of February 28, 1985 and had taken Interstate 65 to a fishing camp in Baldwin County (RT- 772,773, 1047-1049, 2286, 2287).  Gibson and Hart were in the company of numerous individuals on March 1st and 2nd, 1985 (RT- 2474-2477).

The following matters were argued by the prosecutors during their summation as the State's theory of how Dana Hart was murdered by Appellant and Eddie Hart on the evening of February 28, 1985:

But anyway, and the events of the, of the infamous
weekend, the fishing trip that everybody wants to forget,
started March 1st , 2nd, and 3rd.  Now, we will tell you,
ladies and gentlemen, we don't dispute anything that
happened during these three days.  It happened.  It is
documents (sic) by a lot of witnesses. (RT- 2744,2745)

Had the body of 19 year old Dana Hart lying out here on
the Grace Exit, Grace-Garland Exit, exactly where the
letter said they were going to find it. . .  There's been one
person that testified on this stand, one person, ladies and
gentlemen, that said that they were driving to within one
mile of that very spot on the very evening that Dana Hart
disappeared. (RT-2764,2765).

Ladies and gentlemen, where was the body found?
Where was the body found?  Where was the body found?
Over in Butler County, County Road 7, approximately a
mile West of the Interstate. (RT-2770).

Then look at this week of February 25, 1985, three day
later, Dana Hart is seen for the last time, three days later.
(RT-2778).

You've got Mutt and Jeff over there, ladies and
gentlemen.  Never separated.  They were together on,
together on the night in question. (RT- 2779).

Now, let's talk about roads.  Let's put Montgomery up
here where it is.  You remember all those roads that go
out of Montgomery.  They go to Tuscaloosa,
Birmingham, Alex City, Auburn, Luverne, Troy, and
Dothan, and way down here is Mobile, and here comes I-
65 right down to Mobile.  You think it makes a
difference to Grady Gibson what road they found that
body on?  You know, how do you reckon, if someone
else killed Dana, how do you reckon out of all those roads
coming out of Montgomery they just happen to take the
road that the fishing trip was going down? (RT- 2879).

And obviously she can't come in here and tell you what
happened to her but under our system of justice you look
at all the evidence, all those dates Mr. Wasden drew up
there for you and then ask yourselves, I wonder why Dana
ended up dead on the side of I-65 on the right-of-way that
Grady and Eddie went to Mobile of all the roads out of
Montgomery.  That's the one. (RT-2893-2894).

Appellant had filed a pre-trial discovery motion which called for, among other things, the

divulgence of all material:

"which is arguably exculpatory in nature or favorable to the accused or which may lead to exculpatory material included but not limited to:

> (D) any evidence that defendant may have been at a place other than that where the alleged crime was committed at the date and at or about the time said crime was allegedly committed;

> (E) any evidence tending to show that some person other than the defendant committed the crime charged;

> (G) any evidence tending to show that any essential element of the crime charged does not exist, or tending to disprove the existence of any such essential element, or having probative value as to the nonexistence of any such essential element." (CR-39,40).

Gibson subsequently filed a pre-trial request for production of "all evidence in the possession of the State of Alabama that would show that someone other than the two defendants was the perpetrator of the act alleged in the indictment to have been committed by the defendants" (CR-71).

The supplemental record filed with this Court on direct appeal reflects that Gibson's request for exculpatory material was granted by the trial court, including sub-parts (d) and (g) (supplemental record on direct appeal, page 4). The trial court also ordered that the State "shall permit defense counsel for both defendants to inspect and copy... any and all books, papers, documents... or any portions of these, which are within the possession, custody, or control of the state and: (1) Which are material to the preparation of his defense" (supplemental record on direct appeal, pp. 3,5).

Gibson filed a post-conviction challenge to his conviction under Rule 20 of the Alabama

Temporary Rules of Criminal Procedure. The post-conviction petition alleged newly discovered,

exculpatory evidence. Attached to the petition were four ABI memoranda which reflected that one Dottie

Ragsdale had seen Dana Hart alive on March 1, 1985. The substantive facts of, and the procedural history

of, this post-conviction proceeding are set forth in the argument in support of Gibson's contention that the

prosecution suppressed exculpatory evidence.   The Court of Criminal Appeals dismissed the matter on the

basis that the direct appeal was still pending.  Gibson v. State, 547 So.2d 1196 (Ala Crim. App. 1989).

After the direct appeal proceedings Gibson refiled his post-conviction petition.   The trial court denied relief

for Gibson and the Court of Criminal Appeals affirmed on appeal.  Gibson v. State, 580 So.2d 38 (Ala

Crim. App.  1990).  Certiorari review was quashed by the Alabama Supreme Court on May 31, 1991.

The last Rule 32 petition was filed on August 22, 1994.  The following constitutes the facts

adduced at the evidentiary hearing:

Robert Clark, one of the attorneys who represented Grady Gibson during his trial, testified

during the hearing that  during the course of pretrial proceedings he attempted to obtain discovery from the

State of Alabama.  His efforts included filing a mandamus with the Court of Criminal Appeals to compel

the discovery of evidence.  Despite these efforts, Mr. Clark indicated that six memos introduced as exhibits

by appellant were never provided to defense counsel by the State of Alabama prior to trial. (R32RT-55).

Robert Clark also testified that he filed a request for Brady material and a request for

promises of leniency and immunity made to prosecuting witnesses.  (R32RT-56-57).  He further indicated

that the memoranda concerning Dottie Ragsdale were discovered approximately eighteen months after trial

and prior to the previous post conviction proceeding and were the basis of that proceeding.  (R32RT-57).

The defense had spoken with Mrs. Ragsdale prior to the trial of the case, but at that time, at least a year after

Mrs. Hart's death, Mrs. Ragsdale was no longer able to remember when she last saw Dana Hart.(R32RT-

60-61). The defense was never given the information that, soon after Dana Hart's death, Mrs. Ragsdale was able to say conclusively that she saw Dana Hart on March 1, 1985. (R32RT-61).

Furthermore, the defense was never given the information that the ABI had done an investigation into Mrs. Ragsdale's story regarding being off work due to sickness at the time she saw Dana Hart. (R32RT-61). The defense was unable to use any of this investigation to help refresh Mrs. Ragsdale's memory when interviewing her before the trial. (R32RT-61). Because Mrs. Ragsdale could not remember the last time she saw Dana Hart when interviewed by the defense, she was not called as a witness. (R32RT-62).

Clark also testified at the hearing on the present Rule 32 petition that his law partner, Lloyd Copeland, had spoken with a man named Sonny Russell about deals that had been made with prosecution witnesses. (R32RT-66). Mr. Russell had been written bad checks by Pat Reaves and Charles Costner.(CR32R-313-316). Both Reaves and Costner were witnesses for the state against Grady Gibson and were crucial to the State with regard to the time line and admissions by Grady Gibson. (R32RT-66-67). Both Reaves and Costner denied having any kind of agreement with the State to avoid prosecution in exchange for testimony against Grady Gibson. (R32RT-67). DA David Whetstone confirmed to defense counsel that a deal was made at the urging of the Attorney General's office after the trial. (R32RT-68, CR32R-317-318). Mr. Clark also testified that he had seen the case action summary sheets for Reaves and Costner that showed that the cases against them were dismissed after the time for Mr. Gibson's appeal had run. (R32RT-78).

Trial counsel Clark also testified at the hearing that he was not aware of a Bernard Stallworth or a Mr. Skipper prior to Grady Gibson's trial. (R32RT-72). He also testified that he was not given information that Mr. Stallworth had evidence that might exculpate Grady Gibson. (R32RT-94).

Clark further testified that he did not have information prior to trial about a "David or a Jan who were discussing killing Dana and Eddie Hart because of their participation in making drug cases."

(R32RT-79).  Clark stated that he did not know that the ABI had information that somebody had said that

Dana Hart "won't make any more drug cases, we got her." (R32RT-80).  Clark also testified that he was

not aware of the existence of a Johnny Foster who told agent Hunneyman that he had set up the kill for

Dana before the trial and this information was not turned over by the State despite it being in ABI files.

(R32RT-80).

Clark also testified that he was not given a memo containing information about an

interview of Craig Bailey, a criminologist at the State Department of Forensic Sciences. (R32RT-94) The

memo indicated that the hair found in Dana Hart's hand was inconsistent with both defendants and the

victim. (R32RT-96,CR32R-198). However, Mr. Bailey's testimony at trial was that the hair was consistent

with the victim. (R32RT-96).

In the opinion of trial counsel, all of these documents received anonymously after the

appellant's trial and previous post conviction proceeding would have affected the outcome of the trial.

