IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA RECEIVED
NORTHERN DIVISION

2007 MAR 12  P 2: 36

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| GRADY GIBSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. |
| | ) | 2:07-CV-0009-MHT |
| RALPH HOOKS, et al., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Respondents. | ) | |

**ANSWER**

Come now the Respondents, by and through the Attorney General of

Alabama, to respond to the Order to Show Cause issued by this Honorable Court

on January 10, 2007.

**PROCEDURAL HISTORY AND STATEMENT OF THE FACTS[1]**

Grady Gibson was indicted with Eddie Hart for capital murder by the Grand

Jury of Butler County, Alabama, at the Grand Jury's special, 1984, term.  Hart and

Gibson were charged with the intentional killing of Dana Hart for pecuniary gain

---

[1] The procedural history and statement of the facts were taken from the State's
brief filed on direct appeal.

or valuable consideration.[2]  On September 8, 1987, Gibson was arraigned on the indictment and pleaded not guilty.  (CR- 16, 115)

On September 8, 1987, the cause came on for trial before the Honorable Arthur E. Gamble, a circuit judge and a jury.  Hart was represented by his attorney, Honorable J. McGowin Williamson and Gibson by his attorney, Honorable Robert F. Clark.  The State was represented by Honorable Van C. Gholston, District Attorney of Butler County, Honorable Don Siegelman Attorney General of Alabama, and his assistances, Honorable Donald G. Valeska and Honorable H. William Wasden.  (R- 6-8)

On September 15, 1987, the jury, having heard the evidence, arguments of counsel and charge of the Court, found Gibson guilty as charged in the indictment. Gibson was immediately adjudged guilty.  (CR- 115-116)

A sentence hearing under Section 13A-5-45 of the <u>Code of Alabama</u>, (1975), was held immediately after the verdict.  On hearing the evidence, arguments and charge of the Court, the jury recommended a sentence of life imprisonment without the possibility of parole.  The trial judge accepted the jury's recommendation and sentenced Gibson to life imprisonment without parole.  (CR- 116; R- 2951-3066)

---

[2] "§ 13A-5-40.  CAPITAL OFFENSES.

"(a) The following are capital offenses:....

"(7) Murder done for a pecuniary or other valuable consideration...."
(Code of Alabama, 1975)

On October 5, 1987, Gibson filed a motion for a new trial. After a hearing

on December 31, 1987, the same was denied. (CR- 118-155 & 139; R- 3067ff).

## STATEMENT OF THE FACTS

The Respondent's statement is supplemental to and in correct of Gibson's

statement of the facts.

The facts are set forth in chronological order:

February, 1984 - Eddie Hart became a contract agent, a paid informer, for

the Alabama Department of Public Safety. Hart was employed by the

Department on the recommendation of Trooper Gibson. Hart almost

always worked with Gibson, the two often socialized, and Gibson lent

money to Hart. The relationship between Hart and Gibson was much

more than a purely business association. (CR- 179-363; R- 814, 823-

825, 830-835, 1128 & 1476-1477)

November 6, 1984 - Hart and Dana Pouncey were married. (CR- 205 and

281)

December, 1984 (Approximate) - Gibson mentioned to his Sergeant that he,

Gibson, had been reading:

"…murder books about murders and books pertaining to perfect
murders and how to commit a perfect murder…."
(R- 1422)

Gibson also asked his sergeant if, "… You could insure someone's life without their knowledge…." (R- 1423)  The Sergeant said he did not think so.  (R- 1421-1424)

Late December, 1984 – Gibson and Hart were visiting Gibson's friends, William Costner, Pat Reeves and Rose Pogue,[3] who ran a truck-stop-motel-lounge on the Mobile-Baldwin County Causeway.  One night at the truck stop, while Hart was sitting at a food counter with Ms. Pogue, and Gibson was sitting at a nearby table with Mr. Costner, Hart told Ms. Pogue that Gibson was going to buy an insurance policy for Dana Hart.  Gibson immediately responded:

"… 'Yeah.  Eddie says if we are going to knock her off we better hurry up and get some insurance on her'…." (Ms. Pogue's recollection, R- 1532-1533)

or

"… 'if he was going to knock her off they had better go ahead and buy an insurance policy on her….'…." (Mr. Costner's recollection; R- 1656) (R- 1531-1533 & 1653-1656)

January 4, 1985 - Both Gibson and Hart went to the office of Liberty National Insurance Agent Oscar Paul Tompson, who had served the insurance needs of Hart's family for many years.  Hart indicated that he wanted to purchase some insurance on his wife, Dana.  Mr.

---

[3] William Costner and Pat Reeves were common law husband and wife.  (R- 1645) Rose Pogue is Ms. Reeves's sister.  (R- 1468-1469 & 1645, 1468-1469 & 1645)

Thompson told Hart that he could not purchase insurance on a person who was not present. Mr. Thompson then reviewed the Harts' insurance needs and recommended a $10,000.00 permanent life insurance policy with some health benefits. At this point, Gibson, who was present during this discussion of the Harts' very private affairs, volunteered that Hart could purchase more term insurance for the money. The matter was left there, until Mr. Thompson could obtain some more information from the Company and Hart could secure the presence of his wife. (R- 506-515)

January 14, 1985 - Hart returned to Mr. Thompson, along with Dana Hart. Although Hart had originally inquired in his wife's absence, about insurance on her life only, now he wanted insurance on both their lives. The Harts applied for $100,000.00 of term insurance on both their lives. Due to the failure of the Harts to provide information on a gun shot injury suffered earlier by Dana Hart, the policy was cancelled about two weeks later. (R- 515-532)

January 28, 1985 - New York Life Insurance Company Agent William Cauthen, pursuant to a referral by Gibson, met with the Harts at their Wetumpka house trailer. Mr. Cauthen, like his Liberty National colleague, recommended a $10,000.00 permanent life insurance

policy, which would meet the Harts' current needs and build cash

value. However, Hart said that he wanted term insurance in the

amount of $150,000.00, with provision for double indemnity and an

application for the same was completed by Mr. Cauthen. (R- 601-

614)

February 20-25, 1985 - Gibson and Hart picked up the policies issued by

New York Life on the lives of Hart and Dana Hart. (R- 623-624)

Gibson financed the Harts' life insurance policies. (CR- 217-220; R-

2378-2379) Dana Hart's life was insured for $150,000.00

($300,000.00 in the event of accidental death), but Gibson's own wife

was insured for only about $80,000.00. (R- 2452-2453)

It was also about this date that Gibson began planning a fishing

trip to Baldwin County for several law enforcement officers. The

officers often went on such outings, but this was the first time Hart

had been included. He was Gibson's guest. (CR- 248 & 340; R-

1823-1825)

The fishing trip and Dana Hart's death were only a week away.

February 26, 1985 - With money loaned by Gibson, Dana Hart make

arrangements for telephone service for her home. It was to be

installed on Friday, March 1, 1985. She was very much looking

6

forward to having a telephone. (R- 745-750, 1974-1976 & 2006-2007)

February 27 or 28, 1985 -Gibson met his friend, Ira Colvin, Attorney at Law, at Demopolis, Alabama, and arranged to use the cabin on Fish River in Baldwin County, which Mr. Colvin's family owned. Gibson wanted to use the cabin for his law enforcement officers' fishing party that weekend. Mr. Colvin gave Gibson the keys to the cabin. (R. CR-225-228) Even if Gibson had not received the keys from Mr. Colvin, he could have borrowed a set from a neighbor (R- 1018), and Gibson was aware of this. (R- 1023-1025)

February 28, 1985, Thursday - This was the last day anyone saw Dana Hart alive, and there are four versions of the events of that day: one by Gibson, several by Hart and a third by a Mrs. Pam Piggott.

Gibson claimed that he had worked at the A.B.I. office, then went home, packed for the fishing trip, and went to Hart's trailer to pick him up. Although the fishing trip had been "in the works" for a week, no one had mentioned it to Dana Hart. There was a family quarrel about Hart leaving his wife, but Hart left with Gibson. They departed at 7:00 p.m. from Hart's trailer. (CR- 224-227; R- 772-774)

7

Hart's several versions were as follows: In his deposition in the lawsuit over the insurance policy, Hart implied that Gibson had come to the trailer to pick Hart up. (CR- 333) But, in his other statements, Hart claimed that he had left the trailer early that morning with Gibson, spent some time at the A.B.I. office, then spent the rest of the day alone at Gibson's home, until Gibson got off work. Then they went together to Hart's trailer to get his things for the fishing trip. (R- 1045-1046 and 1140-1142) In his initial interview on the missing person report on his wife, Hart told Elmore County Sheriff Sidney Thrash that, "…the night she disappeared…they hadn't had any argument or anything at all…." (R- 673) However, in his subsequent statements and deposition, Hart admitted an argument with his wife over the fishing trip. (R- 1047-1048 & 1142-1143) Hart stated that he and Gibson left his trailer between 7:30 and 8:00 p.m.

