IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

GRADY GIBSON,                    )
                                 )
        Petitioner,              )
                                 )
v .                              )    CIVIL ACTION NO.
                                 )    2:07cv009-MHT
RALPH HOOKS, Warden, and         )        (WO)
TROY KING, Attorney              )
of the State of Alabama,         )
                                 )
        Respondents.             )

OPINION

In this lawsuit, petitioner Grady Gibson, an Alabama

state inmate convicted of murder and sentenced to life

imprisonment without the possibility of parole, seeks

federal habeas relief. The respondents are Ralph Hooks,

a state warden, and Troy King, Attorney General of the

State of Alabama. For reasons that follow, relief will

be denied.


I.  INTRODUCTION

In 1987, Gibson was convicted in an Alabama state

court of murder and sentenced to life imprisonment without

the possibility of parole.  After his motion for a new trial was denied by the trial court, he filed an appeal. While this direct appeal was pending, he also filed a petition for post-conviction relief which was denied by the trial court.  The Alabama Court of Criminal Appeals dismissed the appeal from the denial of his post-conviction relief because his direct appeal was pending. Gibson v. State, 547 So.2d 1196 (Ala. Crim. App. 1989).

The Alabama Court of Criminal Appeals, on Gibson's direct appeal, affirmed his conviction.  Gibson v. State, 555 So.2d 784 (Ala. Crim. App. 1989), and the Alabama Supreme Court denied his petition for certiorari.  Id. Gibson then filed another petition for post-conviction relief.  The trial court held a hearing on the petition and, on May 11, 1990, denied relief on the ground that the issues "could have been but were not raised at trial and were such which could have been but were not raised on appeal."  The Alabama Court of Criminal Appeals affirmed. Gibson v. State, 580 So.2d 38 (Ala. Crim. App. 1990).

Gibson's petition for certiorari to the Alabama Supreme Court was initially granted but later quashed.  <u>Id</u>.  In 2005, Gibson filed another petition for post-conviction relief in state court.  The trial court denied the petition as successive.  The Alabama Court of Criminal Appeals affirmed and the Alabama Supreme Court denied Gibson's petition for certiorari.  <u>Gibson v. State</u>, 976 So.2d 519 (Ala. Crim. App. 2006) (table), <u>cert. denied</u>, <u>Ex parte Gibson</u>, 976 So.2d 1062 (Ala. 2006) (table).

Gibson filed this federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on January 3, 2007. Pursuant to Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court concludes that the petition should be denied.  No evidentiary hearing is required because the facts crucial to a fair determination of the issues presented by Gibson were adequately developed in the state-court proceedings. <u>See</u> <u>McCoy v. Wainwright</u>, 804 F.2d 1196 (11th Cir. 1986).

## II. THE FACTS

The facts are recounted in the direct-appeal opinion of the Alabama Court of Criminal Appeals:

> "The evidence tended to show that the appellant, Grady Gibson, met the appellant Eddie Hart in February 1984. Mr. Gibson, who was employed by the Alabama Bureau of Investigation (ABI), had been investigating Mr. Hart for suspected drug activity. Instead of ultimately making a case against Mr. Hart, Mr. Gibson persuaded Mr. Hart to act as an informant for the ABI. As a result of this association, the appellants became not only co-workers, but also good friends.

> "Shortly after they began working together the appellants met Dana Pouncey, the deceased, through the course of their drug investigations. Miss Pouncey was a troubled teenager who had both psychiatric problems and drug and alcohol dependencies. She and Mr. Hart immediately became romantically involved and were married in November of 1984.

> "Around the beginning of December of that same year, Mr. Gibson began displaying behavior around his workplace which appeared, in hindsight, quite peculiar. He became preoccupied with the concept of insurance and the manner in which proceeds were paid. He also

4

was seen reading books on how to commit the 'perfect' murder. Later in that same month, he was even overheard in a bar saying to Mr. Hart that if they were going to 'knock off' the new Mrs. Hart they had better hurry up and buy some insurance on her.

"On January 4, 1985, Mr. Gibson and Mr. Hart visited the office of Oscar Paul Thompson in Alexander City, Alabama, a Liberty National Life Insurance Company agent, to purchase a life insurance policy on Mrs. Hart's life. After reviewing the financial history and present status of the newlyweds, Mr. Thompson proposed a $ 10,000 policy. Mr. Gibson said that a $ 100,000 policy would provide more adequate coverage.

"On January 14, 1985, after the insurance paperwork was processed, Mr. Hart took Mrs. Hart to Alexander City to discuss the insurance policy with Mr. Thompson. Mrs. Hart, oblivious to the conspiracy against her, agreed to having such a policy taken out on her life. Mr. and Mrs. Hart paid the premium on the policy and left.

"One week later, Mr. Hart saw Mr. Thompson at a funeral. Mr. Thompson told Mr. Hart that Liberty National had refused to issue the policy until Mrs. Hart filled out a questionnaire concerning a gunshot wound to the chest that she had received before meeting Mr. Hart. Mr. Thompson gave the

questionnaire to Mr. Hart, who in turn communicated this difficulty to Mr. Gibson on the following day.