(R32RT-98-99).

The record on appeal also includes an affidavit from Richard Mobley, formerly of the ABI

indicating that his testimony at trial was not truthful. (CR32R-427-428).


I.

IN RE: SUPPRESSION OF EXCULPATORY EVIDENCE

A.

PETITIONER IS NOT PROCEDURALLY BARRED FROM ASSERTING THAT

THE PROSECUTION SUPPRESSED EXCULPATORY EVIDENCE.

While Gibson's direct appeal to the Alabama Court of Criminal Appeals was pending, he filed a post-conviction petition challenging his conviction with the state trial court, which was brought pursuant to Rule 20 of the Alabama Temporary Rules of Criminal Procedure (Rule 20 transcript, CR-25). On November 2, 1988, an evidentiary hearing was held on the motion (Rule 20 RT-1). Two days later, the state trial judge entered a terse written order which found merely "that the Petitioner is not entitled to the relief prayed for" (Rule 20 CR-34). Gibson appealed this ruling to the Alabama Court of Criminal Appeals, which held that his petition for post-conviction relief was premature because his direct appeal was still pending. Gibson v. State, 547 So. 2d 1196 (Ala. Cr. App. 1989).

After his direct appeal was exhausted, Gibson filed an identical Rule 20 petition with the trial court (Rule 20 CR-1). No evidentiary hearing was held on this petition. Instead, the trial court entered an order summarily dismissing the petition (Rule 20 CR-20,21). The sole basis for the dismissal is found in the following conclusory statement of the trial court: "The Court further finds that the grounds alleged in the petition for relief from conviction are precluded pursuant to A.R.A.P. Temp. 20.2 in that the grounds could have been but were not raised at trial and were such which could have been were not raised on appeal" (Rule 20 CR-20). It is apparent that the trial court was attempting to cite Rule 20.2 of the Alabama Temporary Rules of Criminal Procedure (since redesignated as Rule 32.2 of the permanent rules), which provided that a petitioner for post-conviction relief would be precluded from raising any grounds which could have been, but were not, raised at trial or on direct appeal. The Alabama Court of Criminal Appeals affirmed the trial judge's summary dismissal of the Rule 20 petition. Gibson v. State, 580 So. 2d 38 (Ala. Cr. App. 1990). That Court held as follows:

> We agree with the trial court's decision denying the appellants' petitions on procedural grounds. It is apparent to us, after a review of the record, that the claimed error raised in both appellants' Rule 20 petitions could have been, but were not, raised at trial or on direct appeal. (Appellants' first Rule 20 petitions, challenging the same issue, were filed on July 7, 1988. This was prior to oral arguments on the direct appeal in this case

and prior to the filing of the reply briefs of counsel.) Thus, according to Rule

20.2(a)(3) and (5), A.R.Crim.P.Temp., the issues are procedurally barred on a Rule 20

petition.  580 So. 2d at 41.


The Court offered no explanation or analysis of its observation that it was "apparent" the error

could have been raised at trial or on direct appeal. The Court of Criminal Appeals alternatively held

that Gibson's petition would fail on the merits, even if the Court reached the merits.  The Petitioner

requested certiorari review by the Alabama Supreme Court.  That Court initially granted, but later

quashed, the certiorari petition.  Gibson's Rule 20 petition was based upon four separate memoranda

prepared by Alabama Bureau of Investigation (ABI) investigators, which reflected the existence of a

witness, Dottie Ragsdale, who was positive she had seen Dana Hart alive on March 1, 1985 (Rule 20

CR-8-11,30-33).

Under the evidence adduced at trial, if Dana Hart was alive on March 1, 1985, it was

impossible for her to have been killed by Gibson. The Court of Criminal Appeals erroneously found

that only <u>one</u> memorandum was at issue, prepared "by <u>an</u> ABI investigator", Id. at 40 (emphasis

added), although in actuality, four separate memoranda reflecting four different interviews, prepared

by three different ABI investigators, were made the basis of the petition for post-conviction relief.

This conclusion by the Court of Criminal Appeals was unsubstantiated and incorrect. Further,

although the opinion of the Court of Criminal Appeals implied that the "one memorandum" contained

but a statement that the witness had seen Dana Hart on March 1, 1985, without more, the four

memoranda actually contained the witness's extremely detailed recollections of Dana Hart's visit with

her, as well as her explanations of how she had verified the date in question by checking her diary and

her work records.

The testimony presented at the evidentiary hearing indicated that Gibson had been told by an ABI investigator <u>only</u> that Dottie Ragsdale had said she had seen Dana Hart on March 1, 1985(Rule 20 RT-64-66). In this regard, the Court of Criminal Appeals found as follows:

> Testimony from John Perdue, an ABI investigator, showed that Gibson had been told about Mrs. Ragsdale's statement; however, at that time no reference was made to the memo prepared by an ABI investigator ... It appears to us, after a thorough review of the record, particularly the testimony of the ABI investigators, <u>that although the appellants were never furnished with the memorandum,</u> they were notified that Ms. Ragsdale had made the statement. 580 So. 2d at 40-41, emphasis added.

The finding that Gibson had never been furnished with the memoranda was one of the few correct factual conclusions reached by the Court of Criminal Appeals (Rule 20 RT-65,66). Gibson's contention was that the state's failure to furnish the memoranda themselves and their detailed contents constituted error entitling him to a new trial; suppression of Dottie Ragsdale's statement that she had seen Dana Hart on March 1, 1985, without more, was not the issue. Notwithstanding this, the Court of Criminal Appeals found that the suppression "could have been, but were (sic) not, raised at trial or on direct appeal." <u>Id</u>. at 4l. That Court went on to find that "the issues are procedurally barred on a Rule 20 petition." <u>Id</u>.

28 U.S.C. Section 2254(d) provides a number of exceptions to the general proposition that the written findings of a state court on factual issues are presumed to be correct. Subsection (d)(8) provides that the presumption does not apply where "such factual determination is not fairly supported by the record." Section 2254(d) applies to state appellate court findings as well as to the findings of state trial courts. <u>Sumner v. Mata</u>, 449 U.S. 539,546,66 L. Ed 2d 722,730,101 S. Ct. 764 (1981).

In this regard, a finding of a state law procedural bar has two components: (1) because certain facts exist, (2) the defendant is precluded, under state procedural law, from raising an issue. If the legal conclusion of preclusion is based upon facts which are fairly supported by the record, that conclusion is one

of state law which is unreviewable by this Court.  However, the facts upon which that conclusion is predicated are subject to review under the "fairly supported by the record" standard. See, <u>Francois v. Wainwright</u>, 741 F. 2d 1275, 1280-81 (11th Cir. 1984).

Here, the problem with the Court of Criminal Appeals' reasoning, that the suppression of the memoranda could have been raised at trial, is immediately apparent.  That Court correctly found  that Gibson was never furnished with the memoranda.  Without those memoranda being furnished the defendant was unaware of their existence and therefore unable to raise the issue at trial.  The record contains no support whatsoever for any contention that the existence of the memoranda was known at trial, so that the suppression thereof could have been asserted at that time.  In this regard, the Alabama courts have specifically recognized that a defendant is not procedurally barred from asserting the suppression of an exculpatory document when he was unaware of the existence of that document.  As the Alabama Supreme Court held, "Otherwise, the defense lawyer would be placed in the untenable position of being required to request an in camera inspection of an undisclosed document." <u>Ex parte Johnson</u>, 576 So. 2d 1281, 1284 (Ala. 1991).   As such, if the holding of the Court of Criminal Appeals in this case purports to apply the illogical rule that the existence of an undisclosed document can be raised at trial, the Alabama courts do not consistently apply this procedural bar, with the result that it cannot be used to preclude federal habeas corpus relief. <u>Francois v. Wainwright</u>, supra, at 1281; <u>Johnson v. Mississippi</u>, 486 U.S. 578, 100 L. Ed. 2d 575, 108 S. Ct. 1981 (1988).

Since the record is clear that Gibson was never furnished the memoranda, and was never apprised of their existence, the only fact which could possibly save the Court of Criminal Appeals' conclusion that the issue could have been raised at trial would be evidence that Gibson was somehow aware of the <u>contents</u> of the memoranda. Again, there is no fair support for such a conclusion in the record. The record merely shows that Gibson was told "that Dottie Ragsdale said she had seen Dana" (Rule 20 RT-66). There is no support whatsoever even for speculation that Gibson knew the extremely detailed contents of the memoranda including that Ms. Ragsdale had documented seeing Dana in her diary..