Mrs. Pamela Sue Piggott lived in a trailer just twenty feet from that of the Harts. Mrs. Piggott knew Dana Hart, Hart and Gibson. At 5:30 p.m., Mrs. Piggott saw Dana Hart leave her trailer, get in her car and drive out of the trailer park. Thereafter, she never saw Dana Hart or her car again. Although she remained at her trailer all night, Mrs. Piggott did not see Hart or Gibson until the following Sunday, when

8

they came to her trailer asking about Dana Hart's whereabouts. (R-683-691)

Whatever the circumstances of their departure from the Elmore-Montgomery County area for Baldwin County, Gibson and Hart traveled by way of I-65. It rained all the way. (CR- 430; R- 1142-1143) They arrived at the cabin but alleged that the keys Gibson had obtained from his friend would not work. Rather than obtain a key from the neighbor, they drove 15 to 20 miles to get a key from Ira Colvin's estranged wife. At this time, around midnight, Mrs. Colvin noticed nothing unusual about Gibson's appearance. (R- 2577-2582)

March 1, 1985, Friday - At 8:00 a.m. Gibson and Hart arrived at the truck stop operated by the Costners and Rose Pogue. They were dirty, wet and appeared exhausted. They said they had not slept all night. Gibson asked Mrs. Pogue to lend him $200.00, to clean or replace a rug at the cabin. (B. & H.Trs. 1478-1479 & 1487-1496)

At about the same time, George Sellers, a security guard at the K-Mart store on Atlanta Highway in Montgomery, noticed an automobile in the store's parking lot, which would ultimately be identified at that of Dana Hart. (R-726-733)

9

That afternoon, Gibson and Ms. Pogue went shopping in Mobile. At that time, Gibson asked Ms. Pogue, if she thought that Mr. Costner, her brother-in-law, would be interested in going into business with him. Gibson told Ms. Pogue that he was going to come into a lot of money soon. (R- 1480-1484)

Dana Hart's eagerly awaited telephone, which was to be installed, was not, because there was no one at the Hart trailer. (R- 747-749)

March 3, 1985, Sunday - Gibson and Hart returned from the fishing trip, on which they had done remarkably little fishing. They returned to Hart's trailer and immediately began a search for Dana Hart. (R- 690-691 & 1978)

March 6, 1985, Wednesday, 9:15 p.m. - Hart filed a missing persons report on his wife, Dana P. Hart, with the Elmore County Sheriff's Office. (R- 666-670 & 675)

March 11, 1985 - Gibson and Hart filed a missing person report with the A.B.I. on Dana P. Hart. In the making of the report and the attendant interview, both Hart and Gibson were present, but Gibson took the formal lead. (R- 753-7598)

After twice contacting Hart through Gibson, Elmore County Sheriff Sidney Thrash finally obtained Hart's appearance at the Sheriff's Office to expand on the missing person report Hart had made on his wife five days earlier. After hearing Hart's story, Sheriff Thrash told Hart that, if his wife came up in a bad way, he, Hart, would be the first person the Sheriff wanted to talk to. Hart, on hearing this, immediately began to make excuses to leave and broke off the conversation. (R- 670-674)

At around noon on this day, Hart and Mrs. Joanie Mullins, Dana Hart's aunt (R- 1971-1972), were going through the trailer in search of possible clues to Mrs. Hart's whereabouts, when they found an address book of hers. At ten o'clock that night, Hart appeared at Mrs. Mullins' home with the address book. The telephone, ordered by Dana Hart and financed by Gibson, had been installed on March 8, 1985, three days earlier (R- 747), but rather than call, Hart drove from Wetumpka to Mrs. Mullins' home in Montgomery to ask her to go with him to Lt. Williams of the A.B.I. to turn in the address book. (R- 1971-1981) With Hart driving, they drove to Lt. Williams' home, by what Mrs. Mullins considered to be a roundabout way. Their route avoided the K-Mart on Atlanta Highway. However, Mrs. Mullins

11

recalled that Dana Hart had been among the teenagers who frequented the K-Mart parking lot; she suggested that they check with the young people there to see if any of them had seen Dana. Hart agreed to go back past K-Mart for that purpose. (R-1981, 1982) Lt. Williams and his family appeared to be asleep, so Hart and Mrs. Mullins did not go in. Returning to home by what she thought was a more direct route, the two went by to K-Mart. As the parking lot came into view, they saw Dana Hart's automobile. At Hart's suggestion, Mrs. Mullins called Lt. Wayne Ward. (R- 1982-1989)

March 14, 1985 - Gibson received an apparent threatening telephone call and a letter, both stating that, if he would go to the Grace Exit, he would see what was going to happen to him and his family. It was understood by this that the Grace-Garland Exit of I-65 was meant. Numerous law enforcement officers proceeded to that interchange and found a badly decomposed body one mile west of the southbound exit ramp of I-65, exactly where the caller said they would find something. (R- 801-810, 830-855 and 873-915) Although the body was only a skeleton from the waist up, on seeing the body, Gibson stated: "That's her, that's Dana." (R- 914)

12

The remains were confirmed to be those of Dana Hart, by her dental records. She had died of stab wounds to the back, which had been administered from behind. She still had money in her pockets. She had been dead two to three weeks. (R- 953-963, 968-970 & 981-1008, 1342 and 1356)

The place where the body was found was in Butler County. (R-914)

Traces of blue fibers found on the body were consistent with blankets kept at the A.B.I. office in Montgomery, out of which Gibson and Hart worked. (R- 1339 and 1343-1345 & 1410-1411)

March 18, 1985 - On this date, Dana Hart was buried, as at the time of trial, September, 1987, her funeral expenses of $2,179.84, remained unpaid. (R- 1278-1279) At his wife's funeral Hart said: "This was a mistake. It shouldn't have happened." (R- 1985)

Some time thereafter, while visiting his wife's aunt, Hart had a conversation with Mrs. Mullins. Mrs. Mullins testified:

"...Eddie and I were sitting in my living room alone and I told Eddie that we were his family, that because Dana loved him we loved him. If he knew anything at all about the case, if there was anything he could say to help us that we would like to know. And that we would help him if he was involved in any way. We would get him some help, but just talk to me and tell me.

13

"Eddie broke down in tears and he said, 'I want to tell you but it's just so hard.'...." (R- 1986)

April 1, 1985 - Hart canceled the New Your Life policy on his life. (CR- 344)

May - July, 1985 - A.B.I Investigator Richard Mobley was a dinner guest at the home of his friend, Gibson. As Kathy Gibson prepared dinner, the two men discussed the death of Dana Hart. Investigator Mobley was concerned because of certain rumors implicating his friend Gibson were circulating in Andalusia, Alabama. Investigator Mobley described the conversations as follows:[4]

"A.    We were talking about motive, why, why everybody was talking about Grady and Eddie being involved in that murder.

Q.    Okay.

A.    And I -- we were talking about the insurance.

Q.    Uh-huh.

A.    And, and Grady said he wasn't a beneficiary on the policy but that he had loaned Eddie the money to purchase it with.

Q.    Uh-huh.

A.    And then he said, "Anyway, that ain't the motive. The motive is that she found out something about me and was going to flip me. That's the reason I had to kill her."

_____
[4] It is not clear if this relates to one or two occasions.

14

Q.    Now, Defendant Gibson told this?

A.    Yes, Sir...." (R- 1868-1869)

(R- 1864-1866 & 1868-1879)

March, 1986 - A law suit filed by Hart for New York Life's refusal to pay

the death benefit on Dana Hart was settled for $80,000.00. (R- 1275-

1278) Hart's Mobile, Alabama attorney issued a check to Hart for

$52,863.00, retaining the standard 1/3 contingency fee for legal fees.

$12,333.00 of the legal fees was tendered to Gibson's lawyer friend

from Reform, Alabama, who had acted as associate counsel. (R- 1260

& 1301-1304)

May, 1986 - Investigator Richard Mobley and Gibson gave depositions in an

unrelated legal matter in Montgomery, Alabama. Contrary to the

advice of his attorneys and his supervisors, Mobley gave Gibson, his

friend, a ride home. Mobley told Gibson that he was going to have to

disassociate himself from Gibson. Mobley testified:

"...I said, 'This is it.' I said, 'You need to move back to
California and stay out there.'

"Q.    Okay.

"A.    Because every time you turn around I was getting in
trouble for associating with Grady.

"Q.    Okay.

15

"A.    And Grady said, 'All right.  All right.  I will move to
California.  I killed that girl.  I will move to California.'
And he moved to California…." (R- 1886)

(R- 1884-1886)

March 21 - Aug. 20, 1986 - Between March 21, 1986, when he deposited his

attorney's check in his account in the First Alabama Bank, and August

20, 1986, when he withdrew the last $4.48 from his account at the

First National Bank at Alexander City, Hart converted nearly the

entire sum of $52,863.00 into untraceable cash.  This was done by

depositing checks and cash into various banks and then withdrawing it

in the form of cashier's checks drawn to Hart and deposited by him in

another bank, checks drawn to cash and cashed by Hart and cash

withdrawals.  Some of the money would then be deposited in another

bank and the process repeated.  Except for one check in the amount of

$5,000.00 drawn to Kathy and Grady Gibson on April 4, 1986 (R-

1301-1302), there is no record of what Hart did with all this money.

(R- 1286-1291, 1294-1305, 1314-1321 & 1326-1331)

Gibson took an appeal from the conviction. While the direct appeal was

pending in the Alabama Court of Criminal Appeals, Gibson filed a petition for

relief pursuant to Rule 20 of the Alabama Rules of Criminal Procedure, which was

denied on November 4, 1988, (Exhibit # E,  C-10) and  Gibson appealed the denial

to the Court of Criminal Appeals. On June 20, 1989, the Court of Criminal Appeals dismissed the appeal because the direct appeal from the conviction was still pending in the court. Gibson v. State, 547 So. 2d 1196 (Ala. Crim. App. 1989). (C. 490).

The Alabama Court of Criminal Appeals ultimately affirmed the conviction in an opinion issued on July 21, 1989. Gibson v. State, 555 So.2d 784 (Ala. Crim. App. 1989). The Court of Criminal Appeals denied the petition for rehearing on November 17, 1989, and the Supreme Court of Alabama denied the petition for certiorari on January 26, 1990.