"On January 28, 1985, Mr. Gibson sent his insurance agent, William Cauthen, to Mr. Hart's trailer to discuss a policy on Mrs. Hart's life from New York Life Insurance Company. Mr. Cauthen, unaware of Mr. Hart's previous attempt to buy insurance through Liberty National, also recommended a $ 10,000 policy. Mr. Hart said that he preferred a $ 150,000 policy with double indemnity in the case of accidental death. Mr. Cauthen did not argue and allowed Mr. and Mrs. Hart to fill out the application.

"On February 25, 1985, the insurance policy was issued by New York Life and was delivered to Mr. and Mrs. Hart. It should be noted that Mr. Gibson gave the Harts the initial $ 100 premium payment on the policy. The following day, Appellant Gibson invited other co-workers to attend a fishing trip which had been planned for the upcoming weekend.

"On Thursday, February 28, 1985, at approximately 7:30 p.m., Mr. Gibson picked Mr. Hart up at Mr. Hart's trailer. Fifteen minutes later, they left for Fish River in Baldwin County. The Hart's next-door neighbor saw Mrs. Hart subsequently leave in her car at approximately 8:00 p.m. This was the last time she was seen alive.

"The appellants arrived around midnight at the home of Ira Colvin in Daphne, Alabama. Mr. Colvin was a longtime friend of Mr. Gibson and owned the cabin on Fish River that Mr. Gibson and Mr. Hart were going to use for the weekend. Appellant Gibson told Mrs. Colvin that they had been to the cabin earlier that evening, but that the key that Mr. Colvin had given them did not fit. Mrs. Colvin thought it most peculiar that the key did not fit, in light of the fact that Mr. Colvin had given Appellant Gibson his personal set of keys.

"A woman by the name of Rose Pogue, with whom Mr. Gibson had been having an affair, was working in a motel lounge at the Parkway Truck Stop during this time frame. The appellants spent the better part of the 'fishing' weekend in question drinking at this lounge. On the morning of Friday, March 1, Mr. Gibson and Mr. Hart went to the lounge and had a cup of coffee. They appeared to Ms. Pogue to be dirty and tired. Mr. Gibson told Ms. Pogue that he had not slept all night. The next day, Gibson asked her if he could borrow $ 200 to have a carpet cleaned at the cabin he was staying in. She lent him the money.

"Later that day, Ms. Pogue and Mr. Gibson went to a local shopping mall together. During this trip, Mr. Gibson explained to Ms. Pogue that he would be 'coming into a lot of money soon' and that he was interested in going into

business in Florida. He asked Ms. Pogue if she thought her brother-in-law would be interested in the business venture. Ms. Pogue replied that she did not know.

"On Sunday, March 3, 1985, at approximately 4:00 p.m., the appellants returned from their fishing trip. Eight days later, on March 11, 1985, the appellants filed a missing person report with the ABI. Sheriff Sidney Thrash also handled a missing person report which Appellant Hart had filed with him several days earlier. He told Mr. Hart that if Mrs. Hart 'came up in a bad way,' Mr. Hart would be the first person he wanted to see. At this, Mr. Hart became nervous and left.

"Later in the evening of March 11, Mrs. Hart's car was found by her aunt and Mr. Hart in the K-Mart parking lot in Montgomery, Alabama where it had been, according to the K-Mart security guard, for over a week. Police dusted the car for fingerprints and searched it for hair samples, etc., but found nothing of any value to their investigation.

"On March 14, 1985, Mr. Gibson received an anonymous letter and phone call at work. The message in both instances was as follows: 'You are stupid. Go to the Grace exit in Butler County and look about a mile off I-65 about ten feet off the road and you will see what is going to happen to your wife and then to you and Eddie Hart. I promise I will kill

you.' A search team was immediately organized upon receipt of this information.

"After leaving I-65 at the Grace exit, Mr. Gibson told the search team to begin searching to the right of the exit, even though these instructions were not given by the anonymous threat. Shortly thereafter, the badly decomposed, unrecognizable remains of a human body were found. Mr. Gibson walked up to the skeleton and said 'That's her. That's Dana [Hart].'

"Forensic personnel viewed the body, which was not only in an extreme stage of natural decomposition, but was also almost completely destroyed by 'animal and insect activity.' The only way forensic personnel were able to identify the body was through the use of dental records. An autopsy was performed on the body, which revealed that the cause of death was by stabbing with a knife-like object in the neck area at the base of the skull. Defense wounds, characteristic of a fight or struggle to save one's life, were observed on the hands of the victim.

"Approximately two or three months after Mrs. Hart's body was found, Richard Mobley, a friend and co-worker of Mr. Gibson, was at Mr. Gibson's home sharing dinner with Mr. Gibson and his wife, Kathy. Mr. Gibson and Mr. Mobley began discussing the rumors that were

circulating around town that the appellants had killed Mrs. Hart for the insurance proceeds. Mr. Gibson blurted out 'That ain't the motive. The motive is that she found out something about me and was going to flip me. That's the reason I had to kill her.'