The "Catch 22" logic of the Court of Criminal Appeals is illustrated by the following: if a defendant attempts to bring a post-conviction challenge based on newly discovered evidence while the direct appeal is pending, his petition for relief from conviction will be denied as untimely. Then, if he files such a petition after the conclusion of the direct appeal, he will be told that he could have raised the issue on direct appeal. However, if he attempted to raise the issue on direct appeal, by incorporating the newly discovered evidence in the record pursuant to Rule 10(f), this would be an improper use of the Rule, due to the elementary proposition that an appellate court cannot consider matters which were not part of the proceedings below. Thus, Gibson has been left without a remedy due to a circuitous and fallacious analysis which finds no factual support whatsoever in the record.

What the Court of Criminal Appeals' opinion appears to have done is to confuse two separate propositions. On the one hand, the opinion apparently concludes that exculpatory evidence existed, but was known to the defendant; if this be true, there would be no issue of suppression by the prosecution. On the other hand, the opinion also concludes that the issue could have been raised, but was not, and hence, was waived. As was noted above, the memoranda and their contents were not known to Gibson. If the evidence was not known to Gibson, it is difficult in the extreme to ascertain how it could have been raised at trial or on direct appeal.

A procedural bar only arises where an issue is present to be raised, and is not raised, the classic example being a violation of the contemporaneous objection rule. In an exculpatory evidence context, the evidence is either known to the defendant, with the result that no suppression has occurred, or, it is unknown to him, with the result that the merits must be examined. The Court of Criminal Appeals' finding of a procedural bar simply has no application to the fact situation here presented.

It is respectfully submitted that no procedural bar exists in this case, and that the merits of Gibson's constitutional claim with respect to exculpatory evidence are properly before this Court.

Alabama law sets out the requirements that must be met in order to obtain a new trial based on newly discovered evidence. To establish a right to a new trial based on newly discovered evidence, the Defendant must show the following: (1) that the evidence will probably change the result if a new trial is granted; (2) that the evidence has been discovered since the trial; (3) that it could not have

been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching. Ex Parte Heaton, 542 So.2d 931 (Ala.1989).

> ("[I]t is generally not error to deny a motion for new trial based on newly
> discovered evidence tending only to discredit the state's witness
> unless'upon the whole case it appears probable that the new evidence
> would change the result.'
> Maund v. State, 254 Ala. 452, 48 So.2d 553.").

In a similar case, the Alabama Supreme Court held that the trial court erred in denying the defendant's motion for a new trial based on the testimony of two attorneys who represented the defendant at trial. According to the two attorneys the state's main witness told them she lied when she gave highly incriminating testimony at trial. The court stated:

> " 'But as far as this record is concerned we have the testimony of two
> reputable members of the bar which shows that the chief witness for the
> state admitted to them that she had lied under oath in regard to extremely
> vital and material matters. Their testimony stands uncontradicted in this
> record. As before indicated, Fay Kelsoe was the only witness for the state
> who directly connected Woodard with the murder of Dean.
> " 'Unquestionably this evidence was discovered since the trial of
> Woodard and no lack of diligence in connection with its discovery
> appears. It is certainly material to the issue and is not of a cumulative
> nature. We think it such that it could change the result upon another trial.
> As before indicated, the jury which tried Woodard did not have the
> benefit of this evidence.'
> Woodard v. State, 251 Ala. 314, 36 So.2d 897 [ (1948) ].

Newly discovered evidence claims are not automatically precluded by the two-year limitation period of Rule 32.2(c). Rule 32.2(c) specifically allows the trial court to hear a petition alleging newly discovered evidence more than two years after the certificate of judgment is issued by this court if the petition is filed within six months after the discovery of the newly discovered material facts. Rule 32.2(c),Ala.R.Crim.P. As analyzed below, the newly discovered evidence in this case was material and would probably have changed the outcome of the proceedings. The evidence was discovered after Gibson's trial and after his last appeal and could not have been discovered before trial. Each fact was brought to the court within six months of its discovery. Finally, the evidence is not merely cumulative or impeaching.

B.

THE PROSECUTION SUPPRESSED EVIDENCE FAVORABLE TO PETITIONER IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS.

Gibson filed a pre-trial discovery motion which requested, among other things, the divulgence of all material:

"which is arguably exculpatory in nature or favorable to the accused or which may lead to exculpatory material included but not limited to:

(d) any evidence that defendant may have been at a place other than that where the alleged crime was committed at the date and at or about the time said crime was allegedly committed;

(e) any evidence tending to show that some person other than the defendant committed the crime charged;

(g) any evidence tending to show that any essential element of the crime charged does not exist, or tending to disprove the existence of any such essential element, or having probative value as to the nonexistence of any such essential element; (CR-39,40).

Gibson subsequently filed a pre-trial request for the production of "all evidence in the possession of the State of Alabama that would show that someone other than the two defendants was the perpetrator of the act alleged in the indictment to have been committed by the defendants" (CR-71).

The supplemental record on direct appeal reflects that Gibson's request for exculpatory material was granted by the trial court, including sub-parts (d) and (g) (supplemental record on direct appeal, page 4). The trial court also ordered that the prosecution "shall permit defense counsel for both defendants to inspect and copy ... any and all books, papers, documents ... or any portions of these, which are within the possession, custody, or control of the state and: (1) Which are material to the preparation of his defense ... " (supplemental record on direct appeal, pp. 3,5).

Notwithstanding Gibson's discovery requests, and the trial court's orders, the memoranda made the subject of Gibson's postconviction petition challenging his conviction were never produced by the State. As was held in United States v. Agurs, 427 U.S. 97, 106, 49 L. Ed. 2d 342, 351, 96 S. Ct. 2392 (1976), with respect to discovery requests which encompass exculpatory evidence, "When the prosecutor receives a specific or relevant request, the failure to make any response is seldom, if ever, excusable."

The seminal case of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed 2d 215 (1963), established that the prosecution's suppression of evidence which exculpates the defendant violates the due process clause. It should initially be noted there is no question but that the memoranda were suppressed. The Alabama Court of Criminal Appeals found as a fact that the memoranda were never furnished to Gibson. Gibson v. State, supra, 580 So. 2d at 41. This conclusion is amply supported by the record. The record of the evidentiary hearing further reveals that the Alabama Attorney General's office, which prosecuted the case, was furnished with the memoranda in question, which were discussed by the trial prosecutors and ABI investigators (Rule 20 RT-42,43).

By definition, in order to be exculpatory, evidence must be favorable to the defense. "Favorable" evidence was defined in U.S. v. Bagley, 473 U.S. 667,676, 105 S. Ct. 3375,3380, 87 L.

Ed 2d 481,490 (1985), as evidence which "if disclosed and used effectively ... may make the difference between conviction and acquittal.' This standard was reaffirmed in <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39,107 S. Ct. 989, 94 L. Ed. 2d 40 (1987).

Additionally, in order for the suppression of evidence to warrant a new trial, the evidence in question must be material. In <u>Bagley</u>, supra, the Supreme Court held that suppressed evidence is:

> material only if there is a reasonable probability that, had the evidence been disclosed to the defense the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. <u>Bagley</u>, 473 U.S. at 682-83, 105 S. Ct. at 3384, 87 L. Ed. 2d at 494.

<u>Pennsylvania v. Ritchie</u> also reaffirmed this principle. 94 L. Ed 2d at 57. It must further be noted that:

> The omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. <u>United States v. Agurs</u>, 427 U.S. 97, 112-13, 96 S. Ct. 2392, 2401-02, 49 L. Ed. 2d 342, 355 (1976).

The materiality and favorable character of the suppressed evidence in this case are plainly shown by the evidence adduced at trial. As was noted previously, the State's only theory was that Dana Hart was killed on the night of February 28, 1985. A Dana Hart alive and well on March 1, 1985, simply could not have been murdered by Gibson and Eddie Hart. At trial, the prosecution conceded as much in its closing argument to the jury. Furthermore, the prosecutors admitted that Gibson and Eddie Hart were thoroughly alibied from March 1 onward, and bore down heavily on their theory that the killing took place during the night of February 28.

> But anyway, and the events of the, of the infamous weekend, the fishing trip that everybody wants to forget, started March 1st, 2nd, and 3rd. Now, we will tell you, ladies and gentlemen, <u>we don't dispute anything that happened during these three days. It happened. It is documents (sic) by a lot of witnesses.</u> (RT-2744,2745, emphasis added)

> Had the body of 19 year old Dana Hart lying out here on the Grace Exit, Grace-Garland Exit exactly where the letter said they were going to find it...There's been one person that testified on this stand, one person, ladies and gentlemen, that said <u>that they were driving to within one mile of that very spot on the very evening that Dana Hart disappeared.</u> (RT-2764,2765, emphasis added)

seen

Then look at this week of February 25, 1985, <u>three days later, Dana Hart is for the last time, three days later.</u> (RT-2778, emphasis added)

You've got Mutt and Jeff over there, ladies and gentlemen. Never separated. <u>They were together on, together on the night in question.</u> (RT-2779, emphasis added) (RT-2893,2894, emphasis added).