On March 14, 1990, Gibson filed a second petition pursuant to Rule 20 of the Alabama Rules of Criminal Procedure in the Butler County Circuit Court. Gibson alleged that the prosecution had suppressed certain evidence favorable to him, to wit, that Dottie Ragsdale had allegedly seen Dana Hart alive on March 1, 1985. Attached to the petition were copies of several police memoranda of interviews with a Mrs. Dottie Ragsdale and her son, Charles David Ragsdale. Both of these individuals described a visit to them by Dana Hart. The details of the visit, as recounted by each, indicate that they are relating the same visit. According to Mrs. Ragsdale, the visit occurred during the daylight hours of Friday, March 1, 1985. (Exhibit H, C- 8, 9, 10 and 11) According to Mr. Ragsdale, the visit was at 3:00 p.m. on Thursday, February 28, 1985. (Exhibit H, C- 9) Both of

17

these people also stated that Dana Hart's marriage to Hart was in jeopardy and that Dana Hart had accused Hart of beating her. (Exhibit H, C- 1-14)

The State responded to the petition on March 27, 1990. (Exhibit H, C-12-19)

The petition was submitted by agreement on the basis of the 1988 evidentiary hearing. (Exhibit H, C-24)

The evidence at the hearing proved conclusively and without conflict that at the time of trial, the defense knew about the Ragsdales and their evidence and had subpoenaed the Ragsdales to court, although the Ragsdales had not been called as witnesses. Gibson shifted his claim to an admission that he knew about the Ragsdales but allegedly did not know that the Department of Public Safety investigators had prepared memoranda of their interviews with these witnesses. These memoranda were obviously hearsay but were nonetheless described by the Gibson as "suppressed evidence." (Exhibit H)

On May 11, 1990, Honorable A. E. Gamble, Jr., a Circuit Judge, dismissed the petition as being precluded under Rule 20.2.[5] (Exhibit # H, C-20)   Such

---

[5] Rule 20.2. Preclusion of Remedy

> "(a) Preclusion of Grounds. A petitioner will not be given relief under this rule based upon any ground:...unless the ground for relief arises under Rule 20.1(b)...."

summary disposition was authorized by Rule 20.7(d), A. R. Crim. P. (T).  (Exhibit

H, C-20-21)  His Honor's order read:

> "This matter having come before this Court on the Petition for Post
> Conviction Relief and the State's response and motion thereto and
> upon consideration thereof the Court finds that the petitioner was
> properly convicted and sentenced in the Circuit Court of Butler
> County; that at such time the petitioner was represented by retained
> counsel of his choice; that an appeal was perfected to the Alabama
> Court of Criminal Appeals and that the conviction and sentence were
> affirmed by that Court and the Certiorari Petition was denied
> thereafter by the Alabama Supreme Court.  The Court further finds
> that the grounds alleged in the petition for relief from conviction are
> precluded pursuant to A.R.A.P. Temp. 20.2 in that the grounds could
> have been but were not raised at trial and were such which could have
> been but were not raised on appeal.  It is therefore ordered and
> adjudged that the petition for post conviction relief is hereby
> summarily dismissed pursuant to A.R.A.P. Temp. 20.2 and 20.7(d)
> due to preclusion.
>
> "DONE THIS THE 11TH DAY OF MAY, 1999."
> (Ibid.)

On November 10, 1990, the Court of Criminal Appeals affirmed the denial

of relief, holding:

> "We agree with the trial court's decision denying the appellants'
> petitions on procedural grounds.  It is apparent to us, after a review of
> the record, that the claimed error raised in both appellants' Rule 20
> petitions could have been, but were not, raised at trial.

------

> "(3) Which could have been but was not raised at trial, unless the ground for
> relief arises under Rule 20.1(b); or...
>
> "(5) Which could have been but was not raised on appeal, unless the ground
> for relief arises under Rule 20.19b)...."

Gibson v. State, 580 So. 2d 38 (Ala. Crim. App. 1990). Gibson's petition for

rehearing was denied on January 18, 1990. He then petitioned the Supreme Court

Of Alabama; although the writ was granted, it was quashed on May 31, 1991. (C.

490, 491)

Gibson then filed a Petition For Habeas Corpus Relief in the United States

District Court for the Middle District of Alabama. While the federal petition was

pending, Gibson, on August 22, 1994, filed a third petition in the Butler County

Circuit Court. (Exhibit M)  The State moved to dismiss the State proceedings

because Gibson was not entitled to litigate the same issues concurrently in state

court and federal court. (Exhibit M, C-63) Gibson's federal petition was

subsequently dismissed without prejudice so that he could pursue the claims in

state court.

In this third state court petition[6], Gibson alleged that he was entitled to relief

on the grounds of newly discovered evidence. (C. 10) The alleged newly

discovered evidence involved an affidavit taken from Bernard Stallworth.  (C. 13)

Gibson alleged other newly discovered evidence claims in an amendment to

the Rule 32 petition. (C. 117) In a motion filed in circuit court, the State set forth

the claims it believed Gibson was raising in the state petition:

---

[6] These facts are contained in the transcript of the third petition, which is
designated Exhibit M. The Clerk's record is referred to as "C", and the transcript
of the hearing is referred to as "R".

"A.  That, incident to the original trial, the Prosecutor allegedly obtained the evidence of certain witnesses by agreeing to the favorable disposition of certain criminal cases which were pending against such witnesses and allegedly suppressed the fact of such agreement.

B.  That, incident to the original trial, the Prosecutor allegedly suppressed the alleged evidence of one Bernard C. Stallworth, to the effect that near the time of the disappearance of the victim, Dana Hart, he, Mr. Stallworth, observed during the predawn hours two white males in a brown vehicle parked near the place where Mrs. Hart's body was ultimately found.

C. That the Prosecutors, incident to the original trial, allegedly suppressed forensic evidence relating to hair found in the hand of the corpse of the victim."

(C. 135, 136)

On January 3, 1996, Gibson filed a Summary Of The Facts And Claims Raised In State Court.  In this summary, Gibson outlined the original claim raised in the petition and the claims raised in the first amendment and a subsequent amendment.  (C. 237, 239, 240) In a Response to the motion, the State outlined what it considered to be the claims raised by Gibson in the second amended petition:

"1) Claim #4:  Petitioner Gibson claims that, incident to the original trial, the Prosecutor allegedly suppressed the alleged evidence of one Henry D. Skipper, to the effect that Skipper was walking along the side of the road on the morning of March 1, 1985, in close vicinity to the place where Dana Hart's body was later found, and that he saw a tire inner tube lying beside the road near the location where the body was found.

21

2) Claim #5: Petitioner Gibson claims that, incident to the original trial, the Prosecutor allegedly suppressed a Department of Public Safety memorandum which allegedly reveals that Sgt. John Perdue believed that Grady Gibson and Eddie Hart could not have committed the murder of Dana Hart because she was seen alive on March 1, 1985.

3) Claim #5: Petitioner Gibson claims that, incident to the original trial, the Prosecutor allegedly suppressed two Department of Public Safety Memoranda. The first allegedly reveals that investigators had interviewed an informant who stated that he heard a man named "David" and a woman named "Jan" at a party of one Tony Livingston discussing Dana and Eddie Hart and their participation in making drug cases and allegedly saying "The bitch won't make any more drug cases," and "we got her." The second memorandum allegedly reveals that investigators had interviewed an informant who stated that one Johnny Foster had "set up the Dana Hart Murder."

(C. 245, 246)

In its Response to the claims raised in the petition, the State alleged that Claim A was barred from review by the two-year statute of limitation contained in Rule 32.2(c) of the Alabama Rules of Criminal Procedure. (C. 142) The State also alleged that the claim, brought as a newly discovered evidence claim, was barred by the six month statute on newly discovered contained in Rule 32.2(c) of the Alabama Rules of Criminal Procedure. (C. 143)

The State alleged that Claim B was precluded from review because it could have been discovered through due diligence and raised at trial as required by Rule 32.2(a) (3) of the Alabama Rules of Criminal Procedure. The State also alleged

22

that the claim was precluded from review by Rule 32.2(a) (4), because it could have been discovered through due diligence and raised in the previous Rule 32 petition. (C. 144, 145) The State also alleged that the claim was barred from review by the general two-year statute of limitation contained under Rule 32.2(c) of the <u>Alabama Rules of Criminal Procedure</u>, and barred by the six-month statute of limitation on newly discovered evidence, contained in Rule 32.2(c) of the <u>Alabama Rules of Criminal Procedure</u>, because Gibson presented no evidence that the claim was discovered in the six-month period prior to filing the petition. (C. 145)

The State asserted that Claim C was precluded from review under Rule 32.2(a) (2) of the <u>Alabama Rules of Criminal Procedure</u> because it was raised at trial during the cross-examination of Mr. Bailey. (C. 146) The State also alleged that the claim was barred by the two-year statute of limitation contained in Rule 32.2(c) of the <u>Alabama Rules of Criminal Procedure</u>. (C. 147)

In response to Claim 4 raised in the second amended petition, the State denied that it constituted newly discovered evidence because it could have been discovered by due diligence and presented at trial, as required by Rule 32.2(a)(3) of the <u>Alabama Rules of Criminal Procedure</u>. (C. 247) The State also alleged that the claim was precluded under Rule 32.2(a) (4) because it could have been discovered and presented at trial. (C. 247) The State further alleged that this

amendment to the petition was filed on November 8, 1995, and was barred by the general two-year statute of limitation contained under Rule 32.2(c) of the <u>Alabama Rules of Criminal Procedure</u>. (C. 247) The State also denied that this evidence constituted newly discovered evidence, and that there was any proof that the evidence was discovered within the six-month period before the filing the second amendment to the petition, which means that the claim was barred by six-month statute of limitation contained in Rule 32.2(c) of the <u>Alabama Rules of Criminal Procedure</u>. (C. 248)

The State alleged that Claim 5 was precluded under Rule 32.2(a) (3) because it could have been discovered through due diligence and presented at trial. The State also alleged that the claim was precluded from review by Rule 32.2(a) (4) because of the same reason. (C. 248) The State further alleged that the claims raised in the second amendment to the petition were barred by the general two-year statute of limitation under Rule 32.2(c). (C. 249) The State also alleged that the evidence did not constitute newly discovered evidence, and that Gibson failed to prove that the evidence was discovered during the six-month period before he filed the second amendment to the petition. (C. 249)

The State denied that Claim 6 contained any exculpatory evidence and alleged that it was precluded from review under Rule 32.2(a)(3) because it could have been discovered by due diligence and presented at trial. (C. 249, 250) The

24

State also alleged that the claim was precluded from review under Rule 32.2(a) (4) because it could have been discovered and presented in the previous Rule 32 petitions. (C. 250) The State also alleged that the evidence was in the possession of Gibson at or before his trial. Finally, the State alleged that Gibson was not entitled to review of the claim because he failed to prove that the claim was discovered in the six-month period before he filed his second amendment to the petition, which means that the claim is barred by the six-month statute of limitation on newly discovered evidence claims contained under Rule 32.2(c) of the Alabama Rules of Criminal Procedure. (C. 250)

On April 27, 1996, Judge McFerrin conducted an evidentiary hearing on the petition. (R. 3) Robert F. Clark, a practicing attorney, testified that Exhibits 1-6 were not provided to him by the State before or during the trial of Grady Gibson. (R. 55, 56) Clark alleged that he had filed a Motion For Exculpatory Material And For Evidence Of Any Promises Of Leniency Or Immunity To Prosecuting Witnesses. (R. 56) Clark alleged that he was not given any evidence regarding Dottie Ragsdale, other than her name. (R. 59, 60) Clark also alleged that he had not seen Exhibits 7, 8, and 9 before his testimony at this hearing. (R. 63) Clark alleged that he filed his original Rule 32 petition within six months after seeing the memos after the trial. (R. 63, 64) Clark alleged that the State did not reveal to him any deals of immunity made with key prosecution witnesses, which included a lady

named Reaves and a man named Costner. (R. 66, 67) Clark alleged that these

witnesses had denied that they had any kind of agreement with the State. (R. 67,

68) Clark stated that he learned afterwards in a conversation with David

Whetstone, a district attorney, that a deal had been made with the witnesses at the

behest of the Attorney General's Office. (R. 68) Clark also denied that he knew of

the existence of Bernard Stallworth prior to Gibson's trial, and that he did not

know of the existence of the memorandums in Exhibits 7, 8, or 9. (R. 66, 72) On

cross-examination, however, Clark admitted that received discovery information

from the State. (R. 83) Clark admitted that he had the grand jury testimony from

the Montgomery County Circuit Court when he filed his Motion For A New Trial.