"In October 1985, Mr. Hart filed a lawsuit against New York Life for $ 150,000. The suit was settled in March of the following year for $ 80,000-far less than the policy amount. Ira Colvin received approximately $ 12,000 of the proceeds; Claude Patton, Mr. Hart's lawyer, received approximately $ 14,000; Mr. Gibson received $ 5,000; a woman named Bobbie Nell Williams received $ 6,000; and Mr. Hart kept the rest. It should also be noted that Mrs. Hart's funeral bill remains unpaid to date.

"In May 1986, Richard Mobley and Mr. Gibson were named as defendants in an unrelated civil suit. After a deposition was taken in that suit, Mr. Mobley gave Mr. Gibson a ride home. He explained to Mr. Gibson that since Mr. Gibson was a suspect in the murder of Mrs. Hart, he thought it would be best if they stopped socializing with each other, and, further, that Mr. Gibson should leave town. Mr. Gibson replied, 'All right. All right. I will move to California. I killed that girl. I will move to California.' He subsequently did move to California."

<u>Gibson</u>, 555 So.2d at 786-89.

### III.  THE ISSUES

In his federal-habeas petition, Gibson raises the following issues:  (1)  The prosecution suppressed favorable and exculpatory evidence in violation of Gibson's right to due process.  (2) Gibson was deprived of due process when the trial judge stated as a matter of fact, in the presence of the jury, that he had reviewed prior statements and testimony of two prosecution witnesses and found no inconsistences with their trial testimony.  (3) Gibson was deprived of due process by the trial court's refusal to disclosed prior grand-jury testimony of two prosecution witnesses which was materially inconsistent with their trial testimony.  (4) Gibson was deprived of due process when the prosecutor stated as a matter of fact in the presence of the jury that Gibson had "framed" a person in a drug case and paid $ 20,000 in settlement of a resulting lawsuit.  (5) Gibson was deprived of due process when he was convicted

11

by testimony which was recanted.  (6) Gibson was deprived of due process by the prosecution's refusal to conduct DNA testing on evidence found on the victim at the scene of the crime.  Pet., doc. # 1, at 6-14.

Issue 1: During their investigation, law-enforcement officers spoke to Dottie Ragsdale who initially told investigators that she had seen the victim Dana Hart alive on March 1, 1985.  This statement was materially important because it is uncontroverted that Gibson could not have committed the murder on or after that date. Investigators prepared several memoranda about their conversations with Ragsdale.  These memoranda were not disclosed to Gibson, Gibson, 580 So.2d at 40-41, and this nondisclosure is the basis of this claim.[1]  The respondents first contend that this claim is procedurally defaulted.

_____

1.  The Alabama Court of Criminal Appeals incorrectly refers to the four memoranda as if they were a single document.  Gibson, 580 So.2d at 40.

12

This claim was raised by Gibson in his state-court petition for post-conviction relief. The trial and appellate courts found that the claim was procedurally barred because the issue could have been but was not raised at trial or on appeal:

> "We agree with the trial court's decision denying the appellants' petitions on procedural grounds. It is apparent to us, after a review of the record, that the claimed error raised in both appellants' Rule 20 petitions could have been, but were not, raised at trial or on direct appeal. (Appellants' first Rule 20 petitions, challenging the same issue, were filed on July 7, 1988. This was prior to oral arguments on the direct appeal in this case and prior to the filing of the reply briefs of counsel.) Thus, according to Rule 20.2(a)(3) and (5), A.R.Crim.P.Temp., the issues are procedurally barred on a Rule 20 petition."

Gibson, 580 So.2d at 41. Alternatively, the Alabama Court of Criminal Appeals concluded, and the respondents argue, that Gibson's claim fails on the merits:

> "The attorneys stated that they knew about Mrs. Ragsdale's statement. Testimony also showed that the appellants subpoenaed Mrs. Ragsdale and

> talked with her themselves, prior to
> trial. The record shows that the
> appellants furnished the ABI
> investigators with Mrs. Ragsdale's name.
> Further, as discussed above, the memo
> itself would not be discoverable, just
> the contents. Thus appellants'
> contention would fail on the merits."

Id.

The court pretermits consideration of the procedural-default issue because Gibson's claim lacks merit.[2]  See United States v. Nyhuis, 8 F.3d 731, 744 (11th Cir. 1993); Smith v. Dugger, 840 F.2d 787, 791 (11th Cir. 1988).  Because Gibson filed this habeas case after April 24, 1996, it is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, "which establishes a highly deferential standard for reviewing state court judgments." Carroll v. Sec 'y,

_____

2.  Frankly, it is doubtful that the state court's conclusion about a default is correct.  While it is true that Gibson did know about Ragsdale and her information, none of the facts shows that Gibson knew about the existence of the memoranda anytime during the appellate process.  See, e.g., Strickler v. Greene, 527 U.S. 263 (1999).  Gibson's claim here and in the state-court post-conviction proceeding was based on the failure to disclose the memoranda.

Dept. of Corr., 574 F.3d 1354, 1364 (11th Cir. 2009) (quotation marks and citation omitted).  Under AEDPA, federal courts may not grant habeas relief on any claim that was previously "adjudicated on the merits" by the state court unless the adjudication  "(1) resulted  in a decision  that  was  contrary to,  or  involved  an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)(2).