It merely restates the painfully obvious to observe that a Dana Hart seen alive on March 1, 1985, would have literally disintegrated the State's only theory of guilt upon which its primarily circumstantial case rested. The suppressed memoranda not only meet the <u>Bagley</u> materiality test by undermining confidence in the outcome of the trial, they render it highly probable that the outcome would have been different.

As regards the favorable nature of the evidence, it is more than obvious that the requisite "effective use" of the memoranda could have been made by even the modestly experienced litigator. Dottis Ragsdale was unsure at the time of trial, after the passage of years, as to exactly when she had seen Dana Hart. <u>Gibson v. State</u>, supra, 580 So. 2d at 40, (Rule 20 CR-93). The memoranda, and their extremely detailed contents (which details were not revealed to Gibson), could have been used to refresh Ms. Ragsdale's recollection. Gibson's counsel could have displayed the memoranda to Ragsdale prior to trial, and questioned her concerning them. The statements of Dottie Ragsdale memorialized in defendant's exhibits A, B and C were made within one month after Dana Hart's disappearance, and as to exhibit D, within six weeks thereafter (Rule 20 CR-8-11). One of the memoranda recites that Ragsdale was "positive" she saw Dana on March 1, 1985 (Rule 20 CR-8). Although Ms. Ragsdale stated several months later that she could have seen Dana the preceding week, the memoranda could have been used, at the very least, to obtain testimony from her that she was initially <u>certain</u> in her recollection of having seen Dana on March 1. Of course, her subsequent fluctuation of memory would merely go to the weight of the evidence. With her recollection refreshed, Ms. Ragsdale could have testified to the wealth of detail contained in the memoranda, reflecting what transpired during Dana Hart's visit with her; this would further buttress the proposition that she was correct in initially recalling the date of their encounter to be March 1, 1985.

Additionally, even if Ragsdale's memory was not refreshed by the memoranda, her testimony that the statements contained in the memoranda were believed by her to be correct at the time they were made would qualify the memoranda for admission into evidence as past recollection recorded. Had the

memoranda not been suppressed, their contents would have been revealed to the jury, either through Ms. Ragsdale's live testimony, or through the memoranda themselves as evidence of a since faded recollection. As was noted earlier, Gibson was totally deprived of this evidence by the fact that, as of the time of trial, Ms. Ragsdale's memory had faded to the point were she could not remember when she believed she had seen Dana Hart.

The Court of Criminal Appeals noted in its opinion that Ms. Ragsdale very well could have seen Dana the prior week, since her work records indicated she "had been on sick leave from her work one day during the week prior to March 1, as well as on March 1." 580 So. 2d at 40. However, this observation overlooks the fact that Ms. Ragsdale confirmed the March 1 date by reference not only to her work records, but also to her diary (Rule 20 CR-8). As such, disclosure of the memoranda would have led Gibson and his counsel to the diary, which would have been invaluable in establishing the March 1 date. Clearly, the diary contains information that persuaded Ms. Ragsdale she saw Dana on March 1.

The defense also came into possession of newly discovered evidence regarding an interview of Bernard Stallworth. Mr. Stallworth indicated to the ABI that he observed suspicious behavior on March 1st or 2nd in the area where the body of Dana Hart was eventually found.(CR32R-552-555). In his affidavit Mr. Stallworth stated:

> In early March 1985, maybe the 1st or 2nd, I was sleeping in my front bedroom when I heard a vehicle driving slowly down the highway in front of my house. I noticed this vehicle because it was driving very slowly westerly down the road to a side road, about a quarter mile form my house. This vehicle then turned around and proceeded east to a logging road directly across from my house where it pulled in and parked. The time was about 10:30 PM or 11:00 PM. I remember this because I had just finished watching the 10PM news. This vehicle stayed parked on the logging road until about 6:00 AM the next morning. During the night I heard the vehicle door slam about twice. (CR32R-552).

The next morning, Stallworth was outside "chipping splinters" for a fire, and saw that the vehicle was still parked on the logging road. (CR32R-553). He saw one of the two men get out of the car and change clothes behind the "light colored station wagon." He can connect this incident to the discovery of Dana Hart's body because the body was found "only about 200 yards west of the logging road where the vehicle was parked and the fact that only a couple of days after the vehicle activity, I saw buzzards circling and landing in the trees and on the ground at the spot where the police recovered the woman's body. (CR32R-554). This buzzard activity lasted days and days, almost until they found the body." (CR32R-554).

Stallworth's affidavit contradicts the State's theory of the case in a number of ways. First, the State showed that it was raining in the early morning hours of March 1st when it contends that the murder occurred. However, Stallworth stated that on the morning that he was outside his home chopping wood it was cool and clear and it was not raining. This evidence would have been invaluable in showing that the murder or disposal of the body occurred sometime after the rains of the early morning of March 1st and at a time when Gibson and Hart were with other individuals.

Furthermore, Stallworth indicated that the vehicle was a "light colored station wagon," and not the Brown Bronco that Grady Gibson was driving that weekend.(CR32R-554). Clearly there exists a reasonable probability under Bagley that such evidence would have created a reasonable doubt in the minds of the jury. Stallworth has indicated that he was interviewed by state investigators and revealed these exculpatory facts to them. The substance of this material was never revealed to the defense prior to the trial of the defendant.

The appellant further argues that the State failed to disclose an agreement made with witnesses Charles Costner and Patricia Reaves involving the dismissal of fraud charges based upon the writing of $150,000 in bad checks pending against them in exchange for their testimony against Gibson and Hart. Costner was a critical prosecution witness against Grady Gibson. Costner testified that his testimony in the trial was not "in any way related" to the pending charges against him and his wife (Patricia Reaves), and that the Alabama Attorney General's Office was not "handling" the Baldwin County prosecutions. On November 3, 1992, Lloyd Copeland, attorney for Grady Gibson, was contacted by an anonymous informant who indicated that a "deal" had been struck whereby Reaves "didn't have to go to court," in exchange for her and her husband's testimony in the Grady Gibson case. (CR32R-204-209).

On November 9, 1992, the source stated that Charles Costner had made statements that the cases in Baldwin County against him and his wife had been dropped by the State because of his testimony in the Grady Gibson trial. (CR32R-205). Certified copies of the Baldwin County case files indeed showed that the cases had been withdrawn on February 10, 1988 because "information has allegedly been discovered that is exculpatory in nature."(CR32R-205-206).

On January 20, 1998, the depositions of Bayless Biles, criminal attorney for Patricia Reaves, and David Whetstone, District Attorney of Baldwin County were taken. Biles testified that he represented Reaves on the theft charge in Baldwin County. (CR32R-298). He further indicated that an ABI agent came to his office to meet with Ms. Reaves. (CR32R-298). Biles memory was that Ms. Reaves was going to "do something to help themselves..." (CR32R-298). Mr. Biles further indicated that a deal was reached between his client, Reaves and the State of Alabama with respect to testimony against Gibson. (CR32R-302).

In his deposition, DA David Whetstone indicated that the ABI had contacted his office to "see what could be done to help" witnesses in a case in Greenville that had gotten into trouble in Baldwin County. (CR32R-314-315). DA Whetstone stated that he took this to mean that they wanted him to nol pros the case. (CR32R-315). DA Whetstone also stated that he told the victim in the Baldwin County case, Sonny Russell, that the Attorney General's office had contacted him regarding the case and that Mr. Russell agreed to the case being nol prossed. (CR32R-315). DA Whetstone's understanding at the time that the case was nol prossed was that it was a quid pro quo since it is "commonly done that way." (CR32R-318).

At trial, ABI forensic expert Craig Bailey testified that hairs found on the hand of murder victim, Dana Hart, were inconsistent with known hairs obtained from Gibson, his co-defendant Eddie Hart, and one Danny Piggott. Bailey also testified that in his opinion, these hairs were similar to the head hairs of Dana Hart, and could have been Dana Hart's hairs. However, the suppressed ABI memorandum of April 4, 1985 states that in Bailey's opinion, the hairs removed from Dana Hart's hand were inconsistent with Dana Hart's hair.(C-198).