(R. 84) Clark also admitted that he knew about Ragsdale and interviewed her prior

to the trial. (R. 85, 86) Clark also admitted that he received the memos regarding

Ragsdale's inconsistent prior statements before he filed the first Rule 32 petition.

(R. 88) He admitted that he did not try to talk with Ragsdale after he got the

memos. (R. 88, 89) On re-direct, Clark denied that he saw the memo to the file

from John Perdue in regards to the interview with Craig Bailey, a criminologist at

the State Department of Forensic Sciences. (R. 94) Clark also denied that

Stallworth's name was available to him before the trial. (R. 94)

Simon Benson, an investigator with the Department of Public Safety,

interviewed Stallworth, whose residence was approximately 500 yards from where

26

Hart's body was found. (R. 112, 113) During the interview, Stallworth told Benson that people often parked in front of his house on the dirt road, drank beer, sat for a while, and then left. Stallworth indicated that he saw nothing in particular on the night of February 28 or March 1, 1985. (R. 114) Stallworth did not mention anything about two white males being out in the area near his house during the rainy night of February 28 through March 1. (R. 114)

William Rhegness testified that he took a tape recorded interview of Mr. Stallworth in 1994. (R. 123, 124) The tape was later transcribed, and a copy of the transcript was introduced into evidence. (R. 124, 125) It was designated State's Exhibit A. (R. 125)

On January 28, 2005, Circuit Judge H. Edward McFerrin denied relief on the petition. (C. 489) Judge McFerrin concluded that the petition and the amendments should be dismissed because they were filed outside the period of limitation contained in Rule 32.2(c) of the Alabama Rules of Criminal Procedure. (C. 506)

The Court of Criminal Appeals affirmed the denial of the petition. Gibson v. State, CR-04-1192 (Ala. Crim. App. Jan. 27, 2006) The petition for rehearing was denied on February 24, 2006, and the petition for certiorari filed in the Supreme Court of Alabama was denied on June 9, 2006.

## ISSUES RAISED IN THE FEDERAL HABEAS PETITION

I.  In Re:  Suppression of Exculpatory Evidence

   A. Petitioner is not procedurally barred from asserting that the prosecution suppressed exculpatory evidence.

   B. The prosecution suppressed evidence favorable to Petitioner in violation of Petitioner's right to due process of law under the Fifth and Fourteenth Amendments.

II.  Gibson was deprived of due process of law under the Fifth and Fourteenth Amendments when the state court trial judge stated as a matter of fact, in the presence of the jury, that he had reviewed prior statements and grand jury testimony, which were not in evidence, of two crucial prosecution witnesses, and found no inconsistencies with their trial testimony.

III.  Gibson was deprived of due process of law under the Fifth and Fourteenth Amendments when the prosecution and the trial court refused to disclose prior grand jury testimony of two crucial prosecution witnesses which was materially inconsistent with their trial testimony.

IV.  Gibson was deprived of due process of law under the Fifth and Fourteenth Amendments when the prosecutor asserted, as a matter of fact, in the presence of the jury, that he had "Framed" a man in a drug case and paid $20,000 in settlement of a resulting lawsuit.

V.  Gibson was deprived of due process of law under the Fifth and Fourteenth Amendments when he was convicted using testimony that has been recanted.

VI.  Gibson was deprived of due process of law under the Fifth and Fourteenth Amendments when the State refused to conduct DNA testing on evidence found on the victim at the scene of the crime.

28

## CLAIMS RAISED ON DIRECT APPEAL

I.     Did the trial court err by stating in the presence of the jury that it had reviewed prior testimony and statements of prosecution witness Charles Costner and that there were not statements inconsistent with his trial testimony contained therein?

II.    Did the trial court err, and did the prosecutors suppress exculpatory evidence, by refusing to furnish the defendant with prior statements and grand jury testimony of prosecution witnesses Rose Pogue and Charles Costner, which statements and testimony contained statements by the witnesses which were materially inconsistent with their trial testimony?

III.    Did the trial court err in allowing a law enforcement officer to testify to an incriminating oral statement made by the defendant, when the evidence established that the substance of the statement was never disclosed to the defense prior to the officer's trial testimony?

IV.    Did the trial court err in denying defendant's motion for a new trial based on nondisclosure of certain grand jury testimony of prosecution witness Charles Costner, when a showing had been made of probable inconsistency between said grand jury testimony and the witness' trial testimony?

V.    Did the prosecutor commit reversible error by asserting as a fact that the defendant had been civilly sued and "paid over $20,000.00 for framing a man on a drug sale"?

VI.    Did the prosecutor commit reversible error by asserting a defense witness had made material prior inconsistent statements, which the witness denied having made, and never proving the statements were made?

VII.    Did the trial court err by denying the defendant's motions of judgment of acquittal?

29

## CLAIMS RAISED ON APPEAL OF FIRST
## RULE 20 (NOW RULE 32) PETITION

I.    Did Appellant establish, by a preponderance of the evidence that he is entitled to a new trial due to the suppression by the State of exculpatory evidence?

    A.    Did the prosecution suppress the evidence?

    B.    Was the suppressed evidence favorable for the defense?

    C.    Was the suppressed evidence material?

## CLAIMS RAISED ON APPEAL OF SECOND
## RULE 20(NOW RULE 32) PETITION

I.    IN RE:  SUCCESSIVE PETITIONS

    1.  Is a petition under Rule 20, Ala.Temp.R.Crim.P., "successive" where a previous petition was dismissed for being premature?

II.   IN RE:  PRECLUSION OF REMEDY FOR FAILURE TO PREVIOUSLY RAISE THE ISSUE

    1.  Could the ground of Appellant's petition have been raised at trial or on direct appeal?

    2.  Where the existence of the Alabama Bureau of Investigation memoranda in question was not known by Appellant, and the State did not produce the memoranda in response to specific discovery requests for exculpatory evidence, was the existence of the memoranda reasonable ascertainable by Appellant at trial?

30

III.    <u>IN RE:  THE MERITS</u>

1. Did Appellant establish, by a preponderance of the evidence, that he is entitled to a new trial due to the suppression by the State of exculpatory evidence?

2. Did the prosecution suppress the memoranda in question?

3. Were the suppressed memoranda favorable to the defense?

4. Were the suppressed memoranda material?

## CLAIMS RAISED ON APPEAL OF THIRD RULE 32 PETITION

1.    The Constitution of the United States or of the State of Alabama requires a new trial or other relief

a. Because the conviction was obtained by the unconstitutional failure of the prosecution to disclose to the defense evidence favorable to the defendant.

2.    Newly discovered material facts exist which require that the conviction or sentence be vacated by the Court, because:

The facts relied upon were not known by appellant or appellant's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding, and could not have been discovered by any of those times through the exercise of reasonable diligence; and

The facts are not merely cumulative to other facts that were known; and

The facts do not merely amount to impeachment evidence; and

If the facts had been known at the time of trial or sentencing, the result would probably have been different; and

31

The facts establish that appellant is innocent of the crime for which he was convicted or should not have received the sentence that he did.

These newly discovered facts are:

A.   Ms. Dottie Ragsdale's statement to the ABI that she saw Dana Hart alive on March 1, 1985 that was withheld in discovery by Assistant Attorney General Don Valeska.

B.   Statements by Mr. Bernard Stallworth to the ABI indicating that he saw suspicious activity in the area where Dana Hart's body was found on March 1st or 2nd at a time when Gibson has a solid alibi.

C.   The prosecution made a deal with witnesses to testify against appellant Grady Gibson in exchange for charges against them being dropped.

D.   The report of a forensic chemist which materially contradicted his trial testimony and indicated that the hair in Dana Hart's hand was not consistent with either defendant or the victim.

E.   Statements of Mr. Henry Skipper that on March 1, 1985 he passed directly past where Dana Hart's body was later found and did not see a body.

F.   Department of Public Safety memo indicating Sergeant John Perdue's belief of appellant's innocence based on Dana Hart being seen alive on March 1, 1985.

G.   Department of Public Safety memos indicating informants had heard a man named David, a woman named Jan, and a man named Tony Livingston make incriminating statement regarding Dana Hart's murder.

H.   State Narcotics Officer Richard R. Mobley recanted his testimony that Grady Gibson had confessed to him.

32

3.    The trial court erred in not ruling to provide DNA testing to the appellant.

## EXHAUSTION OF CLAIMS RAISED
## IN THE FEDERAL HABEAS PETITION

### (A)

### EXHAUSTED CLAIMS

Gibson raised his federal habeas claims the state courts. Except, as noted in specific arguments, his claims are exhausted for purposes of federal habeas review.

### THE PERIOD OF LIMITATIONS ON HABEAS CASES DOES NOT PRECLUDE REVIEW OF GIBSON'S CLAIMS.

Gibson's claims are timely raised because he filed the federal habeas petition before the expiration of the one-year limitation period.

In the Anti-Terrorism and Effective Death Penalty Act of April 24, 1996 (AEDPA), Congress amended Title 28 U.S.C. §2244 and instituted a one-year limitation period in which to bring a federal habeas corpus petition. The amendment states:

(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the

33

Constitution or laws of the United States is removed, if the applicant was prevented form filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Gibson's conviction became final on June 9, 2006, when the Supreme Court of Alabama denied his petition for writ certiorari. He filed his federal habeas on January 3, 2007, which is within the one-year period after AEDPA became effective. Consequently, Gibson's petition was timely filed.