"A state court decision is contrary to clearly established federal law if it applies a rule that contradicts the governing law set forth in Supreme Court cases  or  confronts  facts  that  are  materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Court's." Windom v. Sec'y, Dept. of Corr., 578 F.3d 1227, 1247 (11th Cir.

2009) (quotation marks, alteration, and citation omitted) (per curiam), <u>petition for cert. filed Nov. 9, 2009</u> (No. 09-8930).  A legal principle is "clearly established" only when it is embodied in a holding of the Supreme Court.  <u>Carey v. Musladin</u>, 549 U.S. 70, 74 (2006).  A state-court decision involves an unreasonable application of federal law where the state court unreasonably applies the correct governing legal principle to the facts, "unreasonably extends a legal principle ... to a new context where it should not apply[,] or unreasonably refuses to extend that principle to a new context where it should apply."  <u>Williams v. Taylor</u>, 529 U.S. 362, 407 (2000).

Gibson's claim, of course, is fundamentally premised on <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  <u>Brady</u> established that a prosecutor has a duty to provide a criminal defendant with all evidence materially favorable to the defendant's defense.  This duty extends to evidence relating to the credibility of a witness when

the defendant's guilt or innocence may turn on that witness's credibility. <u>Napue v. Illinois</u>, 360 U.S. 264 (1959). There is no distinction between impeachment and exculpatory evidence. <u>United States v. Bagley</u>, 473 U.S. 667 (1985). However, constitutional error occurs only if the evidence withheld is material in the sense that its suppression undermines confidence in the outcome of the trial. <u>Id</u>. at 678. Confidence in the outcome of the trial is undermined only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. <u>Id</u>. at 682; <u>see also</u> <u>United States v. Swindall</u>, 971 F.2d 1531 (11th Cir. 1992). The prosecution's duty to disclose extends beyond disclosing favorable evidence to "learn[ing] of any favorable evidence known to the others acting on the government's behalf in the case, including the police." <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995). This duty exists whether or not the prosecution knew of the existence of

the evidence if the evidence was in the possession of the government or generally provided only to governmental entities. <u>Martinez v. Wainwright</u>, 621 F.2d 184, 186-87 (5th Cir.1980).

The state court concluded in its alternative holding that Gibson's <u>Brady</u> claim failed on the merits because Gibson knew about Ragsdale and the information she possessed. That conclusion is entirely consistent with existing case law in the Eleventh Circuit: "Our case law is clear that '[w]here defendants, prior to trial, had within their knowledge the information by which they could have ascertained the alleged <u>Brady</u> material, there is no suppression by the government.' <u>United States v. Griggs</u>, 713 F.2d 672, 674 (11th Cir. 1983); <u>accord LeCroy [v. Sec'y, Fla. Dept. of Corr.</u>], 421 F.3d [1237, 1268 (11th Cir. 2005)] (noting that there was no <u>Brady</u> violation because the defendant could have obtained the information had he used 'reasonable diligence'); <u>Haliburton v. Sec'y for Dep't of Corr.</u>, 342 F.3d 1233,

1239 (11th Cir. 2003); <u>United States v. Valera</u>, 845 F.2d 923, 927-28 (11th Cir. 1988); <u>United States v. Cortez</u>, 757 F.2d 1204, 1208 (11th Cir.1985)."  <u>Maharaj v. Sec'y for Dept. of Corr</u>., 432 F.3d 1292, 1315 (11th Cir. 2005).

Nor, more importantly, is the state court's conclusion an unreasonable application of clearly established Federal law as determined by the Supreme Court.  "There are three components of a true <u>Brady</u> violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). As in <u>Strickler</u>, Gibson's <u>Brady</u> claim founders on the prejudice component.  In <u>Strickler</u>, the prosecution withheld documents consisting of police -interview notes and correspondence between detectives and the State's primary trial witness.  The Supreme Court held that the documents were not material, for the

defendant would have been convicted and sentenced to death even if the testifying witness had been severely impeached. 527 U.S. at 294. Here, the information contained in the memoranda indicated that Ragsdale had seen the victim on a day when Gibson could not have murdered her. But the facts show that Gibson already knew about Ragsdale and her information; indeed, Gibson was the source for the police about her existence. Moreover, a handwritten note by one of the officers involved confirms that Ragsdale later had uncertainty about the date on which she had seen the victim.[3] The Alabama Court of Criminal Appeals quoted the following testimony from the hearing held on Gibson's postconviction petition:

> "Mr. Clark (attorney for appellant Gibson): Other than a showing to the Court as an officer of the Court that we did not receive this information till sometime after the trial and we were not

---

3. On March 1, 1985, Ragsdale was sick and away from work on sick leave. Approximately a week earlier she also was sick, and she became uncertain about what day she had seen the victim.

aware of any of this information in the memos that have been offered.  Now I'm telling the court that we did attempt to interview Mrs. Ragsdale and we did have the information with regard to Mrs. Ragsdale having seen Dana Hart sometime during that time frame.

"The Court: All right, sir.

"Mr. Clark: We had that information, but we did not have the memos that have been offered into evidence.

"The Court: All right, sir. Is that all?