Furthermore, even if the Court were to suggest that the memo made by Sergeant Perdue regarding his interview with Craig Bailey was not discoverable, these memos indicate that there should be exculpatory documents of criminalist Craig Bailey showing these findings. However, no such documents have ever been provided to the defendant.

Plainly, this suppressed evidence was highly exculpatory in nature, since hairs which were inconsistent with the victim's hair as well as with the hair of Gibson and Eddie Hart, would have originated from an unknown third party, most likely the real killer. As was the case with Costner's testimony, the prosecution specifically elicited testimony from Bailey that was in direct contradiction with the suppressed facts.

> "[I]t has been held, and the view seems logical, that if the impeaching
> testimony tends to destroy or obliterate the effect of the evidence upon
> which the verdict rested, it is more than impeaching for that its tendency
> would be to defeat the verdict returned. Dennis v. State, 103 Ind. 142, 2
> N.E. 349."
>
> Reynolds v. City of Birmingham, 29 Ala.App. 505, 198 So. 360

After filing the original petition in 1994, the appellant also came into the possession of yet more evidence that the State should have turned over to the defense at trial. This consisted of ABI memos from March 27, 1985 and March 29, 1985 revealing that investigators interviewed Henry D. Skipper. (CR32R-170-171). Mr. Skipper indicated that he was walking along the side of the road on March 1, 1985 in close vicinity to the place where Dana Hart's body was later found. (CR32R-171). Mr. Skipper further indicated that he remembered March 1, 1985 specifically because he was picking up empty bottles along the road to sell to the Coca-Cola company because that was the day they would be in the area to buy bottles.(CR32R-170). As he walked along the road, Mr. Skipper saw an innertube lying beside the road. (C-170). This innertube was later collected along with the body of Dana Hart.(CR32R-169). Mr. Skipper did not see a body with the innertube on March 1, 1985.(CR32R-171).

These memos indicate that Dana Hart could not have been killed on the night of February 28th or the early morning hours of March 1st, as the State focused on at trial. Furthermore, the appellant has an alibi all times subsequent.

On September 13, 1995,then counsel for Appellant Grady Gibson came into possession of additional Alabama Department of Public Safety documents. A document dated June 19, 1985, revealed that Sergeant John Perdue's "**investigation indicated Grady and Eddie could not have been responsible for Dana's death.**" (CR32R-343, emphasis added). This document constitutes Brady material that could

have been used at trial but instead was withheld from the defendant along with other valuable memorandum tending to show that the defendant was innocent of the crime for which he was convicted. Furthermore, this record indicates that the investigation into Dana Hart's death had provided evidence exculpating the Appellant. Unfortunately, none of this evidence has ever been produced to the defendant by the State.

Previous counsel for the defendant also came into possession of other exculpatory materials on September 13, 1995. These Alabama Department of Public Safety memoranda should have been turned over to the defense but were not. Documents dated March 19 and March 21, 1985 show that investigators had interviewed an informant who stated that he heard a man named "David" and a woman named "Jan" at a party at the home of Tony Livingston discussing Dana and Eddie Hart and their participation in making drug cases. (CR32R-347-348). "The discussion referred to '[t]he bitch won't make any more drug cases' and '[w]e got her.'" (CR32R-348). The March 21, 1985 ABI memo indicated that an informant had stated to an investigator that Johnny Foster had "set up the Dana Hart murder." (CR32R-347).

It is respectfully submitted that constitutional error of the highest magnitude was committed when the State suppressed the evidence at issue. The already grave nature of the situation is compounded by the fact that -- when the Ragsdale memoranda are considered in connection with the dubious credibility of the State's witnesses and the anemic circumstantial evidence supporting those witnesses -- this Court may well be dealing with an innocent man.

II

GIBSON WAS DEPRIVED OF DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS WHEN THE STATE COURT TRIAL JUDGE STATED AS A MATTER OF FACT, IN THE PRESENCE OF THE JURY, THAT HE HAD REVIEWED PRIOR STATEMENTS AND GRAND JURY TESTIMONY, WHICH WERE NOT IN EVIDENCE, OF TWO CRUCIAL PROSECUTION WITNESSES, AND FOUND NO INCONSISTENCIES WITH THEIR TRIAL TESTIMONY.

As the opinion of the Alabama Court of Criminal Appeals on direct appeal reflects, Gibson's counsel attempted during the trial to obtain the previous grand jury testimony of star prosecution witness Charles Costner. Gibson v. State, 555 So. 2d at 784,793. Alabama law provides that such grand jury testimony may be obtained, upon the establishment of a predicate that a material inconsistency exists between the witness's trial testimony and the grand jury testimony. Millican v. State, 423 So. 2d 268 (Ala. Cr. App. 1982). A review of the trial transcript reveals that counsel established such a predicate, through Costner's admissions that he had testified before at least three grand juries, and that he had told some, but not all, of the grand juries about Gibson's alleged statement concerning the purchase of insurance for Dana Hart so he and Eddie Hart could "knock her off" (RT-1714-19). Following these admissions by Costner, two separate requests by Gibson's counsel for the production of Costner's prior testimony resulted in the following comments by the trial judge in the presence and hearing of the jury:

> THE COURT: You can't have them until you, until the Court has reviewed them to see whether there's any inconsistent statements.

> MR. CLARK: Yes, sir.

> THE COURT: I have reviewed them. There is no inconsistent statements at this point. These statements clearly show that he did talk to them and that he did mention insurance to them. (RT-1732, emphasis supplied)

> MR. CLARK: Judge, we would ask that, that Your Honor give us the statements and the Grand Juries', both Grand Juries' testimony with regard to inconsistencies.

> THE COURT: I have checked them here. I don't find any inconsistency. (RT-1739, emphasis supplied)

-39-

Defense counsel subsequently moved for a mistrial, "stating that the trial court's rulings on his request, which were made in the presence of the jury, constituted an impermissible comment on the evidence. The motion was denied...." Gibson v. State, 555 So. 2d at 793. The Court of Criminal Appeals then opined as follows:

> Contrary to Gibson's contention, the trial judge's remarks were not a
> comment on the evidence. Rather, these remarks were an explanation
> of his rulings...The trial court merely explained its reasons and its ruling
> during the cross-examination of (the witness). Such does not constitute
> a comment on the evidence...Thus, Appellant was not entitled to a
> mistrial. Id.

Gibson had argued to the Court of Criminal Appeals that the trial court's comments improperly bolstered Costner's credibility by placing matters not in evidence before the jury. This contention was also made to the Supreme Court of Alabama, which denied Gibson's petition for a writ of certiorari. It is plain that the trial court's remarks deprived Gibson of due process of law, for the very reasons Gibson asserted in the state appellate courts.

The federal courts have long recognized that a conviction cannot be based upon matters not introduced into evidence, usually in the context of prosecutors asserting as fact matters of which there was no evidence. U.S. v. Pearson, 746 F. 2d 787,796 (11 Cir. 1984); Brooks v. Kemp, 762 F. 2d 1383, 1403 n. 29 (11 Cir. 1985); U.S. v. Murrah, 888 F. 2d 24,26 (5 Cir.1989), and cases therein cited. This principle specifically extends to a prosecutor vouching for his witnesses, by stating or implying that evidence not presented to the jury supports their credibility. U.S. v. Dennis, 786 F. 2d 1029, 1046, modified on rehearing, 804 F. 2d 1208 (11 Cir. 1986). Obviously, the same proposition holds equally true, if not more so, for judges. In U.S. v. Fischer, 531 F. 2d 783, 786 (5 Cir. 1976), the former Fifth Circuit specifically held that a trial judge is prohibited from making comments which infringe upon the jury's function of determining witness credibility.

Fischer relied strongly upon U.S. v. Cisneros, 491 F. 2d 1068 (5 Cir. 1974). The Cisneros Court held as follows with respect to the role of a trial judge:

> "'...he may not assume the role of a witness...He may analyze and dissect the evidence, but he may not either distort it or add to it'...He may not charge the jury 'upon a supposed or conjectural state of facts, of which no evidence has been offered.'...Nor may he give testimony, be a partisan witness, or add to the evidence adduced by either side."

491 F.2d at 1074-75, quoting from Quercia v. U.S., 289 U.S. 466, 53 S. Ct. 698,77 L. Ed 1321 (1933), emphasis in original.


In Cisneros, the trial judge, in charging the jury, commented upon his adverse observations of a defense witness's behavior while leaving the witness stand. The court held that this comment "add-ed facts, thus violating one of Quercia's basic prohibitions." 491 F. 2d at 1075. The rationale for the foregoing decisions is the bedrock principle that the evidence lawfully adduced at trial constitutes the only factual basis upon which a criminal defendant may be convicted. Plainly, a conviction based upon the placement before the jury of matters not introduced into evidence violates due process of law. Here, the trial judge, just as did the judge in Cisneros, introduced new facts to the jury, of which no evidence had been offered, and which drastically affected the credibility of a witness. While the credibility of the Cisneros witness was impeached by the trial judge's improper comments, the credibility of the prosecution witness here was supported.