## I.

## GIBSON IS NOT ENTITLED TO ANY RELIEF ON THE GROUND THAT THE PROSECUTORS SUPPRESSED EXCULPATORY EVIDENCE

### (A)

### This Claim Is Procedurally Barred From Review In Federal Habeas Because The State Court Denied Review Of It On Procedural Grounds.

Gibson alleges that the State suppressed exculpatory statements by failing to furnish him with a copy of a police memorandum that was prepared by an ABI

34

investigator after an interview of Dottie Ragsdale. This claim was also raised in his second Rule 20 (now Rule 32) petition. The Court of Criminal Appeals found the claim to be procedurally barred because it could have been raised at trial and on appeal. Gibson v. State, 580 So.2d 38, 41 (Ala. Crim. App. Nov 30, 1990). The claim was raised again in Gibson's third petition, but the Court of Criminal Appeals again found it to be procedurally barred from review. Gibson v. State, CR-04-1192 (Ala. Crim. App. Jan. 27, 2006) (Mem.op.).

A state court's rejection of a federal constitutional claim on procedural grounds will preclude federal review of the claim if the state court's procedural ruling rests upon an "independent and adequate" state ground. *See* Coleman v. Thompson, 501 U.S. 722, 729 (1991)("This Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."). *See also* Harris v. Reed, 489 U.S. 255, 260 (1989) ("This Court long has held that it will not consider an issue of federal law on direct review from a judgment of a state court if that judgment rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision"), quoting Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935). "[A] federal claimant's procedural default precludes federal habeas review, like direct review, only if the last state court rendering a judgment in the case rests its

judgment on the procedural default." <u>Harris</u>, at 262. "[If] it fairly appears that the state court rested its decision primarily on federal law," this Court may reach the federal question on review unless the state court's opinion contains a "'plain statement' that [its] decision rests upon adequate and independent state grounds." <u>Id</u>. at 261. "[T]he state court must actually have relied on the procedural bar as an independent basis for its disposition of the case." <u>Id</u>. at 261-262.

The state court clearly relied on Gibson's failure to comply with a state procedural rule as a basis for its refusal to review the merits of the claim. Consequently, this Court is bound to honor the state court's application of its procedural default rule.

**(B)**

**Even If This Court Found That The Claim Is Not Procedurally Barred, Gibson Is Not Entitled To Relief Because He Has Not Shown That The State Courts Failed To Properly Apply Federal Law As Determined By The Supreme Court Of The United States.**

Even though the Court of Criminal Appeals denied relief on the procedural grounds, it also indicated that Gibson would not be entitled to relief on the merits. <u>Gibson v. State</u>, **580** So.2d at 41. That court concluded that Gibson's attorneys knew about Ragsdale's statement and had talked to her prior to the trial. The court found that Gibson had subpoenaed her for trial, and that Gibson himself had furnished the ABI investigators with Ragsdale's name. Consequently, the court

concluded that Gibson knew, or had an opportunity, to discover the alleged

statement without any assistance from the prosecutors.

Gibson is not entitled to any federal habeas relief on this claim because he

has not shown that the state courts failed to properly apply the relevant federal law.

More specifically, he has not shown that the state court's ruling is contrary to

established federal law.

Title 28 U.S.C. S 2254(d), as amended by the AEDPA, states in pertinent

part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

AEDPA applies to Gibson's present petition even though his conviction

occurred before the date AEDPA became effective. It also applies even though

Gibson had filed a previous federal habeas petition before the effective date of

AEDPA, because Gibson dismissed that previous petition. The present federal

petition was filed after the effective date of AEDPA, thus it is subject to the limited

review available in federal habeas proceedings. <u>Sanchez v. Gilmore</u>, 189 F.3d 619

(7th Cir. 1999) ("Sanchez maintains that his petition is not governed by the 1996

amendments to 28 U.S.C. § 2254, the Antiterrorism and Effective Death Penalty

Act (AEDPA), because he filed his first petition for relief in 1990. But we deal

here with his second petition filed in 1997, and that is the year which controls

whether AEDPA applies.  It applies; he cannot move the date to pre-AEDPA times

by relying on his old unexhausted petition.").  See also <u>Hull v. Kyler</u>, 190 F.3d 88

(3rd Cir. 1999) ("Hull's initial petition was dismissed without prejudice, and it is

only his present petition that is relevant for purposes of analyzing his

ineffectiveness claim. His present petition was filed almost a year after AEDPA's

enactment, and is therefore governed by the amended § 2254. See <u>In re Minarik</u>,

166 F.3d 591, 598 (3d Cir.1999) (interpreting <u>Lindh</u> as holding that the post-

AEDPA § 2254 applies to petitions filed after April 24, 1996); cf. <u>Matteo v.</u>

<u>Superintendent</u>, SCI Albion, 171 F.3d 877, 884-85 (3d Cir.1999) (en banc)

(applying post-AEDPA § 2254(d)(1) to a petition filed after AEDPA's enactment,

although the petitioner had filed a prior, dismissed petition before 1996), petition

for cert. filed, 68 U.S.L.W. 3008 (U.S. June 22, 1999)).

    Gibson's first petition should be treated as if it had never been filed. <u>Hull v.</u>

<u>Kyler</u>, Id. at 103-104 ("Typically, when a complaint (or habeas petition) is

dismissed without prejudice, that complaint or petition is treated as if it never

existed. See, e.g., Christy v. Horn, 115 F.3d 201, 208 (3d Cir.1997) (holding that a

habeas petition filed after a prior one was dismissed without prejudice is

considered the petitioner's first habeas petition)).  *See also*  In re Medina, 109 F.3d

1556, 1561-1562 (11th Cir. 1997) ( holding that the provisions of AEDPA applies

to second petition even though the first petition was filed before the effective date

of AEDPA.) Because Gibson's present petition was filed after the adoption of

AEDPA, it is subject to AEDPA's constraints.

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court discussed

the meaning of the "contrary to" and "unreasonable application" phrases contained

in the AEDPA. The Court stated:

> Under § 2254(d) (1), the writ may issue only if one of the
> following two conditions is satisfied--the state-court adjudication
> resulted in a decision that (1) "was contrary to ... clearly established
> Federal law, as determined by the Supreme Court of the United
> States," or (2) "involved an unreasonable application of ... clearly
> established Federal law, as determined by the Supreme Court of the
> United States."  Under the "contrary to"  clause, a federal habeas court
> may grant the writ if the state court arrives at a conclusion opposite to
> that reached by this Court on a question of law or if the state court
> decides a case differently than this Court has on a set of materially
> indistinguishable facts.  Under the "unreasonable application" clause,
> a federal habeas court may grant the writ if the state court identifies
> the correct governing legal principle from this Court's decisions but
> unreasonably applies that principle to the facts of the prisoner's case.

Id. at 412.

The Court further stated:

Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Id. at 407.

Gibson has not shown that the state court applied Brady v. Maryland, 373 U.S. 83 (1963) in a manner that was contrary to the Supreme Court's conclusion on this issue of law, and he has not shown that the state court unreasonably applied Brady to the facts of his case.

The record of the second Rule 32 reflects the following:

"Q.    Isn't it a fact that Grady Gibson provided the names of Dottie Ragsdale and David Ragsdale to the [Alabama] bureau [of Investigation]?

"A.    Yes, sir.

"Q.    To interview?

"A.    Yes, sir.

"Q.    And so that's how you [the investigators] first found out about the Ragsdales, was through the Defendant, Grady Gibson?

"A.    Yes, sir."  (Exhibit H, R-40)

And

"Q.    ..."You [Investigator Perdue] recall just having a conversation where you told them [Gibson and Hart] that Dottie Ragsdale said she had seen Dana?

40

"A.    Yes, sir.  <u>He [Gibson] wanted to know what we found out.  He was the one who told us to go see her.  He had already talked with her</u>...."  (Exhibit H, R-66)

And

"By Mr. Valeska:

"Q.    Now, [Investigator] John [Perdue], explain to the Court, please, sir, how ya'll came to find out about the Ragsdales?

"A.    From Grand Gibson and Eddie Hart.

"Q.    All right.

There was no information derived by [the Department of] Public Safety on their own excluding Hart and Gibson, was it?

"A.    No, sir.

"Q.    You got that from the two Defendants in this case?

"A.    Yes, sir...."  (Exhibit H, R-80)

This evidence is not contradicted anywhere in the record.  There is simply no factual basis for a claim that the State suppressed any relevant fact relating to Mrs. Ragsdale.

Gibson alleges that the State did not inform him about the memoranda.  In addition to the fact that the Gibson and his Attorney had to know of the existence of memoranda on any witness who was interviewed, Gibson's constitutional rights under <u>Brady</u> extended only to Mrs. Ragsdale and her evidence, not to the State's police and attorney work-product relating to the evidence.

41

The Court of Criminal Appeals's opinion contains the following testimony from the Rule 20 evidentiary hearing:

> "Mr. Clark (attorney for Gibson): Other than a showing to the Court as an officer of the Court that we did not receive this information till sometime after the trial and we were not aware of any of this information in the memos that have been offered. Now I'm telling the court that we did attempt to interview Mrs. Ragsdale and we did have the information with regard to Mrs. Ragsdale having seen Dana Hart sometime during that time frame.
>
> "The Court: All right, sir.
>
> "Mr. Clark: We had that information, but we did not have the memos that have been offered into evidence.
>
> "The Court: All right, sir. Is that all?
>
> "Mr. Williamson (attorney for Hart): That's basically it. We had knowledge there was a Dottie Ragsdale sometime in the time frame she had seen Dana Hart. But the time we got to her I talked to her two years after the event and a week or so before the trial, we didn't have the information contained in the memos or any access to that particular information. But we do know there was a Dottie Ragsdale. I did subpoena Dottie Ragsdale. She was here at trial. The reason we didn't put her on, she was at that time not clear as to when she said she saw Dana Hart."

Clearly, the Court of Criminal Appeals reasonably applied Brady to the facts of Gibson's case.