"Mr. Williamson (attorney for appellant Hart): That's basically it.  We had knowledge there was a Dottie Ragsdale sometime in the time frame she had seen Dana Hart.  But the time we got to her I talked to her two years after the event and a week or so before the trial, we didn't have the information contained in the memos or any access to that particular information. But we do know there was a Dottie Ragsdale.  I did subpoena Dottie Ragsdale. She was here at trial.  The reason we didn't put her on, she was at that time not clear as to when she said she saw Dana Hart."

Gibson, 580 So.2d at 40.

The question which must be answered is whether "the favorable evidence could reasonably be taken to put the

21

whole case in such a different light as to undermine confidence in the verdict." <u>Kyles</u>, 514 U.S. at 435. Gibson has pointed to nothing in those memoranda which was materially different from what he knew, which he could not have ascertained through the exercise of reasonable diligence, or which would undermine confidence in the verdict.[4]  Thus, whether this court would agree with the decision or not, the court cannot say that the state court's merit determination is contrary to or an unreasonable application of clearly established federal law as determined by the United  States Supreme Court. As discussed above, the state court's decision is not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding; thus, this court may not grant habeas relief on this claim.

_____

4.  <u>Banks v. Dretke</u>, 540 U.S. 668 (2004), is not to the contrary.  In <u>Banks</u>, the prosecutors failed to disclose that a key witness was a paid police informant, and they stood by as that witness affirmatively testified to the contrary.

Issue 3:  Gibson claims that he was deprived of due process by the trial court's refusal to disclose prior grand-jury testimony of two prosecution witnesses that was materially inconsistent with their trial testimony. This claim was raised as a federal constitutional claim in state court.  Gibson claims that prior grand-jury testimony of "star prosecution witnesses Rose Pogue and Charles Costner contained a number of statements that were materially inconsistent with the witnesses' trial testimony."  The trial judge reviewed the grand jury testimony of these two witnesses in camera and denied the defense motion for production.  The trial judge found that there were no material inconsistencies.  On direct appeal the Alabama Court of Criminal Appeals also reviewed the alleged inconsistencies:

> "Our examination of the record below reveals that the trial court followed the guidelines established in Millican [v. State, 423 So.2d 268 (Ala. Cr. App. 1982)].  After an in camera inspection of all grand jury testimony and available trial testimony, the court concluded that, contrary to appellants'

> assertions, no relevant material
> inconsistencies existed between the
> testimony of witnesses before the grand
> jury and the testimony given at trial.
> Neither does this court find that
> without the witnesses' grand jury
> testimony appellants' trial would have
> been fundamentally unfair. Under these
> circumstances, the trial court correctly
> denied appellants' request to view the
> grand jury testimony.
>
> "We would further note that none of the
> memoranda or grand jury testimony
> contained any exculpatory evidence or
> evidence which would have affected the
> outcome of this trial. Thus, no <u>Brady
> v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194,
> 10 L.Ed.2d 215 (1963), analysis is
> required."

<u>Gibson</u>, 555 So.2d at 792.

Of course, <u>Brady</u> requires the government to produce for the defense any impeachment evidence against government witnesses. <u>Giglio v. United States</u>, 405 U.S. 150 (1972); <u>United States v. Bagley</u>, 473 U.S. 667 (1985). Under <u>Brady</u>, the withholding of evidence that is material to a defendant's guilt or punishment violates his right to due process. 373 U.S. at 87. "[E]vidence is 'material' within the meaning of <u>Brady</u> when there is a

reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. In other words, favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" <u>Cone v. Bell</u>, ___ U.S. ___, ___, 129 S.Ct. 1769, 173 (2009) (quoting <u>Kyles</u>, 514 U.S. at 435).

Because the Alabama courts reached the federal question, their decision is subject to the deferential review standard under AEDPA. 28 U.S.C. § 2254(d). It bears repeating that <u>Strickler</u> set out the three elements of a <u>Brady</u> claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." 527 U.S. at 281-282. As with his first <u>Brady</u> claim, Gibson's claim here founders on the prejudice prong.

The first "star" witness whose grand jury testimony was not produced was Rose Pogue. Her testimony established several important facts: (1) She and Gibson "had an intimate relationship for several months." R. at 1467.[5] (2) The relationship between Gibson and Hart as "very close." R. at 1476-77. (3) She saw Gibson and Hart at the truck stop on March 1, drinking coffee. R. at 1478-79. (4) She and Gibson went shopping that weekend and during that time Gibson asked her if she and her husband wanted to go into business because he was going to come into a lot of money soon. R. at 1480-82. (5) She saw Gibson again on Saturday afternoon. He looked tired and his clothes were dirty. He "[s]aid he hadn't slept all night." R. at 1488. (6) Gibson asked her for loan of $ 200.00 to have carpet cleaned. R. at 1489.

Gibson complains that, if Pogue's grand-jury testimony had been disclosed at trial, he would have

_____

5. As used in this opinion, the "R" refers to the trial transcript.

discovered the following inconsistencies between her trial and grand jury testimony which would have allowed him to impeach Pogue:

> (1) Trial - Gibson told Pogue he was going to be coming into a lot of money soon when they went on a shopping trip to a mall. On the shopping nip, she bought two pair of shoes and nothing else.  R. at 1483, 1484.
>
> Grand Jury - Gibson made this statement to her on a trip to a mall. It wasn't a shopping trip; she didn't buy anything; she went for the purpose of picking up a specific thing, a ring she had in the shop.  CR. at 392.[6]
>
> (2) Trial - She never expected the $ 200.00 back which Gibson got from her to have a carpet cleaned at the cabin; she gave him the $ 200.00. R. at 1572.
>
> Grand Jury - The $ 200.00 was a loan .  Gibson retained a loan at the lounge of the truck stop.  CR. at 393.