The trial judge specifically stated, in the presence and hearing of the jury, that he had reviewed what counsel had described as prior statements and grand jury testimony, remarking that he found no inconsistent statements in them, and that the documents "clearly" showed that Costner had discussed insurance. "Insurance" referred to Costner's rendition of Gibson allegedly having stated that he and Eddie Hart needed to procure insurance for Dana if they were going to "knock her off". These comments plainly informed the jury that material which was not in evidence supported Costner's credibility.

-41-

Most importantly, the trial judge's remarks that he had found no inconsistencies in the prior statements and testimony informed the jury, by reference to matters not in evidence, that Charles Costner "had been telling the same story all along". Secondly, the prior mention of insurance took the sting out of Costner's trial admission that he had failed to relate this crucial fact to at least one grand jury, thus lending further support to the conclusion that he had, in fact, "told the same story all along". This "evidence", especially when invested with the prestige and authority of the trial court, could only have rendered Costner invulnerable to cross-examination.

Although Rose Pogue testified to substantially the same facts in this regard as did Costner, this does not render the error harmless. Firstly, Costner's testimony was far more damaging than that of Pogue. Costner testified that Gibson's statement was that "if he was going to knock her off they had better go ahead and buy an insurance policy on her so it wouldn't look funny" (RT-1656). Rose Pogue's testimony notably omitted the "so it wouldn't look funny" statement. Secondly, the improper bolstering of Costner's testimony could only have had a "spillover" effect to bolster that of Pogue: if Costner was telling the truth about Gibson's statement, because he had consistently said the same thing about it, then obviously, Pogue's testimony must also be the truth. One simply cannot say with any decree of certainty that the improper bolstering of Costner's believability, and thereby of Pogue's as well, did not influence the jury's verdict.

<u>III</u>

<u>GIBSON WAS DEPRIVED OF DUE PROCESS OF LAW UNDER THE FIFTH AND
FOURTEENTH AMENDMENTS WHEN THE PROSECUTION AND THE TRIAL COURT
REFUSED TO DISCLOSE PRIOR GRAND JURY TESTIMONY OF TWO CRUCIAL
PROSECUTION WITNESSES WHICH WAS MATERIALLY INCONSISTENT WITH
THEIR TRIAL TESTIMONY.</u>

It is well established that impeachment evidence is subject to disclosure pursuant to Brady v. Maryland, supra. U.S. v. Bagley, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed 2d 481 (1985). Prior grand jury testimony of star prosecution witnesses Rose Pogue and Charles Costner contained a number of statements which were materially inconsistent with the witnesses' trial testimony. Yet,

the prosecutors strenuously resisted disclosing the grand jury testimony, and the trial court, after an in camera review of the testimony, refused to order its disclosure (RT-1597,1601,1604,1605) .

Prior to trial, Petitioner filed a motion for discovery, production and inspection (CR-39) which requested Brady material both generally and specifically, and which included the following particularized request:

> Evidence reflecting adversely on the credibility of any state witness;
> including but not limited to convictions of any such witness for a crime
> involving moral turpitude ; inconsistent statements, whether oral, written, or
> recorded, by any such witness on a material aspect of this case; any facts
> tending to show bias or prejudice by such witness for the state of (sic)
> against the defendant. (CR-40)

This particular discovery request was denied(supplemental record on direct appeal, CR-3-6).   The trial court not only committed error by not placing the State under an obligation to disclose such impeachment material, and by entering an order relieving the State from this constitutional duty, but further erred in not disclosing the grand jury testimony when it had been reviewed by the court.   The trial court surely can be presumed to have recognized the significance of the matters contained therein, which are set forth below. With regard to Rose Pogue, the following can be noted:

1.    Trial - Gibson told Pogue he was going to be coming into a lot of money soon when they went on a shopping trip to a mall. On the shopping trip, she bought two pairs of shoes and nothing else (RT-1483,1484).

Grand Jury - Gibson made this statement to her on a trip to a mall.  It wasn't a shopping trip; she didn't buy anything; she went for the purpose of picking up a specific thing, a ring she had in the shop (CR-392).

2.    Trial - She never expected the $200.00 back which Gibson got from her to have a carpet cleaned at the cabin; she gave him the $200.00 (RT-1572).

Grand Jury - the $200.00 was a <u>loan</u> - Gibson retained a loan at the lounge of the truck stop (CR-393).

3.   Trial - Gibson told her about the ABI's secret witness against him in the homicide case at the truck stop in Baldwin County; he had come down to Baldwin County to find out who the witness was (CR-1495,1496).

Grand Jury - Gibson told her about the AST's secret witness against him in the homicide case in Nashville, Tennessee; this was when "he came up and he asked me if I knew who it could be" (CR-399,400).

4.   Trial - Pogue never asked Gibson about his involvement in the murder (CR-1507,1508).

Grand Jury - Gibson told Pogue he didn't kill Dana because Pogue asked him about it (CR-394-398).

5.   Trial - Gibson told Pogue not to talk to the ABI (RT-1522).

Grand Jury - There is no mention of this incriminating fact whatsoever.

6.   Trial - Gibson told Pogue not to tell everything she knew to his lawyer (RT-1559).

Grand Jury - There is no mention of this incriminating fact whatsoever.

7.   Trial - While on the shopping trip to the mall, Gibson asked Pogue about going into business with Charles Costner, due to the fact that he would be coming into a lot of money soon (RT-1481).

Grand Jury - There is no mention whatsoever of Gibson stating his interest in going into business with Costner while he and Pogue were on the shopping trip (CR-392); it is only after the murder that Gibson beings talking about a desire to go into business with Costner (RT-392,393).

8.    Trial - Friday morning Gibson <u>said</u> he hadn't slept all night (RT-1488).

Grand Jury - Friday morning Gibson <u>looked like</u> he hadn't slept all night (CR-392).

Of course, the relevance of Gibson not having slept all night is obvious in view of the prosecution's theory that the murder was committed the preceding night. This inconsistency demonstrates the power which may be exerted by a single change of one word.

To top it all off, Pogue testified at trial that she had told the grand jury the same facts she was relating to the ladies and gentlemen of the petit jury (RT-1583). With this statement, it is respectfully submitted that Pogue demonstrated either a failure of memory not to be expected in a person of ordinary aptitude, or, demonstrated that she is a deliberate perjurer. Either of these alternatives could have been opened for exploration by defense counsel, if Pogue's prior testimony. Had been furnished as requested in pre-trial discovery.

Inconsistent statements one and three, above, are particularly noteworthy. Gibson's alleged statement that he was attempting to ascertain the identity of a "secret witness" against him, whom the ABI had developed, was obviously highly incriminating. Pogue testified at trial that Gibson made the statement in Baldwin County, Alabama, while testifying before the grand jury that the statement was made in Nashville, Tennessee. Obviously, when a witness makes two statements, each of which relates that an incriminating admission by the defendant was made in a different State of the Union, the witness's veracity is less than sterling.

Pogue's trial and grand jury testimony also completely differed as to the purpose of, and activities during, a trip to a shopping mall during which Gibson allegedly made another incriminating admission. Plainly, if a witness tells different stories as to what facts and circumstances surrounded the making of an incriminating admission, the existence of the admission itself is drawn into serious question.

As to Charles Costner, there is only one material difference in his testimony, but it is a highly material one. At trial, Costner testified that Gibson had remarked that if they were going to kill Dana, they needed to go ahead and get insurance on her soon <u>"so it wouldn't look funny"</u> (RT-1656). His assertion that Gibson had made the "so it wouldn't look funny" statement was reiterated numerous times during his direct and cross-

examination. Further, as Costner testified (RT-1718,1719), and as is reflected by his grand jury testimony (CR-428,442), in the grand jury he was twice asked a catch-all question to the effect that he should add anything that he felt was material to the grand jury investigation which he had not previously testified to.