42

## II.

**GIBSON IS NOT ENTITLED TO RELIEF ON HIS CLAIM THAT HE WAS DEPRIVED OF DUE PROCESS WHEN THE TRIAL JUDGE STATED, IN PRESENCE OF THE JURY, THAT HE HAD REVIEWED THE PRIOR STATEMENTS AND GRAND JURY TESTIMONY OF TWO PROSECUTION WITNESSES AND FOUND NO INCONSISTENCIES WITH THEIR TRIAL TESTIMONY, BECAUSE THIS CLAIM WAS NOT RAISED AS A DUE PROCESS CLAIM IN STATE COURT AND GIBSON HAS FAILED TO SHOW THAT THE RULING WAS INCONSISTENT WITH ANY RULING BY THE SUPREME COURT ON THIS ISSUE.**

During the trial, Gibson's defense counsel wanted to impeach the State's witness, Charles Costner, with his previous grand jury testimony. Defense counsel asked the trial judge to have the grand jury testimony provided to him. The trial judge denied the request in the presence of the jury. Gibson raised this as a claim on direct appeal.

The Court of Criminal Appeals's opinion quotes the portion of the trial transcript that contains the trial judge's statement:

"THE COURT: You can't have them until you, until the Court has reviewed them to see whether there's any inconsistent statements.

"MR. CLARK: Yes, sir.

"THE COURT: I have reviewed them. There is no inconsistent statements at this point.

"These statements clearly show that he did talk to them and that he did mention insurance to them."

No objection was made by defense counsel, and cross-examination of Costner continued. Moments later, defense counsel again requested

43

that the grand jury testimony be produced, to which the trial judge
stated:

"MR. CLARK:  Judge, we would ask that, that Your Honor give us
the statements and the Grand Juries', both Grand Juries' testimony
with regard to inconsistencies.

"THE COURT:  I have checked them here. I don't find any
inconsistency."

Again, no objection was made, and cross-examination continued. The
trial judge subsequently determined that it was necessary that he
confer with the attorneys in chambers. The availability of Costner's
grand jury testimony was once again the topic of conversation. The
trial judge repeated his earlier ruling that, as there were no
inconsistencies between Costner's grand jury testimony and his
current trial testimony, defense counsel was not entitled to use the
grand jury testimony for impeachment purposes. Thereupon, defense
counsel moved for a mistrial, stating that the trial court's rulings on his
request, which were made in the presence of the jury, constituted an
impermissible comment on the evidence. The motion was denied,
concluding the conference; the parties returned to the courtroom and
cross-examination of Costner continued.

Gibson v. State, 555 So.2d 784, 793 (Ala. Crim. App. 1989).

## (A)

**This Claim Cannot Be Considered Exhausted For Federal Habeas Review
Because It Was Not Raised And Adequately Argued As A Federal
Constitutional Claim In State Court On Direct Appeal.**

When Gibson raised this claim on direct appeal, he raised it as a state law

claim. He did not allege on appeal that the trial judge's comments violated his

federal constitutional right to due process. Consequently, he is precluded from

presenting this claim as a federal constitutional due process claim in his federal habeas petition.

A claim has not been exhausted unless it was presented as a federal constitutional claim during the state court proceedings. Under that standard, this claim was not properly exhausted because it was presented as a state law issue in the brief on appeal, and decided on the basis of state law by the Court of Criminal Appeals. Because this claim was not presented to the state court as a violation of any specific federal constitutional right, Gibson's constitutional claim is not proper for review in this petition.

"[E]xhaustion of state remedies requires that petitioners "fairly presen[t]" federal claims to the state courts in order to give the State the " 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights" (some internal quotation marks omitted). If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court." Duncan v. Henry, 513 U.S. 364, 365 (1995), citing Picard v. Connor, 404 U.S. 270, 275, (1971).

Because Gibson did not raise this claim as a federal constitutional claim in state court, this federal due process claim was not exhausted in state court and it must be considered procedurally defaulted because it cannot now be raised in any state court collateral petition. Any attempt to raise the claim would be barred by Rule 32.2 (a) (5) of the <u>Alabama Rules of Criminal Procedure</u>, which precludes from review claims that could have been reviewed on direct appeal, and Rules 32.2 (b) and(c) which, respectively, preclude the filing a successive petition and filing a petition more than one year after conviction has become final.

## (B)

**Even If This Court Found That The Claim Is Not Procedurally Barred, Gibson Is Not Entitled To Relief Because He Has Not Shown That The State Courts Failed To Properly Apply Federal Law As Determined By The Supreme Court Of The United States.**

Gibson's failed to present a specific precedent from the Supreme Court that holds that the trial court's comments in the presence of the jury violated his due process rights. In the absence of any specific federal constitutional decision that establishes the trial judge's action denied him due process, Gibson cannot establish that the state court's decision was contrary to existing federal law as determined by the Supreme Court, or that the state court unreasonably applied federal law as determined by the Supreme Court. The Eleventh Circuit Court of Appeals has recognized that a state court ruling cannot be contrary to a Supreme Court

46

precedent if the Supreme Court has not ruled on that question of law. "In applying the 'contrary to' prong of § 2254(d), we have recognized that where no Supreme Court precedent is on point, we cannot say that the state court's conclusion ... is contrary to clearly established Federal law as determined by the U.S. Supreme Court." Isaacs v. Head, 300 F.3d 1232, 1252 (11th Cir. 2002), citing McIntyre v. Williams, 216 F.3d 1254, 1258 (11th Cir.2000). In Isaacs, the Eleventh Circuit found the state court's decision was not contrary to existing federal law because there was no Supreme Court opinion addressing the specific question of law presented in that case. "Isaacs has pointed to no Supreme Court precedent which has held that the giving of a prayer at trial is a per se violation of the constitution, and we have found none. Thus, we hold that the Georgia Supreme Court's decision was not contrary to clearly established federal law as determined by the Supreme Court." Id. at 1252.

Gibson has presented no existing federal precedent to establish that the trial court's statement in the presence of the jury constituted a denial of due process. Gibson cites United States v. Fischer, 531 F.2d 783 (5th Cir. 1976) and United States v. Cisneros, 491 F.2d 1068 (5th Cir. 1974), which in turn relies on Quercia v. U.S., 289 U.S. 466 (1933). Quercia, however, provides no legal basis to support Gibson's claim because it involved a trial judge's comment on the evidence during instructions to the jury. The trial judge in Gibson's case did not comment on the

47

evidence; he merely stated to defense counsel that he could not provide the grand jury testimony to him because the grand jury testimony was not inconsistent with the testimony the state witnesses gave at trial. As the Court of Criminal Appeals correctly noted, the judge's statement was merely an explanation of his rulings. Consequently, the claim Gibson raised on appeal presented only a state law question. This Court cannot reach the question of whether the trial judge's statement was error because state law questions are not reviewable in federal habeas corpus. "[A] state's interpretation of its own laws provides no basis for federal habeas relief since no question of a constitutional nature is involved. "[A] state's interpretation of its own laws provides no basis for federal habeas relief since no question of a constitutional nature is involved." Garcia v. Perringer, 878 F.2d 360, 362 (11th Cir. 1989), citing Beverly v. Jones, 854 F.2d 412, 416 (11th Cir.1988); Carrizales v. Wainwright, 699 F.2d 1053, 1054-55 (11th Cir.1983).

**III.**

**GIBSON WAS NOT DEPRIVED OF DUE PROCESS WHEN THE TRIAL JUDGE REFUSED TO DISCLOSE PRIOR GRAND JURY TESTIMONY OF STATE WITNESSES ROSE POGUE AND CHARLES COSTNER, BECAUSE THE TRIAL JUDGE REVIEWED THE TRANSCRIPTS OF THE GRAND JURY TESTIMONY AND CONCLUDED THAT THE TESTIMONY WAS NOT INCONSISTENT WITH THE TRIAL TESTIMONY.**

Gibson contends that Pogue and Costner gave testimony during the grand proceeding that was inconsistent with the testimony they gave at trial. Gibson contends that the grand jury testimony should have been available to them for use in impeaching the trial testimony given by the two witnesses.

**Gibson's claims of conflicts in the testimony are set forth below.**

"....W.'...[two legal pages of language on a variety of subjects omitted]  Costner stated that around Christmas of 1984 Eddie Hart and Grady Gibson were at the truck stop.  Costner said Eddie and Dana had apparently been fussing and Eddie was griping about how hard she was to get along with.  Someone told Eddie that he ought to call Dana and he wasn't going to.  Sometime during the conversation Rose Pogue made a comment about getting health insurance from an agent named Steve Hester.  Eddie blurted out Grady is going to buy an insurance policy on Dana.  Grady Gibson said <u>Yeah, Eddie says that if we're gonna knock her off we'd better get some insurance</u>.  Costner states that everybody laughed and they forgot about the conversation until much later.  Costner stated that no one has ever told him who was responsible for the murder of Dana Hart.  Costner agreed to testify to the above facts.

After hearing the reading of the indictment, I mean, the statement, is there anything that is in that statement that is

incorrect, not true or not factual which should be amended or altered at this time?

"A.    Well, I'm under indictment for which we know we're innocent, but that's, you know, that's facts the way it's printed there.

"Q.    But I believe he says Costner is facing charges for alleged issuance of worthless checks.

"A.    Right, right.  Right.

"Q.    Okay.

"A.    But the conversations and the facts are there as were in basic told to me, which is mostly hearsay but, you know, Grady bragged that Perdue and Williams were not smart enough to catch him doing anything, you know, it'd be a cold day in --

"Q.    Let's talk about those conversations for a moment.

"A.    Okay...."


**Gibson claims a conflict with Costner's trial testimony, wherein he stated**:

"By Mr. Wasden [the Prosecutor]:

"Q.    I will rephrase the question.

        Did you hear Rose make a statement concerning insurance?

"A.    [Costner] Just --

"Q.    Did you?

"A.    Yes, sir.

"Q.    Did from -- did the Defendant, Hart, make a statement concerning insurance?

"A.    Yes, sir.

"Q.    What did Defendant Hart say?

"A.    That Grady was going to buy some insurance on Dana.

"Q.    Who was Dana at that time?

"A.    At that time I didn't know who she was until I went to the funeral.

"Q.    Let's go to the time that the Defendant Eddie Hart made the statement.

"Did the Defendant, Grady Gibson, make any statement in response?

"A.    Yes, sir.

"Q.    What did he say, please, sir?

"A.    He had said that if he was going to knock her off they had better go ahead and buy an insurance policy on her so it wouldn't look funny.

"Q.    Did you take it as a joke at that time?