---

6.  "CR" refers to a transcript of the grand jury testimony as set forth in Gibson's brief in support of his petition.

(3) Trial - Gibson told her about the ABI's secret witness against him in the homicide case at the truck stop in Baldwin County, he had come down to Baldwin County to find out who the witness was. R. at 1495, 1496.

Grand Jury - Gibson told her about the AST's secret witness against him in the homicide case in Nashville, Tennessee; this was when "he came up and he asked me if I knew who it could be." CR. at 399, 400.

(4) Trial - Pogue never asked Gibson about his involvement in the murder R. at 1507, 1508.

Grand Jury- Gibson told Pogue he didn't kill Dana because Pogue asked him about it. CR. at 394-398.

(5) Trial - Gibson told Pogue not to talk to the ABI. R. at 1522.

Grand Jury - There is no mention of this incriminating fact whatsoever.

(6) Trial- Gibson told Pogue not to tell everything she knew to his lawyer.  R. at 1559.

Grand Jury - There is no mention of this incriminating fact whatsoever.

(7) Trial - While on the shopping trip to the mall, Gibson asked Pogue about going into business. with Charles Costner, due to the fact that he would be coming into a lot of money soon. R. at 1481.

Grand Jury - There is no mention whatsoever of Gibson's stating his interest in going into business with Costner while he and Pogue were on the shopping trip, CR. at 392; it is only after the murder that Gibson begins talking about a desire to go into business with Costner. CR. at 392, 393.

(8) Trial - Friday morning Gibson said he hadn't slept all night. R. at 1488.

Grand Jury - Friday morning Gibson looked like he hadn't slept all night. CR. at 392.

The court has carefully reviewed the trial testimony of Pogue. During cross examination of her, Gibson's lawyer brought out that after Dana Hart's murder, Pogue's sister and brother-in-law Charles Costner were indicted on unrelated criminal charges. Only after those indictments did Pogue make statements to law enforcement officers about Gibson. R. at 1544-46. Indeed, the cross

examination suggests strongly that the only reason Pogue made any statement about Gibson was to seek favorable treatment for her sister and brother-in-law on the criminal charges filed against them.  R. at 1544 - 1555. In addition, she admitted that when law enforcement officers interviewed her shortly after Hart's death, she did not volunteer any of the information about Gibson or Hart to which she testified in the trial.  R. at 1635. In light of Gibson's impeachment strategy and Pogue's testimony, the court concludes that access to the relatively minor inconsistencies pointed out between her trial and grand-jury testimony would not have affected the outcome of the trial.  In other words, the additional grounds for impeachment would not have further undermined Pogue's credibility to such an extent that the outcome of the case would have been different.  After careful review of the testimony, the court concludes that the failure to disclose the grand-jury testimony does not affect confidence in the verdict.

Now the court turns to Gibson's similar arguments about the other "star" witness Charles Costner. Gibson argues in his brief that there is only one but highly material difference between Costner's trial and grand-jury testimony:

> "At trial, Costner testified that Gibson had remarked that if they were going to kill Dana, they needed to go ahead and get insurance on her soon 'so it wouldn't look funny' (R. at 1656). His assertion that Gibson had made the 'so it wouldn't look funny' statement was reiterated numerous times during his direct and cross examination. Further, as Costner testified (R. at 1718, 1719), and as is reflected by his grand jury testimony (CR-428,442), in the grand jury he was twice asked a catch-all question to the effect that he should add anything that he felt was material to the grand jury investigation which he had not previously testified to."

Pet. Brief, doc. # 2, at 45-46. Thus, Gibson complains that, with respect to Costner, the trial court's failure to order the disclosure of Costner's grand-jury testimony deprived him of due process. During cross examination Costner admits that at his first appearance before a

grand jury he did not mention the conversation about insurance. When asked why he didn't tell the first grand jury about the conversation, Costner replies, "Sir, I didn't remember it." R. at 1720. More importantly, on cross examination Gibson's counsel brought out that the first time Costner ever mentions to anyone the conversation about insurance was in a lawyer's office with ABI agents present after he and his wife had been indicted on unrelated criminal charges. R. at 1733-1736. This took place in the fall of 1986. Id. Again, the cross examination of Costner strongly suggests that the only reason for his coming forward with the insurance information was to help himself and his wife.

After careful consideration of the evidence as a whole, the court concludes that had the grand-jury transcript been disclosed to Gibson, his ability to question Costner about his omission of the "funny" portion of the statement would not have made a difference in the outcome of the trial. There was no real dispute

about Gibson and Hart having discussed the purchase of insurance on Dana Hart, and that is the most damning aspect of the testimony. Knowledge about whether Costner did not testify to the grand jury that Gibson and Hart discussed whether it would have looked "funny" would not have changed the outcome of the trial. Any Brady error regarding Pogue and Costner did not result in prejudice and does not undermine confidence in the verdict. Gibson is not entitled to relief on this claim.