Most interestingly, Costner's grand jury testimony is notable for its omission of any statement by Gibson that the insurance should be obtained soon "so it wouldn't look funny" (CR-428). The omission is even more glaring by virtue of the fact that Costner was invited to add to his testimony as follows:

> Q: . . .Eddie blurted out Grady is going to buy an insurance policy on Dana. Grady Gibson said yeh, Eddie says that if we're gonna knock her off we had better get some insurance. Costner states that everybody laughed and they forgot about the conversation until much later. Costner stated that no one has ever told him who was responsible for the murder of Dana Hart. Costner agreed to testify to the above facts.
>
> After hearing the reading of the indictment, I mean, the statement, is there anything in that statement that is incorrect, not true or not factual which should be amended or altered at this time?
>
> A: Well, I am under indictment for which we know we are innocent, but that's you know, that's facts the way it's printed there (CR-428).

Again, at page 111 Costner is asked if there is anything "material" to the grand jury investigation of Dana Hart's death about which the grand jury should know and which he has not told them "merely because I have not asked you"; again, Costner does not mention the alleged remark about getting insurance soon "so it wouldn't look funny".

By the simple addition of the comment that "they had better go ahead and buy an insurance policy on her so it wouldn't look funny", to the statement "if we're gonna knock her off we'd better get some insurance", Costner transformed what was clearly a joke, and nothing more, into a sinister prediction of things to come. His twist of the knife by the addition of one remark completely transformed the character of Gibson's comment. Clearly, defense counsel should have been allowed

the opportunity to confront Costner with his previous failure to testify to the most damaging portion of Gibson's statement.

To compound the error, the prosecutors continuously objected to defense request that the trial court inspect the grand jury testimony to determine whether or not inconsistencies existed. Well knowing the nature and contents of the material they were intentionally suppressing, the prosecutors proceeded to make statements such as the following to the trial court:

> Defendant Gibson's counsel must first lay an affirmative predicate. <u>There is no reason to believe that the inconsistency does exist.</u> (CR-1558, emphasis supplied).

> So they have no way to lay a predicate, Your Honor. (RT-1592)

> And the predicate that the defense counsel in this case must lay is that they must make a showing that there is in fact an inconsistency between the Grand Jury testimony and the trial testimony. And if we are just going to go through it and have them ask in fact if there is, I will submit that's not a proper predicate. <u>They don't have any evidence to submit to this court there is any</u> inconsistency. That's what is required. (RT-1602, emphasis supplied).

> They have not laid the predicate. <u>There is no independant evidence of it and they're asking Your Honor to go fishing trying to find something. It's a waste of this Court's time.</u> I'm going to comply with the case law. We ask Your Honor to allow us to go ahead with our case in chief. <u>That's all this was, was a fishing expedition.</u> (RT-1604, emphasis supplied)

> The witness stated he had been before three Grand Juries and that he believed he had made those statements. He asked what questions were asked and those questions Mr. Clark is asking him had not been asked. <u>There is no evidence of any, any prior inconsistency.</u> Mr. Clark has not laid the predicate to continue questioning along these lines. (RT-1735,

emphasis supplied)This is a fishing trip, Judge . . .Exactly what it is. (RT-1745, emphasis supplied).

In response, Your Honor, he's not laid the predicate, whatsoever (RT-1748).

The veracity of Pogue and Costner was critical to the prosecution's case. Had the jury entertained a reasonable doubt as to whether they could or should believe Pogue and Costner, a major part of the evidence incriminating Gibson would have been nullified. It is submitted that under the standard enunciated in Bagley and Ritchie, supra, confidence in the outcome of the proceedings has been undermined by the failure of the prosecutors and the trial court to disclose the impeachment material contained in the grand jury testimony, and that Gibson is entitled to a new trial.

IV

GIBSON WAS DEPRIVED OF DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS WHEN THE PROSECUTOR ASSERTED, AS A MATTER OF FACT, IN THE PRESENCE OF THE JURY, THAT HE HAD "FRAMED" A MAN IN A DRUG CASE AND PAID $20,000.00 IN SETTLEMENT OF A RESULTING LAWSUIT.

During the prosecutor's cross-examination of Gibson, the following occurred:

Q:  You paid over $20,000.00 for framing a man on a drug sale, didn't you?

MR. CLARK:  Judge, now, I am going to object to that. If he wants to introduce the pro tanto settlement with the State of Alabama, if he will introduce the pro tanto settlement that got Mobley out of that then I will withdraw my objection. I want the statement, if he's going to do it, I want the pro tanto statement of how

much the State of Alabama paid,  <u>I want to put it in, Judge, if he's going into it.</u>
(RT-2418,2419, emphasis supplied).


THE COURT:  Furnish it to him, Mr. Valeska, if you have it.

MR. VALESKA:  Pardon?

THE COURT:  Furnish it to him if you got it.

MR. VALESKA:  <u>I don't have it,</u> Judge, but I will get it for him.

THE COURT:  Alright.

MR. VALESKA:  It's cross examination.  I will get it for him.

BY MR. VALESKA:

Q:  You framed a man on the drug buy, didn't you?

A:  Absolutely not.

Q:  Well, the man was in Pensacola when you said he was selling you drugs,
wasn't he?

A:  No, he wasn't.  (RT-2419,2420 emphasis supplied)


It is apparent from defense counsel's objection that he believed the pro tanto settlement
would <u>disprove</u> Mr. Valeska's prejudicial accusation against Petitioner, and support Petitioner's
denial thereof ("the pro tanto settlement that got <u>Mobley</u> out of that...of how much the <u>State of</u>
<u>Alabama</u> paid").  Nonetheless, the prosecutor never furnished the pro tanto settlement.

The Court of Criminal Appeals found that the prosecutor's inadmissible, inflammatory factual allegations,
made under the guise of cross-examination, were proper, because "evidence concerning this lawsuit (and Gibson's
apparent need for money) was admissible to show appellant Gibson's motive to commit the offense of murder for
pecuniary gain." 555 So. 2d at 794.  This theory of admissibility is totally untenable for the very simple reason,

apparently overlooked by the Court of Criminal Appeals, that the lawsuit in question was not filed until October of 1985 (RT-1873), some eight months after the disappearance of Dana Hart. Since Gibson's "need for money" could only have arisen with the lawsuit, it is absolutely impossible for this lawsuit, which was filed after the death of the decedent, to have had anything whatsoever to do with motive.

Plainly, the only purpose of the prosecutor's assertions was to place prejudicial facts, which were not in evidence, before the jury. As was noted in the argument under issue II, supra, it violates due process for a prosecutor to make such assertions, and thereby base a conviction upon evidence not produced at trial. See Brooks v: Kemp; U.S. v. Murrah; U.S. v. Pearson, supra. When a prosecutor engages in such tactics, the defendant has been deprived of his due process right to be tried only upon the evidence adduced at trial.

The "evidence" contained in the prosecutor's factual assertions was not relevant to anything, and had as its only purpose to show the jury that Gibson was a man of bad character, with criminal propensities. It was inadmissible whether its admissibility is tested under federal law, Fed.R.Evid. 401,404, or under Alabama law. See, e.g. Bowden v. State, 538 So. 2d 1226,1227 (Ala. 1988), holding that evidence of collateral crimes is only admissible when "there is a real and open issue" as to which the collateral crime evidence is relevant, "such as the accused's motive, intent, identity, or common plan, design, scheme, or system".

The prejudicial effect of Mr. Valeska's factual assertions could only have been enormous. Gibson's denials of having "framed a man on a drug sale" were a poor match indeed for what amounted to the testimony of the prosecutor, with the authority and credibility that his office carries. It is likely for a jury to improperly deduce that if one is so lacking in moral restraint that he would frame an innocent man for selling drugs, it would only take a short additional step down the road of criminality by such an individual for him to commit murder for pecuniary gain.

<u>V</u>

<u>GIBSON WAS DEPRIVED OF DUE PROCESS OF LAW UNDER THE FIFTH AND</u>

<u>FOURTEENTH AMENDMENTS WHEN HE WAS CONVICTED USING TESTIMONY THAT</u>

<u>HAS BEEN RECANTED.</u>

Former Narcotics Officer with the Alabama Bureau of Investigation, Richard Mobley, stepped forward in September of 2001 and filed an affidavit with the Court indicating that his testimony at trial was not truthful.(CR32R-427-428). In his affidavit Mobley states that he was "pressured by agents of the State of Alabama into testifying untruthfully about two reputed confessions that Defendant Grady Gibson had made" to him about the Dana Hart case. (CR32R-427). Mobley further went on to state that Gibson never confessed to him that he murdered Dana Hart. (CR32R-427). Mobley stated that he was threatened with the loss of his job and an indictment against him if he did not testify that Gibson had confessed to him. (CR32R-427). Mobley stated in his affidavit that his testimony in the trial had been that Grady made the following statements:

1) "The motive is that she [Dana Hart] had found out something about me, was going to flip me and that's the reason I had to kill her."