"A.    I didn't pay any attention to it at that time.

"Q.    Okay...." (R- 1655-1656; emphasis supplied)

Obviously, there is no substantive difference between the two passages. Gibson alleges that Costner did not say, "...So it wouldn't look funny...." in the grand jury. However, in neither instance did Costner claim to be quoting Gibson verbatim. The grand jury testimony was based on a memorandum produced by an

51

investigator stating in the third person what Costner had told him. It was, as

Costner stated in the grand jury, '….Mostly hearsay." (CR- 428) In his trial

testimony, Costner's description of what Gibson said begins with: "He has said

that…." On the other hand, Costner's grand jury testimony does not deny the "so

it wouldn't look funny" language. Indeed, such was Gibson's obvious meaning,

whether intended in earnest or jest and whether he actually articulated it or not.

What is so incriminating about this incident is, not the precise words which were

said but the psychology of Gibson's response. When Hart mentioned "insurance,"

apparently referring to health insurance according to the grand jury testimony,

Gibson immediately moved in with a "jest" about life insurance and killing Dana

Hart. This is the substance of this evidence and there is no conflict, let alone

contradiction, on this substance.

**As to witness Rose Pogue:**

1. In the Montgomery County Grand Jury, Mr. Pogue testified that on the

March 1, 1985, shopping trip, the occasion when Gibson stated he was coming into

some money soon, they went for one specific purpose (CR- 392); at trial she stated

that she bought two pairs of shoes (R- 1483-1484). Gibson claims that if he had

had the grand jury transcript, he could have impeached Pogue on this point. This,

however, would have constituted an attempt to present impeachment on an

immaterial point, and such impeachment is not allowed.  C. Gamble, McElroy's Alabama Evidence, § 156.01, especially §§ 156.01(4) and (5).

2.  There is no conflict at all between Pogue's grand jury testimony that she loaned Gibson $200.00 (CR- 393) and her trial testimony that she loaned Gibson $200.00 and "...never expected it back...." (R- 1572)

3.  In the grand jury and at trial, Ms. Pogue testified to an inquiry or inquiries by Gibson about a secret witness.  (CR- 399-400 an R- 1495-1496)  In the grand jury, Ms. Pogue indicated that this happened in Nashville, Tennessee, shortly after she moved there from Baldwin County, Alabama; in her trial testimony, she indicated that he happened in Baldwin County shortly before she moved.  There may have been two instances, one in each place, but even if there was only one, whether it happened in Baldwin County or Nashville, is another example of an immaterial point, on which a witness may not be impeached.  The substance of the testimony on both occasions is the same:  Gibson traveled a considerable distance to inquire about a secret witness.

4.  In the Montgomery County Grand Jury, Ms. Pogue testified:

"Q.    Next paragraph.  Grady has told Rose on <u>several occasions</u> that he did not kill Dana and has no reason to kill her.  Why were y'all talking on <u>several occasions</u> as to whether or not he had killed her, Rose?

"A.    Because I asked him...."  (CR- 395; emphasis supplied)

At trial, Ms. Pogue testified about a trip she, Pat Costner, and Gibson took from Prattville, Alabama, to Nashville, Tennessee. Her testimony reads:

"Q.    [By the Prosecutor] Okay, how long does it take to drive from Prattville to Nashville?

"A.    About five hours.

"Q.    Okay.

         Did the Defendant Grady Gibson during that drive, did he talk any at all?

"A.    Yes.

"Q.    Okay. Did he discuss the investigation into the murder of Dana Hart that had been going on?

"A.    We talked about it some.

"Q.    What did the Defendant, Grady Gibson, tell you with regard to the investigation into the murder of Dana Hart, as best you can recall?

"A.    Uh, I can't recall.

"Q.    Well, let me --

"A.    Exactly.

"Q.    Let me ask you with regard to the -- he did discuss it, is that correct?

"A.    Yes.

"Q.    Okay.

         Did you ever ask him about his involvement?....

54

[Objection, argument and ruling omitted]

"By Mr. Wasden:

"Q.    Did you ask him about his involvement in the murder of Dana Hart if any?

"A.    No.

"Q.    Okay.

    "But the matter was discussed?

"A.    Yes.

"Q.    Okay

    "Was Par in the car?

"A.    Yes.

"Q.    Okay.

    "When you got to Nashville, when you got to Nashville, what did the Defendant, Gibson, do?  Did he stay there?

"A.    Yes.

"Q.    How long did he stay there?

"A.    Overnight…."  (R- 1507-1508)

Obviously, this trip from Prattville to Nashville was not one of the "several occasions" to which Ms. Pogue testified in the Montgomery County grand jury.

5. & 6.  Ms. Pogue was asked about several matters at trial, abut which she was not questioned in the grand jury.  The conflict here is between the questions

asked, not the answers given.  Obviously, a witness cannot be impeached for failing to answer questions that were never asked,

7.  In her Montgomery County Grand Jury testimony, Ms. Pogue was not asked about Gibson's statement, during the March 1, 1985, shopping trip, about going into business with Mr. Costner with money he expected soon, and, of course, she did not testify to it.  (CR- p. 302)  She was, however, asked about instances at a later point of time, when Gibson indicated an interest in going into business with Costner, and testified to those.  (CR- 392-393)  At trial she was asked about the former and testified to it (R- 1481-1482), but not about the latter.  Here again, the conflict is not in the witness' answers, but in the interrogators' questions.  Ms. Pogue was not subject to being impeached for failing to give testimony for which she was not asked.

8.  In the Montgomery County Grand Jury Ms. Pogue testified:

"Q.    Did he brag a lot to you about his illegal criminal activity?

"A.    He bragged a lot period, you know.  I'm not gonna say he did or he -- he bragged a lot about a lot of things.

"Q.    Third paragraph, page one of the memorandum, returning to the memorandum.  On March 1st, '85, at approximately 8:00 A.M. Pogue said that he saw Grady Gibson and Eddie Hart at the restaurant at the Parkway Truck Stop.  Pogue recalled Grady acting very nervous and depressed and seemed to have a lot on his mind.  Tell, tell us what made you think that.  What did he do to make you think that?

"A.    Well, when he, we first walked in he was sitting in the restaurant, and I walked over and his clothes were dirty, he hadn't changed, they were all wrinkled, he looked like he hadn't slept all night. And he just acted like he had a lot on his mind, you know.

"Q.    It says he went shopping with you that afternoon.

"A.    Uh-huh...." (CR- 392)

At trial, she testified:

"Q.    [By the Prosecutor]....

"Okay. Going back to the morning, morning of March 1st, can you describe the appearance of Grady Gibson?

"A.    Tired looking. Clothes were dirty. He said he hadn't slept all night...." (R- 1488)

There is no conflict between these passages. Gibson said he had not slept and looked like he had not slept.

Gibson's alleged conflicts contain no contradictions. The two possible conflicts which can be identified are on matters so immaterial that they could not have been used for impeachment. Since these possible conflicts could not have been introduced in evidence, they obviously could not have affected the outcome and would not be grounds for relief. United States v. Agurs, 427 U.S. 97, 112-113 (1976); United States v. Bagley, 474 U.S. 667, 684 (1985). Gibson has shown no relevant contradictions.

57

The Court of Criminal Appeals reviewed the alleged conflicts in the evidence and found that the trial court reviewed the grand jury testimony and properly addressed the availability of the testimony for impeachment of the prosecution witnesses under the procedure set out on Millican V. State, 423 So. 2d 268 (Ala. Crim. App. 1982).  The Court of Criminal Appeals held that its own review of the testimony found that there were no relevant material inconsistencies in the testimony. It also found that the grand jury testimony contained no exculpatory evidence that would have affected the outcome of the trial as required under Brady v. Maryland. See Gibson v. State, 555 So.2d at 792.

Gibson has not shown that the state court applied Brady in a manner that was contrary to the Supreme Court's conclusion on this issue of law, and he has not shown that the state court unreasonably applied Brady to the facts of his case. Consequently, he is not entitled to any relief on this claim.  Williams v. Taylor, 529 U.S. at 407, 412.

IV.

**GIBSON IS NOT ENTITLED TO RELIEF ON A CLAIM THAT THE PROSECUTOR STATED IN THE PRESENCE OF THE JURY THAT GIBSON HAD "FRAMED" A MAN AND PAID $20,000 IN A SETTLEMENT OF A RESULTING LAWSUIT BECAUSE THE STATE COURT DENIED RELIEF ON STATE PROCEDURAL GROUNDS, AND THE CLAIM WAS NOT RAISED AS A FEDERAL CONSTITUTIONAL CLAIM IN STATE COURT.**

(A)

**This Claim Cannot Be Considered Exhausted For Federal Habeas Review Because It Was Not Raised And Adequately Argued As A Federal Constitutional Claim In State Court On Direct Appeal.**

When Gibson raised this claim on direct appeal, he raised it as a state law claim. He did not allege on appeal that he was deprived of his federal constitutional right to due process. Consequently, he is precluded from presenting this claim as a federal constitutional due process claim in his federal habeas petition.

"If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court." Duncan v. Henry, 513 U.S. 364, 365 (1995), citing Picard v. Connor, 404 U.S. 270, 275, (1971).

Because Gibson did not raise this claim as a federal constitutional claim in state court, this federal due process claim was not exhausted in state court and it must be considered procedurally defaulted because it cannot now be raised in any state court collateral petition. Any attempt to raise the claim would be barred by Rule 32.2 (a) (5) of the <u>Alabama Rules of Criminal Procedure</u>, which precludes from review claims that could have been reviewed on direct appeal, and Rules 32.2 (b) and(c) which, respectively, preclude the filing a successive petition and filing a petition more than one year after conviction has become final.

(B)

**Even If The Claim Is Exhausted, It Was Waived In State Court Because The Defense Counsel Withdrew The Objection And Later Failed To Make A Motion To Exclude The Evidence.**

During cross-examination of Gibson the following occurred:

"Q.    Now, you know about lawsuits, don't you, Mr. Gibson?

"A.    I'm vaguely familiar with lawsuits, yes, sir.

"Q.    And the lawsuit where you and Randy Mobley got sued, Randy Mobley didn't have to pay no money to anybody, did he?

"A.    I, I don't know.

"Q.    But you did, didn't you?

"A.    I don't know if I had to or not. I ended up doing it.