Issues 2 and 4:[7] Gibson contends he is entitled to habeas relief because (1) the trial judge stated as a

---

7. In Gibson's brief's discussion of his Brady claim about Ragsdale, he also argues about newly discovered evidence claims: statements by Bernard Stallworth about suspicious activity in the area where Dana Hart's body was discovered; the prosecution's failure to disclose an agreement with witnesses involving the dismissal of criminal charges for their testimony; and a memorandum made by a law-enforcement officer indicating that there should be exculpatory documents of a criminalist. Brief of Pet'r at 34-36. These claims either were not raised in state court or were raised in the 2005 post-conviction motion which was denied on state procedural grounds. Thus, these claims are defaulted for the same reasons discussed throughout this opinion.

matter of fact in the presence of the jury that he had reviewed prior statements and testimony of two prosecution witnesses and found no inconsistences with their trial testimony and (2) the prosecutor stated as a matter of fact in the presence of the jury that Gibson had "framed" a person in a drug case and paid $20,000 in settlement of a resulting lawsuit. In this court these claims are posited as federal due-process claims. However, in state court these claims were presented solely as state-law claims.

On direct appeal, the claim about the trial judge's comments about his review of prior witness statements and lack of inconsistencies was framed only as error under state law. Gibson argued that the trial judge's comments were improper because they "constituted comments on the weight to be given evidence by the jury; placed matters not in evidence before the jury; and improperly supported Costner's credibility with prior consistent statements." Ex. C at 77. The only law cited by Gibson in his brief is

Alabama case law.  There is no reference to any federal constitutional provision or United States Supreme Court case law.  In his reply brief on direct appeal, Ex. D, Gibson again argues only issues of state law, citing no federal authority.  This issue was not raised in any post-conviction proceeding filed by Gibson in state court.

On direct appeal, the claim about the prosecutor asserting as a fact that Gibson had been sued for framing another person was raised solely as a state-law claim. Gibson argued that the prosecutor's comments improperly interjected inadmissible evidence into the trial and constituted the admission of specific bad-act evidence. Again, Gibson presents neither in his direct-appeal brief nor in his reply any argument premised on federal law.

The Alabama Court of Criminal Appeals in its opinion treated these two issues as only raising state-law issues. Gibson, 555 So.2d at 793.  The court resolved each issue solely on the basis of state substantive or procedural law.

AEDPA requires a petitioner to exhaust remedies available in state court before bringing them in a federal-habeas petition. 28 U.S.C. § 2254(b)(1)(A). In order to file a habeas petition under § 2254, a state prisoner must first exhaust all available state-court remedies. 28 U.S.C. § 2254(b)(1); see Duncan v. Henry, 513 U.S. 364, 364-65 (1995); Picard v. Connor, 404 U.S. 270, 275 (1971). In order to satisfy the exhaustion requirement, the petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). Exhaustion is not satisfied "merely" if the petitioner presents the state court with "all the facts necessary to support the claim" or even if a "somewhat similar state-law claim was made." Kelley v. Sec'y for Dept. of Corr., 377 F.3d 1317, 1344 (11th Cir. 2004) (citation omitted). The petitioner must instead "present his claims to the state courts such that they are

permitted the 'opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'" Id. (quoting Picard, 404 U.S. at 277). In other words, it is incumbent on a petitioner to "alert the [state] court to the alleged federal nature of [his] claim." Baldwin v. Reese, 541 U.S. 27, 33 (2004). An issue that was not presented to the state court and which can no longer be litigated under state procedural rules is considered to be procedurally defaulted. O'Sullivan, 526 U.S. at 839-40, 848; Coleman v. Thompson, 501 U.S. 722, 735 n. 1 (1991); Bailey v. Nagle, 172 F.3d 1299, 1302-03 (11th Cir. 1999).

If Gibson now brought as part of a new post-conviction proceeding in state court either of these due-process claims, the claims would be barred by the statute of limitations, Ala.R.Crim.P. 32.2(c) (one year after judgment on direct appeal), or the petition rejected as a successive petition under Ala.R.Crim.P. 32.2(b). That is not the end of the matter, however. This default may be

excused if Gibson could satisfy the cause and prejudice standard. See Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000).

The exhaustion question was raised in the respondents' answer filed in this case. Gibson has filed no response after being afforded the opportunity to do so. It is clear that Gibson cannot meet the cause-and-prejudice standard. First, he knew of the claims at the time he took a direct appeal. There is no reason why these claims could not have been raised as federal claims as well as state- law claims. Gibson has not shown that any external impediment existed to his raising a federal claim in state court. Consequently, the court concludes that Gibson cannot show cause. Gibson's unexhausted claims are defaulted, and this court may not reach the federal questions presented.

Issue 5: Gibson contends he was deprived of due process because his conviction was secured by testimony that was later recanted. Former ABI Narcotics Officer

Richard Mobley filed in September 2001 an affidavit indicating that his testimony at trial was not truthful. In his affidavit, Mobley states that he was "pressured" by state agents into testifying untruthfully about two confessions Gibson made to him; Mobley further states that Gibson never confessed to him that he murdered Dana Hart. Mobley states that he was threatened with the loss of his job and an indictment against him if he did not testify that Gibson had confessed.