2) "All right. All right. I will move to California. I killed that girl. I will move to California. (CR32R-428).

Mobley now states that he left out important qualifying portions of the statements that clearly indicated that Gibson was discussing the ABI theory of the case and not confessing to murder. He indicates that the correct statements were:

1) "John's [John Perdue of ABI] theory is Dana had found out something about me and I was afraid she was going to flip me. His theory was that I had to kill her for that reason."

2)"All right.  All right.  I will move to California.  They say I killed that girl."

(CR32R-428).

Mobley further stated that Grady Gibson never confessed to the murder of Dana

Hart to him as he testified that he had done in Court. (CR32R-428).

It has long been the law that "a conviction obtained by the knowing use of perjured

testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that

the false testimony could have affected the judgment of the jury." United States v. Agurs, 427

U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (footnotes omitted).

Each of the above newly discovered pieces of evidence are powerful in their own right.

However, when taken together the information is powerfully exculpatory.  Even the case's chief

investigator was convinced that the appellant could not have committed this murder when looking

at the exculpatory evidence that was not given to the appellant. (CR32R-343).

There exists a "reasonable probability that, had the evidence been disclosed to the

defense, the result of the proceeding would have been different." Brady v. Maryland, 373 U.S. 83,

83 S. Ct. 1194, 10 L.Ed. 2d 215 (1963); United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct.

3375, 3383, 87 L.Ed. 2d 481 (1985); *see also* Kyles v. Whitley, 514 U.S. 419, 433, 115 S.Ct.

1555, 131 L.Ed.2d 490 (1995)(all items of suppressed evidence must be considered collectively,

not merely individually.)


## VI

## GIBSON WAS DEPRIVED OF DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS WHEN THE STATE REFUSED TO CONDUCT DNA TESTING ON EVIDENCE FOUND ON THE VICTIM AT THE SCENE OF THE CRIME.

The past decade has seen great advances in a powerful criminal justice tool: deoxyribonucleic acid, or DNA. DNA can be used to identify criminals with incredible accuracy when biological evidence exists. By the same token, DNA can be used to clear suspects and exonerate persons mistakenly accused or convicted of crimes. In all, DNA technology is increasingly vital to ensuring accuracy and fairness in the criminal justice system.

On Saturday, October 30, 2004, President Bush signed into law the Justice for All Act of 2004 (HR 5107). This omnibus legislation enhances the rights and protections for all persons involved in the criminal justice system through two different, but complementary, mechanisms: (1) a new set of statutory victims' rights that are both enforceable in a court of law and supported by fully-funded victims' assistance programs; and (2) a comprehensive DNA bill that seeks to ensure that the true offender is caught and convicted for the crime.

The legislation provides much-needed funds to test a nationwide backlog of more than 300,000 rape kits and other crime scene evidence, funding for victims' services through grants to prosecutor and defender offices, ensures access to post-conviction DNA testing for those serving time in prison or on death row for crimes they did not commit, and it authorizes grants to states to improve the quality of death penalty trials as well as assist families of murder victims.

The State objected to the appellant's request for DNA testing. The State argued that Mr. Gibson should have requested DNA testing in the original petition and that "'Alabama courts have recognized the admissibility of DNA testing since 1991' and, therefore, appellant could not meet 'newly discovered evidence' standard." See Dowdell v. State, 854 So.2d 1195,1197-1198 Ala. Crim. App.(2002). Appellant would first distinguish the present case from that of Dowdell.

In Dowdell, Barry Dowdell pleaded guilty to the charges against him in 1986 (Id. at 1196). After that time it is unclear that he ever directly appealed his case. Id. Records indicate that he filed a previous Rule 20, Ala. R. Crim. P. Temp. That was denied by the circuit court. That denial

was affirmed by the Court of Criminal Appeals on November 17, 1989. Id. The record also

indicates that Dowdell filed another post-conviction relief petition in 1999 that was denied but not

appealed. Id. Nothing in the record indicates that Dowdell requested DNA testing at the trial

court level in his previous post-conviction proceeding, and regardless, he did not appeal the

denial. Id.

   In the present case, the appellant's previous post-conviction proceeding was

dismissed by the trial court on May 11, 1990. Appellant appealed to the Alabama Court of

Criminal Appeals which affirmed the trial court on November 30, 1990. The last Rule 32 petition

was filed on August 22, 1994 and has been pending since that time. Although the DNA request

was made in 2003, the date of the filing of the petition should be taken into account in

determining that the appellant has raised this claim in a timely manner.

   Furthermore, the appellant was not made aware of the probable exculpatory nature

of the DNA in this case until receiving documents showing that the criminalist did not believe that

the hairs were those of Dana Hart despite his testimony at trial. The claims regarding the

inconclusive hair evidence were made on January 27, 1995 (CR32R-146). The appellant has

always maintained his innocence with respect to this crime. The record indicates that his petition

for DNA testing has been made a part of his 1994 petition for post-conviction relief. As opposed

to the post-conviction petition of Dowdell before the courts in 2002, this petition is the first filed

by this appellant since acceptance of DNA in the Alabama courts in 1991.

   Appellant would suggest that the interests of justice require that DNA testing be

performed in this case. Even the federal government is now providing funds to states to test DNA

in cases where that availability was not available in the past. While DNA testing has been

recognized in the State of Alabama since 1991, the fact remains that the DNA in the present case

has never been tested.

   As Judge Shaw stated in his concurrence in Dowdell,

"A criminal trial is not a lottery, a spin of the roulette wheel or a throw of the dice. The orderly processing of cases through the court is an important value, but it is not the end in itself. It is only the method by which we attempt to achieve the ultimate purpose of the criminal justice system-the fair conviction of the guilty and the protection of the innocent. That is what our constitutional guarantees are all about. Our system fails every time an innocent person is convicted, no matter how meticulously the procedural requirements governing criminal trials are followed."

New Jersey v. Thomas, 245 N.J.Super. 428, 435, 586 A.2d 250, 253-54 (1991) (discussing postconviction requests for DNA testing). In Dabbs v. Vergari, 149 Misc.2d 844, 850, 570 N.Y.S.2d 765, 769 (Sup.Ct.1990) (also discussing postconviction requests for DNA testing), the court noted:

"Consistent with society's 'overriding concern with the justice of the finding of guilt' United States v. Agurs, 427 U.S. [97,] 112 [(1976)]), the courts, as well as the prosecution, must be vigilant to correct a mistake. 'It is the State that tries a man, and it is the State that must insure that the trial is fair' (Moore v. Illinois, 408 U.S. 786, 810 [(1972)] [Marshall, J., concurring in part and dissenting in part] ). Put another way, '[t]he State's obligation is not to convict, but to see that, so far as possible, truth emerges' (Giles v. Maryland, 386 U.S. 66, 98 [(1967)] [Fortas, J., concurring] ). 'When evidence favorable to the defendant is known to exist, disclosure only enhances the quest for truth; it takes no direct toll on that inquiry'

-55-

(<u>United States v. Bagley</u>, 473 U.S. [667,] 692-693 [(1985)]

[Marshall, J., dissenting] ).”

And in <u>Ex parte Frazier</u>, 562 So.2d 560, 565 (Ala.1989), the

Alabama Supreme Court, quoting <u>Estes v. Texas</u>, 381 U.S. 532,

540, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), noted:

“ ‘Court proceedings are held for the solemn purpose of

endeavoring to ascertain the truth which is the *sine qua non* of a fair

trial. Over the centuries Anglo-American courts have devised

careful safeguards by rule and otherwise to protect and facilitate the

performance of this high function.’”

    <u>Dowdell v. State</u>, 854 So.2d 1195,1198-1199(Ala. Crim. App.2002)


There is no legitimate reason for the State of Alabama to deny DNA testing in this case. It is imperative, not only to the federal government, but also to the State of Alabama that the true offenders of crimes are caught and convicted. At the time that this Court decided <u>Dowdell</u>, the federal courts had not passed the Justice for All Act of 2004. Nor was the State in the position to receive federal funds for testing of DNA from prior convictions before the passage of this act. Although the legislature has failed to act since the urging of both Judge Shaw and Judge Baschab in <u>Dowdell</u>, public policy now dictates that the DNA in this case should be analyzed in the interest of justice.

CONCLUSION

It is submitted that Petitioner Gibson's conviction was obtained in flagrant violation of his right to due process of law, as the same is secured to him by the Fifth and Fourteenth Amendments to the Constitution of the United States. Petitioner's unconstitutionally obtained conviction is due to be set aside.

-56-

For such relief, your Petitioner, Grady Gibson, respectfully prays.

Respectfully submitted,

JENNY R. RYAN