"Q.    You paid over $20,000.00 for framing a man on a drug sale, didn't you?

60

"MR. CLARK:  Judge, now, I'm going to object to that. If he wants to introduce the pro tanto settlement with the State of Alabama, if he will introduce the pro tanto settlement that got Mobley out of that then I will withdraw my objection. I want the statement, if he's going to do it, I want the pro tanto statement of how much the State of Alabama paid. I want to put it in, Judge, if he's going into it.

"MR. VALESKA:  Can I finish?

"I don't care. He can introduce whatever he wants to.

"MR. CLARK:  They've got it. I mean it's a public record if he's going into it I want what they paid.

"MR. VALESKA:  I just told him he can introduce whatever he wants.

"MR. CLARK:  No, Judge, I want him to give it to me. They've got it. They know what it was.

"THE COURT:  Furnish it to him, Mr. Valeska, if you have it.

"MR. VALESKA:  Pardon?

"THE COURT:  Furnish it to him if you've got it.

"MR. VALESKA:  I don't have it, Judge, but I will get it for him.

"THE COURT:  All right.

"MR. VALESKA:  It's cross-examination. I will get it for him."

Gibson v. State, 555 So. 2d at 793-794.

The Court of Criminal Appeals held that Gibson obtained a favorable ruling when he made the objection and the trial court ordered the prosecutor to produce a

61

copy of the settlement offer. The prosecutor promised to obtain a copy and give it to Gibson. The court also found that Gibson failed to make a motion to exclude the evidence when the prosecutor failed to produce the copy. Gibson v. State, 555 So.2d at 794.

Under state procedural law, a defendant who obtains a favorable ruling on his objection at trial has no error to raise on appeal. "To preserve an issue for appellate review, the issue must be timely raised and specifically presented to the trial court and an adverse ruling obtained." Mitchell v. State, 913 So. 2d 501, 505 (Ala. Crim. App. 2005). "Where an accused receives a favorable ruling to his objection by the trial court, nothing is preserved for review because an adverse ruling is a preliminary requirement to preservation of error and appellate review; absent an adverse ruling the issue of the objection is not properly before this court." Streeter v. State, 406 So. 2d 1024, 1028 (Ala. Crim. App. 1981). When Gibson withdrew his objection, there was no objection on which the trial court could enter an adverse ruling. See Shute v. State, 469 So. 2d 670, 673 (Ala. Crim .App. 1984)(where counsel stipulated to qualifications of the expert witness, but later withdrew the stipulation without objecting to the expert's testimony, there was no adverse ruling to review on appeal). Consequently, under state procedural rules, Gibson waived any such claim in the trial court, he presented no issue to be

reviewed on appeal, and this claim is considered waived for purposes for federal habeas review.

A state court's rejection of a federal constitutional claim on procedural grounds will preclude federal review if the state procedural ruling rests upon an "independent and adequate" state ground. *See* Coleman v. Thompson, 501 U.S. 722, 729 (1991). *See also* Harris v. Reed, 489 U.S. 255, 260 (1989). This claim is precluded from habeas review because the Alabama Court of Criminal Appeals's ruling that Gibson received a favorable ruling on his objection and did not make a motion to exclude the evidence when he did not get the copy from the prosecutor. The court thus denied this claim on an adequate and independent state ground.

## V.

## GIBSON'S CLAIM THAT HE WAS DEPRIVED OF DUE PROCESS OF LAW WHEN HE WAS CONVICTED USING TESTIMONY THAT HAS BEEN RECANTED IS NOT PROPER FOR HABEAS CORPUS REVIEW BECAUSE IT WAS FOUND TO BE PROCEDURALLY BARRED IN STATE COURT.

Gibson's claim regarding an affidavit in which Richard Mobley alleged that he gave untruthful testimony at trial was raised in his third petition. The trial court found the claim to be barred by the limitation period contained in Rule 32.2 (c) of the Alabama Rules of Criminal Procedure. The relevant portion of the trial court's order states:

### `The Mobley Affidavit

Finally, to any extent petitioners intended to base a post-conviction claim on the affidavit of Richard Mobley, the claim is rejected.  There is, in fact, no issue relevant to the affidavit pending before the court, i.e., there is no such claim in the original petition or any of the amendments.  Even assuming otherwise, moreover, like all of the issues raised by petitioners, any claim based on the Mobley affidavit is barred by the statute of limitation."

(Exhibit #M, C-489-506)

The Court of Criminal Appeals affirmed the denial of the claim on the ground that it was barred by the limitations period. Gibson v. State, CR-04-1192 (Ala. Crim. App. Jan. 27, 2006)

A state court's rejection of a federal constitutional claim on procedural grounds will preclude federal review if the state procedural ruling rests upon an "independent and adequate" state ground. See Coleman v. Thompson, 501 U.S. 722, 729 (1991). See also Harris v. Reed, 489 U.S. 255, 260 (1989). This claim is precluded from habeas review because the Alabama Court of Criminal Appeals's ruling that the period of limitations precluded review of this claim. The court thus denied this claim on an adequate and independent state ground.

## VI.

**GIBSON'S CLAIM THAT HE WAS DEPRIVED OF DUE PROCESS OF LAW BECAUSE THE STATE REFUSED TO CONDUCT DNA TESTING ON EVIDENCE FOUND ON THE VICTIM AT THE SCENE OF THE CRIME IS NOT PROPER FOR HABEAS CORPUS REVIEW BECAUSE IT WAS FOUND TO BE PROCEDURALLY BARRED IN STATE COURT AND IT WAS NOT RAISED AS A FEDERAL CONSTITUTIONAL CLAIM IN STATE COURT.**

### (A)

**This Claim Cannot Be Considered Exhausted For Federal Habeas Review Because It Was Not Raised And Adequately Argued As A Federal Constitutional Claim In State Court.**

When Gibson raised this claim on appeal of the denial of the petition, he raised it as a state law claim. He did not allege on appeal that he was deprived of his federal constitutional right to due process. Consequently, he is precluded from presenting this claim as a federal constitutional due process claim in his federal habeas petition.

A claim has not been exhausted unless it was presented as a federal constitutional claim during the state court proceedings. Under that standard, this claim was not properly exhausted because it was presented as a state law issue in the brief on appeal, and decided on the basis of state law by the Court of Criminal Appeals. Because this claim was not presented to the state court as a violation of any specific federal constitutional right, Gibson's constitutional claim is not proper for review in this petition.

65

"[E]xhaustion of state remedies requires that petitioners "fairly presen[t]" federal claims to the state courts in order to give the State the " 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights" (some internal quotation marks omitted). If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court." Duncan v. Henry, 513 U.S. 364, 365 (1995), citing Picard v. Connor, 404 U.S. 270, 275, (1971).

This claim was decided on the basis of state law; therefore, Gibson would not be entitled to review even if the claim is exhausted because a state court ruling on an issue of state law is not reviewable in federal habeas. "[A] state's interpretation of its own laws provides no basis for federal habeas relief since no question of a constitutional nature is involved." Garcia v. Perringer, 878 F.2d 360, 362 (11th Cir. 1989), citing Beverly v. Jones, 854 F.2d 412, 416 (11th Cir.1988); Carrizales v. Wainwright, 699 F.2d 1053, 1054-55 (11th Cir.1983).

Because Gibson did not raise this claim as a federal constitutional claim in state court, this federal due process claim was not exhausted in state court and it must be considered procedurally defaulted because it cannot now be raised in any

66

state court collateral petition. Any attempt to raise the claim would be barred by Rule 32.2 (a) (5) of the Alabama Rules of Criminal Procedure, which precludes from review claims that could have been reviewed on direct appeal, and Rules 32.2 (b) and(c) which, respectively, preclude the filing a successive petition and filing a petition more than one year after conviction has become final.

### (B)

### Procedural Default

When this claim was raised in Gibson's third petition, the Court of Criminal Appeals held that it was procedurally barred because it was filed after the expiration of the two-year period of limitation applicable to his case under Rule 32 of the Alabama Rules of Criminal Procedure. Gibson v. State, CR-04-1192 (Ala. Crim. App. Jan. 27, 2006). Consequently, this claim is now barred from review in federal habeas corpus.

A state court's rejection of a federal constitutional claim on procedural grounds will preclude federal review if the state procedural ruling rests upon an "independent and adequate" state ground. *See* Coleman v. Thompson, 501 U.S. 722, 729 (1991). *See also* Harris v. Reed, 489 U.S. 255, 260 (1989). This claim is precluded from habeas review because the Alabama Court of Criminal Appeals's ruling that the period of limitations precluded review of this claim. The court thus denied this claim on an adequate and independent state ground.

## CONCLUSION

Gibson is not entitled to relief on his claims in this federal habeas petition and the petition should be denied.

## EXHIBITS[7]

1)  Trial Transcript, Exhibit A;

2)  Gibson's brief on direct appeal, Exhibit B;

3)  State's brief on direct appeal, Exhibit C;

4)  Gibson's reply brief on direct appeal, Exhibit D;

5)  First Rule 20 Trial Transcript, Exhibit E;

6)  Gibson's brief on appeal, Exhibit F;

7)  State's brief on appeal, Exhibit G;

8)  Second Rule 20 Trial Transcript, Exhibit H;

9)  Gibson's brief on appeal, Exhibit I;

10)  State's brief on appeal, Exhibit J;

11)  Gibson's reply brief on appeal, Exhibit K;

12)  Memorandum opinion, Exhibit L;

13)  Gibson's Third Petition (Rule 32 petition), Exhibit M;

---

[7] Due to the voluminous nature of the exhibits, they will be filed under separate cover.

14)     Gibson's brief on appeal, Exhibit N;

15)     State's brief on appeal, Exhibit O;

16)     Memorandum opinion, Exhibit P;

17)     Certificate of Judgment, Exhibit Q

Respectfully submitted,

Troy King – KIN047
*Attorney General*
State of Alabama

_____
James B. Prude (PRU005)
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify on this 12th day of March, 2007, I served a copy of the foregoing on the attorney for Gibson (excluding exhibits), by placing the same in the United States Mail, first class, postage prepaid and addressed as follows:

> The Honorable Jenny R. Ryan
> 2600 7th St.
> Tuscaloosa, Al 35401

> James B. Prude
> Assistant Attorney General

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama 36130-0152
(334) 242-7300
243163/104112-001

70