This claim was raised in Gibson's third post-conviction petition filed in state court in 2005. Ex. N. The trial court rejected the claim as barred by the statute of limitations. The Alabama Court of Criminal Appeals agreed. <u>Gibson</u>, 976 So.2d at 519. No state court reached this claim on the merits.

"A state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." <u>Judd v. Haley</u>, 250 F.3d 1308, 1313 (11th

Cir. 2001).  However, a state court's rejection of a federal constitutional claim on procedural grounds precludes federal review only if the state procedural ruling rests upon an "adequate and independent" state ground.  Marek v. Singletary, 62 F.3d 1295, 1301 (11th Cir. 1995) (citation omitted).  In Ward v. Hall, 592 F.3d 1144 (11th Cir. 2010), the Eleventh Circuit said:

> "We have 'established a three-part test to enable us to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision'.  Judd, 250 F.3d at 1313. 'First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim.' Id. Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  See id.  Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied 'in an arbitrary or unprecedented fashion.' Id.

592 F.3d at 1156-57.[8]

---

8.    In a footnote, the Eleventh Circuit then

(continued...)

40

In this case, the last state court to speak to the

question expressed clearly that the claim was barred on

(...continued)
qualified    <u>Judd</u>'s    first    prong    with    the    following
observation from the Supreme Court:

> "The problem we face arises, of course,
> because many formulary orders are not
> meant to convey anything as to the
> reason for the decision. Attributing a
> reason is therefore both difficult and
> artificial.    We    think    that    the
> attribution necessary for federal habeas
> purposes can be facilitated, and sound
> results more often assured, by applying
> the following presumption: Where there
> has been one reasoned state judgment
> rejecting   a   federal   claim,   later
> unexplained    orders    upholding    that
> judgment or rejecting the same claim
> rest upon the same ground. If an earlier
> opinion   'fairly   appears   to   rest
> primarily upon federal law, we will
> presume that no procedural default has
> been invoked by a subsequent unexplained
> order that leaves the judgment or its
> consequences in place." Similarly where,
> as here, the last reasoned' opinion on
> the   claim   explicitly   imposes   a
> procedural default, we will presume that
> a later decision rejecting the claim did
> not   silently   disregard   that   bar   and
> consider the merits."

<u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991) (quotation
marks, citations and alterations omitted).

the basis of the state limitations period; that decision rested solely on state-law grounds. Alabama's post-conviction statute of limitations is firmly established and regularly followed. Hurth v. Mitchem, 400 F.3d 857, 863 (11th Cir. 2005). Thus, this claim is procedurally defaulted.

Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a habeas petitioner can show either cause for and actual prejudice from the default or a fundamental miscarriage of justice. Murray v. Carrier, 477 U.S. 478, 485-86, 495-96 (1986); Bailey, 172 F.3d at 1306. Cause is established if "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray, 477 U.S. at 488. "Such external impediments include evidence that could not reasonably have been discovered in time to comply with the rule; interference by state officials that made compliance impossible; and ineffective assistance of counsel at a

stage where the petitioner had a right to counsel." <u>Mize</u>
<u>v. Hall</u>, 532 F.3d 1184, 1190 (11th Cir. 2008) (citing
<u>Murray</u>, 477 U.S. at 488).

Gibson has not suggested any cause for his default.
It is plain that he knew about Mobley's affidavit in 2001
because the affidavit was filed in state court; thus, he
reasonably could have discovered it.  Instead, he waited
until 2005 to file his post-conviction motion.  Thus, even
if the state courts might have entertained the petition
within a reasonable time of Mobley's filing the affidavit,
<u>see</u> Ala.R.Crim.P. 32.2(c) (petition must be filed within
six months of discovery of new evidence), Gibson does not
explain why he waited or why he reasonably could not have
discovered the affidavit.  In the absence of a showing of
cause for his default, Gibson is entitled to no relief on
this claim.

<u>Issue 6:</u>  Gibson claims he was deprived of due process
by the prosecution's refusal to conduct DNA testing on
evidence found on the victim at the scene of the crime.

The respondents contend that this claim is unexhausted and, therefore, now defaulted because it was not raised as a federal claim in state court. The record before the court shows that Gibson raised this claim in his post-conviction motion filed in 2005, and that the motion was denied on procedural grounds. It is unnecessary for the court to belabor the discussion of this claim. Gibson's due-process DNA testing claim is foreclosed by <u>District Attorney's Office for the Third Judicial Dist. v. Osborne</u>, ___ U.S. ___, 129 S.Ct. 2308 (2009), and <u>Cunningham v. District Attorney's Office for Escambia County</u>, 592 F.3d 1237 (11th Cir. 2010). Gibson is not entitled to relief on this claim.

***

For the foregoing reasons, the court concludes that Gibson is not entitled to habeas relief and thus his

§ 2254 petition should be denied.  A separate final judgment will be entered.

DONE, this the 24th day of March, 2010.

        /s/ Myron H. Thompson
    UNITED STATES DISTRICT JUDGE